**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASSOCIATED BUILDERS & | ) | |
| CONTRACTORS OF WESTERN | ) | |
| PENNSYLVANIA, et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO:  2:20-cv-649 |
| | ) | |
| COMMUNITY COLLEGE OF | ) | |
| ALLEGHENY COUNTY, et. al. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**PURSUANT TO F.R.C.P. 12(b)(1) and 12(b)(6) BY THE PITTSBURGH REGIONAL**
**BUILDING TRADES COUNCIL, AFL-CIO**

Joshua M. Bloom, Esquire
PA 78072
Joshua M. Bloom & Associates, P.C.
3204 Grant Building
310 Grant Street
Pittsburgh, PA 15219
412-288-6000

Victoria L. Bor, Esquire
DC 288852
Jonathan D. Newman, Esquire
DC 449141
Sherman Dunn, P.C.
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
202/785-9300

*Counsel for Defendant Pittsburgh Regional*
*Building Trades Council, AFL-CIO*

The Plaintiffs in this case, a construction contractor association, several of the association's construction contractor members, and several individuals, seek to invalidate a project labor agreement ("PLA") between the Community College of Allegheny County ("CCAC" or "the College") and the Pittsburgh Regional Building Trades Council ("the Building Trades") on the grounds that the agreement violates the U.S. Constitution, the National Labor Relations Act and Pennsylvania competitive bidding laws.  As explained below, Plaintiffs' Complaint fails to establish that this Court has subject matter jurisdiction over their claims or that their allegations state claims upon which relief can be granted, and the Complaint should therefore be dismissed in its entirety.[1]

I.      **Statement of the Facts**

CCAC entered into a PLA with the Building Trades on February 15, 2011.  See Exhibit 1 to Plaintiffs' Complaint (Doc. 1-2).[2]  CCAC entered into the PLA to provide for the efficient, safe, quality, timely, and on-budget completion of its construction projects. Id., pgs. 2-3. The College determined that it could achieve those goals by agreeing to a PLA that would:

   a) avoid[] potential work stoppages, sympathy strikes, jurisdictional strikes, slowdowns, walkouts, picketing, handbilling and other disruptions or interference with work, and promot[e] labor harmony and peace for the duration of the Project;
   b) standardiz[e] terms and conditions governing the employment of labor on the Project;

---

[1]  Pursuant to the Magistrate Eddy's Standing Order on Rule 12(b)(6) motions, the undersigned certifies that counsel for the Defendants conferred with counsel for all Plaintiffs in a good faith effort to determine whether the pleading deficiencies identified in this Memorandum could be cured by amendment, but that Plaintiffs' counsel declined to amend the Complaint.

[2]  A PLA is a pre-hire collective bargaining that establishes the terms and conditions of employment for an entire construction project. "Such agreements are common in the construction industry, where the short-term nature of employment impedes post-hire collective bargaining, and where contractors need predictable costs and a steady supply of skilled labor." Johnson v. Rancho Santiago Cmty. Coll., 623 F.3d 1011, 1016 n. 1 (9th Cir. 2010).

    c) permit[] a wide flexibility in work scheduling and shift hours and starting times;

    d) achiev[e] negotiated adjustments as to work rules and staffing requirements from those which otherwise might obtain;

    e) provid[e] comprehensive and standardized mechanisms for the settlement of work disputes including jurisdictional disputes;

    f) ensur[e] a reliable source of skilled and experienced labor; and

    g) further[] the public policy objectives, to the extent lawful, as to improved employment opportunities for Minority Business Enterprises, [and] Women Business Enterprises.

Id., p. 2.

The PLA provides that covered work is available to any successful bidder, regardless whether the bidder is union or non-union or whether the contractor's employees are members of any union.  Id., p.2.  It requires all contractors on a covered construction project to execute and become bound to the PLA while working on that project and only on that project, and to recognize the local unions affiliated with the Building Trades as the exclusive bargaining representatives of all of their craft employees working on the project. Id., pgs. 2, 6.

With an exception described below, the PLA requires contractors to secure their employees through referral systems ("hiring halls") operated by the affiliated local unions, while requiring the unions to exert their best efforts to recruit sufficient numbers of skilled craft workers to fulfill the contractors' need for workers.  Id., p. 7. It also expressly provides that the local unions will operate their referral systems

> in a non-discriminatory manner and in full compliance with Federal, State, and Local laws and regulations requiring equal employment opportunities and non-discrimination, and [that] referrals [would] not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements. . . .

Id., p. 7.  Additionally, the PLA expressly provides that employees subject to the PLA will not be required "to join a union or to pay dues or agency fees as a condition of being employed, or remaining employed on the Project . . . ."  Id.

Under the PLA, contractors retain the right to determine the competency of their employees, to reject any referral for any just reason, and to select their craft foreman and/or their general foreman. Id., p. 8.

The PLA contains an exception from the referral system for contractors that do not have a preexisting relationship with one of the affiliated local unions, permitting them to employ directly a certain number of core employees who are not referred by the unions.  Id.  In addition, the PLA exempts nonunion contractors from making contributions to the fringe benefit funds for any core employee who do not voluntarily elect to become a local union member.  Id., p. 12.

Finally, the PLA mandates that all workers be paid the prevailing wage and benefit rates, id.;[3] requires contractors to contribute to joint employer-union benefit plans on behalf of all employees other than "core employees," id.; provides mandatory dispute resolution procedures, id., pgs. 8-9, 10; prohibits work stoppages or slow-downs of any type, id., pgs. 9, 10; prescribes uniform hours of work, and a drug and alcohol testing procedure, id., pgs. 12-13, 14-15; and prohibits discrimination, id., pgs. 10-12, 13-16.

During 2010, Plaintiffs Associated Builders and Contractors of Western Pennsylvania ("ABC"), R.A. Glancy & Sons, Inc. ("Glancy & Sons"), and Westmoreland Electric, Inc., sued in the Court of Common Pleas of Allegheny County, Pennsylvania, to enjoin CCAC from applying an earlier PLA to the College's construction projects. See Glancy & Sons v. CCAC, No. GD10-14783 (Ct. Com. Pl. 2011), attached hereto as Attachment A.[4]  The court denied the

---

[3]  The Pennsylvania Prevailing Wage Act of 1961, 43 P.S. §165-1, et. seq. requires all contractors, union and non-union, to pay their employees the prevailing wages on all construction projects publicly funded by $25,000 or more.

[4]  Courts may take judicial notice of public records, judicial proceedings, and another court's opinion when determining a motion to dismiss. Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd., 181 F.3d 410, 426 (3d Cir. 1999).

plaintiffs' motions for a hearing date and preliminary injunction, finding the plaintiffs were not likely to prevail on the merits and were unable show immediate and irreparable harm based upon either federal or state law.  Id.  Relying on Building. & Constr. Trades Council v. Associated Builders & Contrs. ("Boston Harbor"), 507 U.S. 218, 221-22 (1993), the court held that the PLA did not violate federal law because CCAC was acting as a proprietor rather than a regulator when it enforced the PLA.  The court also held that the PLA did not violate Pennsylvania's lowest responsible bidder laws, relying upon A. Pickett Constr. Inc. v. Luzerne County Convention Center Auth., 738 A.2d 20 (Pa. Commw. Ct. 1999), and Sossong v. Shaler Area School District & Pittsburgh Regional Building Trade Council, 945 A.2d 788 (Pa. Commw. Ct. 2008).  Id.

On May 1, 2020, approximately ten years after they filed their first lawsuit, ABC, Glancy & Sons, and Westmoreland Electric, now joined by eight new Plaintiffs, filed the instant action. Plaintiff ABC is a membership organization of contractors.  Doc. 1, p. 3.  Plaintiffs Arrow Electric, Hampton Mechanical, Lawrence Plumbing, Glancy & Sons, and Westmoreland Electric ("Plaintiff Contractors"), are non-union contractor members of the ABC.  Id.  They complain that the PLA requires them to: (1) recognize an affiliate union of the Building Trades as the exclusive representative of their employees; (2) hire employees from the union's job-referral system; and (3) contribute to the union's pension and health-care funds.  Id., pgs. 8-9.

Plaintiffs Oliver, Glancy, and Casteel ("Plaintiff Employees") are workers employed by Hampton Mechanical and Glancy & Sons.  Id., p.3.  They are not members of any union, and they allege that the PLA prevents them from working on CCAC's construction projects because the agreement compels them to obtain employment through the unions' hiring halls.  Id., pgs. 9-10.

Plaintiffs Boyd and Glancy IV ("Plaintiff Taxpayers") are residents and taxpayers in Allegheny County and the Commonwealth of Pennsylvania.  Id., p. 4.  They allege that CCAC's enforcement of its PLA will cause the College to award its construction projects to "someone other than the lowest bidder."  Id., p. 10.

## II.    Argument

### A.    The Complaint Must be Dismissed Pursuant to F.R.C.P. 12(b)(1) for Lack of Subject Matter Jurisdiction.

"No principle is more fundamental to the judiciary's proper role in our system of government than the [Article III] constitutional limitation of federal court jurisdiction to actual cases or controversies."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Raines v. Byrd, 521 U.S. 811, 818 (1997)).  The case or controversy requirement is enforced through justiciability doctrines, including standing and ripeness.  Toll Bros. v. Twp. of Readington, 555 F.3d 131, 137 (3d Cir. 2009).  Federal courts are presumed to lack subject matter jurisdiction unless it appears affirmatively from the record.  Renne v. Geary, 501 U.S. 312, 316 (1991).  And the Plaintiffs bear the burden of demonstrating subject matter jurisdiction, id.; Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007), which they have failed to do in this case.

#### 1.    The Plaintiffs Lack Standing

Plaintiffs must meet three elements to satisfy Article III's "irreducible constitutional minimum of standing:"

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks, citations and alterations omitted).  None of the Plaintiffs has alleged that it has actually suffered, or is about to suffer, any injury as a result of CCAC's implementation of the PLA, and therefore, the Plaintiffs have failed to establish standing.

        a.      Neither ABC nor Any of the Plaintiff Contractors has Alleged an Injury Sufficient to Establish Standing

ABC, a membership organization of mainly non-union contractors, asserts it has associational standing to challenge the PLA.  Doc. 1, p. 8.  The Plaintiff Contractors, on the strength of whose standing ABC must rely,[5] allege that enforcement of the PLA injured them because their employees' "exercise of their constitutional right to decline union membership" has rendered each of the Contractors

> ineligible to work on the college's construction projects unless it: (1) recognizes a union that belongs to the Pittsburgh Regional Building Trades Council as the exclusive representative of its employees – even though its employees have exercised their constitutional and statutory rights to decline union representation; (2) hire[s] employees from the [sic] a union's job-referral systems rather than use its own employees to perform work on college's projects; and (3) contribute[s] to that union's pension and health-care funds.

Id., p. 9.  None of these allegations satisfies the "irreducible constitutional minimum of standing" for the Plaintiff Contractors or, by extension, for ABC.

In Contractors Ass'n of E. Pa. v. City of Philadelphia, 735 F. Supp. 1274 (E.D. Pa. 1990), aff'd in pertinent part, vacated and remanded on other grounds, 945 F.2d 1260, 1268 (3d Cir. 1991), several contractor associations challenged a city ordinance establishing minority participation requirements on an array of public contracts.  The associations all had contractor-

---

[5] ABC's associational standing is dependent upon it showing that "its members would otherwise have standing to sue in their own right."  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  Thus, the analysis is the same for ABC and the Plaintiff Contractors.

members that had previously worked on city construction projects and that were now subject to the ordinance's participation requirements.  Id. at 1283.  The court, however, found it was not enough for the plaintiffs merely to state that they "generally bid on these types of projects." Instead, they had to show "the injury suffered . . . with some specificity."  Id.

The court in Contractors Ass'n found that four contractors "provide[d] information on the injury suffered with sufficient particularity to persuade the court that they meet the Article III requirement of injury in fact," by alleging they had either submitted a lowest cost bid that was rejected because it did not satisfy the participation requirements; had attempted to meet the participation requirements but had failed, despite their best efforts, and therefore did not submit bid; and/or had found the costs involved in satisfying the participation requirement cost-prohibitive.  Id. at 1283 and n.3.  By contrast, two contractors that simply submitted requests for bids and stated that they "generally bid on these types of projects" failed "to meet the Article III requirements." Id. at 1283-84.  Thus, a contractor seeking to challenge a restrictive contracting requirement "has not suffered injury conferring standing until the part of the law sought to be challenged actually has been applied to the party's detriment." Hunt Paving v. City of Indianapolis, 800 F. Supp. 740, 747 (S.D. Ind. 1992), and cases cited at 747-48 (requiring plaintiffs to show they actually submitted bids to have standing to challenge a bid specification).

None of the Plaintiff Contractors has alleged that it has suffered any harm as a result of the PLA requirement.  None has alleged that it submitted bids to work on a CCAC project that were rejected due to the PLA requirement, or that the PLA has been applied to its detriment.  In fact, none has even alleged that it "generally bid[s] on these types of projects," or indeed, that is has ever worked on a CCAC project.

Moreover, nothing on the PLA's face precludes the Plaintiff Contractors from bidding for or securing work under the PLA.  The PLA plainly states it is "available to . . . any successful bidder for work on the Project, without regard to whether that successful bidder performs work at other sites on either a union or non-union basis, and without regard to whether employees of such bidder are or are not members of any union."  Doc. 1-2, p. 2.  The PLA also permits successful bidders whose employees are not otherwise represented by affiliates of the Trades Council to employ a number of their incumbent "core" employees on the project.  Id., p. 8.  As the Supreme Court observed in Boston Harbor, when a public entity chooses to utilize a PLA on its construction project, "those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA.]"  507 U.S. at 231.  Any alleged injury the Plaintiff Contractors have suffered by not obtaining work under the PLA is thus not "fairly traceable" to the PLA, Lujan, 504 U.S. at 560-61, but rather, is the result of their own choices.

Because the Plaintiff Contractors have failed to allege they are suffering actual or imminent harm, Lujan, 504 U.S. at 560, they lack standing to pursue this case.  And because ABC's members do not "otherwise have standing to sue in their own right," Hunt, 432 U.S. at 343, the ABC lacks standing as well.

b.    The Plaintiff Employees Lack Standing

The Plaintiff Employees allege that the PLA prevents them from working on CCAC construction projects because "they have exercised their constitutional and statutory right to decline union membership and [the PLA] compels them to obtain employment through the union's hiring halls if they want to perform any onsite construction work."  Doc. 1, pgs. 9-10.

8

Like the Plaintiff Contactors, the Plaintiff Employees have failed to establish any "causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560-61. That is, any work opportunities the Plaintiff Employees may have lost were not "fairly traceable" to enforcement of the PLA, id., but instead resulted from their employers' failure to seek work on any construction project covered by the PLA.

As is true for the Plaintiff Contractors, nothing in the PLA itself precludes the Plaintiff Employees from working on a CCAC project while maintaining their non-union status and refraining from financially supporting any union. The PLA explicitly provides that no employee covered by the PLA will be required to join any union or pay any agency fees, and that the unions' referral systems will not be affected by obligations of union membership. Doc. 1-2, p. 7. Finally, the Plaintiff Employees' allegation that the PLA "compels them to obtain employment through the unions' hiring halls" is flatly contradicted by provisions in the PLA that enable non-union contractors to utilize a number of their preexisting employees as "core employees," without going through the hiring halls. Compare Doc 1, pgs. 6-7 and Doc 1-2, p. 8. The Plaintiff Employees have not alleged – because they cannot – that their employers were denied the right to utilize them as "core employees."

Accordingly, whether the Plaintiff Employees' asserted "constitutional and statutory right[s]" would have been injured had their employers bid for and been awarded work on a project subject to the PLA is simply "conjectural or hypothetical," and not the kind of "actual or imminent" injury necessary to establish standing. Lujan, 504 U.S. at 560-61.

c.      The Plaintiff Taxpayers Lack Standing

Finally, the Taxpayer Plaintiffs assert that they have "standing as taxpayers [to the Commonwealth of Pennsylvania and Allegheny County] to challenge CCAC's violation of

Pennsylvania's competitive-bidding laws and other constitutional violations that arise from the college's project labor agreement." Doc. 1, pgs. 4, 10.  It is well-settled that "state taxpayers have no standing . . . to challenge state tax or spending decisions simply by virtue of their status as taxpayers." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 346 (2006).  While "a municipal taxpayer may, in some cases, challenge municipal expenditures," the taxpayer's right to do so "is not unlimited." Nichols v. City of Rehoboth Beach, 836 F.3d 275, 280 (3d Cir. 2016) (citing Frothingham v. Mellon, 262 U.S. 447, 487 (1923)).  The Third Circuit instead applies "good-faith pocketbook requirements."  To establish municipal taxpayer status, the plaintiff must pay taxes to the municipality and the municipality must have expended "more than a de minimis amount of tax revenue" on the challenged practice. Id. at 280-81 (citing Doremus v. Board of Ed. of Hawthorne , 342 U.S. 429, 434 (1952)); see also ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 262, 263 n.2 (3d Cir. 2001) (explaining Doremus and citing cases in which other circuits have recognized that municipal taxpayers lack standing where there is no evidence of expenditure).

Plaintiff Taxpayers allege that they pay taxes to Allegheny County, but completely fail to allege that CCAC has actually expended even a "de minimis amount" of excess tax revenue on enforcing the PLA.  They do not allege that by requiring putative bidders to agree to adhere to the PLA, CCAC has awarded construction contracts to anyone other than the lowest bidder.  In fact, the Plaintiff Taxpayers do not allege that CCAC awarded any work to anyone at all under the PLA.  Accordingly, as the Complaint fails to satisfy the "good-faith pocketbook requirements" for municipal taxpayer status, the Plaintiff Taxpayers lack standing to pursue their claims.

2. <u>The Plaintiffs' Claims are not Ripe</u>

Federal courts "will not decide a case where the claim involves contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>Thomas v. Union Carbide Agric. Prods. Co.</u>, 473 U.S. 568, 580-81 (1985). Plaintiffs must show that they have been genuinely aggrieved and that there is a substantial controversy that is "definite and concrete." <u>Peachlum v. City of York</u>, 333 F.3d 429, 433-34 (3d Cir. 2003) (quoting <u>Babbit v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979)).

The Complaint alleges that the PLA precludes the Contractor Plaintiffs from bidding for work and the Employee Plaintiffs from working on covered projects without relinquishing their rights, and that it causes the Taxpayer Plaintiffs to incur some economic harm. Although the Complaint alleges that the College entered into the PLA in 2011, it completely fails to allege that the College has ever actually used the PLA on any projects since then, much less that CCAC has used the PLA in a way that has implicated the Plaintiffs' asserted rights. More to the point, Plaintiffs have completely failed to allege that CCAC is either currently enforcing or threatening to enforce the PLA in a way that will cause them injury. In short, rather than presenting a "definite and concrete" dispute, the Complaint simply presents claims that are "hypothetical [and] abstract." <u>Babbit</u>, 442 U.S. at 298 (internal quotations and citation omitted). Hence, just as the Plaintiffs lack standing, their claims are not ripe.

B. <u>The Plaintiffs' Complaint Must be Dismissed Pursuant to F.R.C.P. 12(b)(6) for Failure to State a Claim for which Relief can be Granted.</u>

1. <u>The Complaint Fails to State a Claim under the First or Fourteenth Amendments of the U.S. Constitution.</u>

In Claim for Relief No. 1, the Plaintiffs assert that CCAC is violating the First and Fourteenth Amendments of the U.S. Constitution "by requiring its contractors to hire their

11

employees through the job-referral systems operated by unions affiliated with the [Building Trades]."  Doc. 1, p. 11.  The PLA expressly states that "[n]o employee covered by this Agreement shall be required to join any Union or pay any agency fees or dues as a condition of being employed," and that the "job referral system will be operated in a non-discriminatory manner," with referrals unaffected by "obligations of union membership."  See Doc. 1-2, p. 7.  Yet Plaintiffs claim the "'non-discrimination' provision is disingenuous," asserting – without providing any factual basis – that "[t]he requirement that contractor and subcontractors hire their employees from the unions' job-referral systems compels workers to join and pay those unions as a condition of performing any onsite construction work for the college, because the unions will not refer non-members through their hiring halls."  Doc. 1, p. 7.  And because, in their view, the PLA therefore requires the contractors' employees "to relinquish their First amendment rights" to refrain from "join[ing] or financially support[ing] a union as a condition of employment," they claim CCAC "is running afoul of the Supreme Court's holding in Janus v. AFSCME, Council 31, 138 S. Ct. 2448 (2018)."  Doc. 1, pgs. 10-11.

The Plaintiffs' First Amendment claims thus rest entirely on the bald, unsupported assertion that the unions will operate their referral systems in contravention of the clear language of the PLA and the requirements of federal law.  This kind of "naked assertion[] devoid of further factual enhancement," is simply insufficient to defeat a motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Moreover, the Supreme Court long ago rejected this very same assumption of misconduct as the basis for imposing liability in an analogous situation.  The collective bargaining agreement in Teamsters Local 357 v. NLRB, 365 U.S. 667 (1961), contained a hiring hall provision that, like the PLA's provision, stated that referrals would be made "irrespective of whether such

employee is or is not a member of the Union." Id. at 668.  The National Labor Relations Board

nonetheless found the hiring-hall arrangement per se unlawful, as "inherent[ly] and unlawful[ly]

encourag[ing] union membership." Id. at 671 (internal quotations omitted).  The Supreme Court

disagreed, writing that "surely discrimination cannot be inferred from the face of the instrument

when the instrument specifically provides there will be no discrimination . . . because of the

presence or absence of union membership." Id. at 675.

The same rule applies here.  The PLA expressly states that the unions will operate their

referral systems in a non-discriminatory manner, without regard to union membership, and that

no employee will be required to join a union or pay dues as a condition of employment.  In the

face of these clear commitments, the Plaintiffs have offered nothing more than empty assertions

that the non-discrimination provisions are "disingenuous," Doc. 1, p. 7, and that the unions will

disregard the obligations they have undertaken in the PLA.  As in Teamsters Local 357, absent

allegations that the hiring halls are "in fact used unlawfully," Plaintiffs have presented no factual

basis for "assum[ing] that [the] union[s will] conduct[ their] operations in violation of  law or

that the parties to this contract did not intend to adhere to its express language."  365 U.S. at 676.

They have thus failed to state a claim that the PLA implicates their constitutional rights and

Claim No. 1 should therefore be dismissed.

    2.  <u>The Complaint Fails to State any Claims Under the National Labor Relations Act.</u>

Plaintiffs' Claim for Relief No. 2 alleges that the PLA violates various provisions of the

National Labor Relations Act: the Employee Plaintiffs' Section 7 rights to decide whether they

want union representation and to be free from discrimination based on union membership; the

Contractor Plaintiffs' rights to decline to recognize a union that their employees have not chosen

as their representative; and Section 8(e)'s prohibition of agreements not to do business with other

employers, except when entered into by "employers engaged primarily in the construction industry." Doc. 1, pgs. 11-13. The Plaintiffs assert that the NLRA makes these rights enforceable against CCAC through 29 U.S.C. § 1983. Id., p. 13.

In Golden State Transit Corp. v. City of Los Angeles, 686 F.2d 758 (1982), the Supreme Court held that when a state interferes with rights secured by the NLRA – that is, when its conduct is preempted by the NLRA -- § 1983 provides a federal cause of action to enforce those rights. As the Court further explained in Boston Harbor, "[w]hen we say the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see Machinists [v. Wisconsin Employment Relations Council, 427 U.S. 132 (1976)], or for NLRB jurisdiction, see [San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959)]." 507 U.S. at 227 (emphasis added). But as the Court went on to explain,

> A State does not regulate . . . simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to regulation.

507 U.S. at 227 (emphasis in original).

In Boston Harbor, the Supreme Court rejected an almost identical challenge to a PLA. In that case, the Massachusetts Water Resources Authority decided to use a PLA to "maintain worksite harmony, labor-management peace, and overall stability throughout the duration of [its construction] project." Id. at 221. The PLA required contractors to obtain workers from the hiring halls of the local unions affiliated with the building trades council, contained a union security clause and exclusive recognition provision, required contractors to contribute to fringe benefit trust funds, and established uniform work rules, id. at 221-22, all provisions the Court regarded as typical in the construction industry. Finding "no reason to expect the[] defining

14

features of the construction industry to depend upon the public or private nature of the entity contracting services," the Court concluded that "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous conduct would be permitted, this Court will not infer such a restriction." Id. at 231-32. In fact, the Court went on to note that "[p]ermitting the States to participate freely in the market-place is not only consistent with the NLRA preemption principles generally but also, in these cases, promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry." Id. at 231.

In Hotel Employees & Resturant. Employees Union, Local 57 v. Sage Hospitality Resources, L.L.C., 390 F.3d 206 (3d Cir. 2004), the Third Circuit applied Boston Harbor in holding that as long as a public entity is acting as a "market participant," it may condition funding for development projects on certain labor conditions. Id. at 209. In Sage, the city required recipients of tax increment financing to agree to a union organizing neutrality agreement as a condition of receiving the funds. The Court of Appeals articulated a two-part test to determine whether a public entity is acting as a "market participant:" (1) whether the challenged condition serves the public entity's proprietary interest in a project or a transaction, as in investor, owner, or financier; and (2) whether the scope of the funding condition is specifically tailored to the proprietary interest, i.e., does the condition only apply to the projects at issue. Id. at 215-16. As the Court explained, a procurement decision that "satisfies these two steps . . . reflects the government's action as a market participant and escapes preemption review," while a funding condition that "sweeps more broadly" than the government's "proprietary economic interest . . . must submit to review under labor law preemption standards." Id. at 216.

Applying this test, the Court found that the city was acting as a market participant in requiring union neutrality clauses from the recipients of its TIF funding, because by providing bond financing for the project, the city's proprietary interest was the same as that of any other investor, and because the neutrality clause was specifically tailored only to apply to the project for which the city had invested funds.  Id. at 217-18. The Court relied, in part, on Building & Constr. Trades Dep't v. Allbaugh, 295 F.3d 28 (D.C. Cir. 2002), in which the D.C. Circuit upheld an executive order requiring neutrality towards PLAs, which "applied to all federally funded contracts [but] applied only to those contracts."  Id. at 215 (emphasis added).

Other federal courts have similarly applied Boston Harbor's "market participant" test. See Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011 (9th Cir. 2010) (public school acted in proprietary capacity in using a PLA for all of its construction projects costing over $200,000); Bldg Indus. Elec. Contractors Ass'n v. City of New York, 678 F.3d 184 (2d Cir. 2012) (New York City acted as market participant in requiring use of a PLA on approximately half of all of its construction projects).  In ABC v. City of Jersey City, 836 F.3d 412, 418-21 (3d Cir. 2016), the Third Circuit reaffirmed its two-part "market participant" test. The Court found, however, that the city was not acting in its proprietary capacity when it conditioned tax abatements on the developers' agreement to abide by a PLA, because the city did not own, manage, or fund the construction projects, but was instead engaged in "assessment and computation of taxes – a primeval government activity."  Id. at 420-21 (internal citations and quotations omitted).

Lower courts in Pennsylvania applying these principles have similarly found that public entities acted as market participants in utilizing PLAs on their construction projects.  In fact, when ABC, Glancy & Sons, and Westmoreland Electric challenged CCAC's earlier PLA, the

16

Court of Common Pleas of Allegheny County denied their motions for a hearing date and preliminary injunction based in part on its conclusion that CCAC was acting as a market participant rather than a regulator when it entered into the PLA.  See Attachment A.  Similarly, U.S. District Judge Horan recently adopted the Opinion of U.S. Magistrate Judge Lenihan, and found that Westmoreland County acted as a market participant when it entered into a PLA with the Building Trades for all of its construction projects costing more than $150,000.  ABC of W. Pa. v. Cty. of Westmoreland, 2020 WL 571031 (Feb. 5, 2020 W.D. Pa.), adopting report and recommendation in ABC of W. Pa. v. Cty. of Westmoreland, 2020 WL 571691 (Jan. 21, 2020 W.D. Pa.) (citing ABC v. City of Jersey City, 836 F.3d 412, 418 (3d Cir. 2016)).

The Complaint alleges that CCAC entered into the PLA in this case for "the college's onsite construction work."  Doc. 1, p. 5.  The PLA recites that CCAC's purpose in adopting the agreement "is to promote efficiency in the construction of the [covered] Project and to provide for the peaceful settlement of any and all labor disputes and grievances without strikes or lockouts, thereby promoting the public interest in assuring the timely and economical completion of the Project."  Doc. 1-2, p. 1.  The agreement further specifies the provisions CCAC regards as intended to achieve those goals.  Id., pgs. 2-3.  The PLA also explicitly applies "only to this Project," and the Complaint contains no allegations that CCAC has used the PLA to impose obligations that extend beyond the projects the College owns and finances.  Because the PLA is clearly intended to serve CCAC's proprietary interest in the successful completion of its construction projects and is narrowly tailored to serve that purpose, there is no question that CCAC was acting as a market participant when it entered into the PLA.  Accordingly, NLRA preemption principles do not apply.

The Plaintiffs also allege that the PLA violates Section 8(e) of the NLRA, 29 U.S.C. § 158(e).  Doc. 1, p. 13.  Section 8(e) generally prohibits employers and labor organizations from agreeing not to do business with another entity.  There is, however, an exception for restrictive subcontracting agreements between "a labor organization and an employer in the construction industry."  Id.  Plaintiffs claim the PLA violates Section 8(e) because CCAC is not "an employer in the construction industry."  However, it is well-established that Section 8(e)'s prohibition of certain agreements – as well as the construction industry exception to that prohibition – apply only to agreements between unions and "employers" within the meaning of Section 2(2) of the Act.  Elec. Workers Local 3 (NY Elec. Contractors Ass'n), 244 N.L.R.B. 357, 358 (1979).  As a "political subdivision" of a state, CCAC is not "an employer" under the NLRA.  See 29 U.S.C. § 152(2) ("the term 'employer' . . . shall not include . . . a State or any political subdivision thereof.")  Moreover, as discussed above, the Supreme Court made clear in Boston Harbor that not only is Section 8(e) inapplicable to a governmental entity, but nothing in the NLRA precludes such an entity, when acting as a purchaser of construction services, from entering into the kind of pre-hire agreement at issue here.  507 U.S. at 231 (Section 8(e) is inapplicable because the State is excluded from the NLRA's definition of "employer.")

For all of these reasons, Plaintiffs have failed to state any claims that the PLA violates the NLRA, and their Claim for Relief No. 2 should therefore be dismissed.

3.   The Plaintiffs' Pennsylvania State Law Claims Must be Dismissed.

The Plaintiffs' Claim for Relief No. 3 alleges violations of Pennsylvania state competitive bidding laws.  This Claim must be dismissed as well, because no "extraordinary circumstances" justify this Court's exercise of jurisdiction once all of the federal claims are dismissed.  Associated Builders & Contractors, et. al. v. Cty. of Northampton, 376 F. Supp.3d

476, 492 (E.D. Pa. 2019) (citing Hancock Indus. v. Schaeffer, 811 F.2d 255, 237 (3rd Cir. 1987)).

Even if the Plaintiffs had alleged facts supporting a finding of extraordinary circumstances – which they did not – nothing in the Complaint suggests that CCAC abused its discretion by entering into the PLA.  A. Pickett Constr. Inc. v. Luzerne Cty. Convention Ctr. Auth., 738 A.2d 20, 25 (Pa. Commw. Ct. 1999) (a County had the discretion to enter into a PLA with the Building Trades union: "[q]uite simply, that it may be difficult or distasteful for Plaintiffs to accept the provisions of the PLA does not mean it is anti-competitive."); Sossong v. Shaler Area Sch. Dist. & Pittsburgh Reg'l Bldg Trade Council, 945 A.2d 788 (Pa. Commw. Ct. 2008), appeal denied, 967 A.2d 962 (Pa. 2009) (a school district had the discretion to require a contractor to enter into PLA as a condition of bidding on construction projects without violating the competitive bidding statutes); Glenn O. Hawbaker, Inc. v. PA Dept. of Gen. Services, 2009 Pa. Commw. LEXIS 1755, Appeal Denied, 609 Pa. 480, 17 A.3d 319 (Pa. 2011) (Dept. of General Services had discretion to require a PLA within the bid specifications of a prison construction project) (attached hereto as Attachment B).

The Plaintiffs' reliance on Allan Myers, L.P. v. DOT, 202 A.3d 205 (Pa. Commw. Ct. 2019) is misplaced.  The court in Allen Myers read the PLA to provide special treatment to contractors that recognized a Steelworkers local union, by exempting them from the hiring hall and no-strike provisions: The "PLA favored contractors under agreement with United Steelworkers, and for this reason alone, there is no common standard on which bids are based. We hold, therefore, that the PLA requirement . . . violates competitive bidding."  Id. at 215-16 (emphasis added).  Unlike Allen Myers, there is no allegation here that CCAC is applying anything but "common standard[s]" to everyone bidding for work on its projects.

Accordingly, Claim for Relief No. 3 must be dismissed, both because no exceptional circumstances warrant this Court retaining jurisdiction over the state law claims, and because the Plaintiffs have failed to state a claim for relief.

## CONCLUSION

The Plaintiffs have failed to establish this Court's jurisdiction over their claims or any plausible claims for relief.  The Defendant Building Trades therefore respectfully submits that Plaintiffs' Complaint should be dismissed in its entirety, with prejudice, pursuant to F.R.C.P. 12(b)(1) and (6).

Respectfully Submitted,

Joshua Bloom & Associates, P.C.

/s/ Joshua M. Bloom_____
Joshua M. Bloom, Esquire
PA 78072
3204 Grant Building
310 Grant Street
Pittsburgh, PA 15219
412-288-6000

Victoria L. Bor, Esquire
DC 288852
Jonathan D. Newman, Esquire
DC 449141
Sherman Dunn, P.C.
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
202/785-9300

*Council for Defendant Building Trades*

July 6, 2020

Attachment A

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

R.A. GLANCY & SONS, INC., ROBERT A.
GLANCY, ALLEGHENY CITY ELECTRIC,
INC., EAST END PLUMBING AND
MECHANICAL, INC., FLORINDA
MASCILLI, MERIT ELECTRICAL GROUP,
INC., ANDY MICHIELLI, JKECO
ELECTRIC, INC., MANUEL KALOGERIS,
WESTMORELAND ELECTRIC, INC.,
RYCO, INC., RICHARD BOSCO, NEWMAN
PLUMBING, INC., BRIDGES & COMPANY,
INC., ROBERT FITZGERALD, THOMAS &
WILLIAMSON, JON THOMAS AND
ASSOCIATED BUILDERS AND
CONTRACTORS OF WESTERN
PENNSYLVNIA,

Plaintiffs

v.

COMMUNITY COLLEGE OF ALLEGHENY
COUNTY,

Defendant

and

PITTSBURGH REGIONAL BUILDING
TRADES COUNCIL,

Intervenor.

No.  GD 10-14783

OPINION

Honorable Joseph M. James

Copies Sent To:

Diane M. Tokarsky, Esquire
Joshua M. Bloom, Esquire
Robert L. McTiernan, Esquire

FILED

11 MAY -2 AM 11: 19

DEPT OF CCURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

### In The Court Of Common Pleas Of Allegheny County, Pennsylvania
### Civil Division

| | |
|---|---|
| R.A. GLANCY & SONS, INC., ROBERT A. GLANCY, ALLEGHENY CITY ELECTRIC, INC., EAST END PLUMBING AND MECHANICAL, INC., FLORINDA MASCILLI, MERIT ELECTRICAL GROUP, INC., ANDY MICHIELLI, JKECO ELECTRIC, INC., MANUEL KALOGERIS, WESTMORELAND ELECTRIC, INC., RYCO, INC., RICHARD BOSCO, NEWMAN PLUMBING, INC., BRIDGES & COMPANY, INC., ROBERT FITZGERALD, THOMAS & WILLIAMSON, JON THOMAS AND ASSOCIATED BUILDERS AND CONTRACTORS OF WESTERN PENNSYLVNIA, | No.   GD 10-14783 |

                        Plaintiffs

            v.

COMMUNITY COLLEGE OF
ALLEGHENY COUNTY,

                        Defendant
            and

PITTSBURGH REGIONAL BUILDING
TRADES COUNCIL,

                        Intervenor.

### O P I N I O N

JAMES, J.                                                      April 29, 2011

    Plaintiffs R.A. Glancy & Sons, Inc., et al. ("Glancy") have filed a Motion for

Preliminary Injunction and requested that the Court enjoin Defendant Community

No.        GD 10-14783

College of Allegheny County ("CCAC") from proceeding to process bids for the construction project known as the K. Leroy Irvis Science Center. Glancy also requested that CCAC be enjoined from proceeding with any future projects that require prime contractors or subcontractors to enter into Project Labor Agreements.

Glancy contends that the use of Project Labor Agreements is improper because requiring such agreements violates state statutes and regulations and is in conflict with the Commonwealth of Pennsylvania's requirements of competitive bidding. They also argue that the decision to use Project Labor Agreements constitutes an abuse of discretion.

CCAC and Intervenor Pittsburgh Regional Building Trades Council ("Building Trades") argue that the Preliminary Injunction should not be granted because current case law holds that Glancy is not likely to prevail on the merits. In fact, current case law supports the position that the denial of a hearing on the request for preliminary injunction is not an abuse of discretion. <u>Franklin Decorators, Inc. v. Hende-Jon Furniture Showrooms, Inc.</u>, 489 A.2d 246, 248 (Pa. Super. 1985).

For a preliminary injunction to be issued, all of the prerequisites must be established; if the petitioner fails to establish any one of them there is no need to address the others. <u>Allegheny County v. Commonwealth</u>, 544 A.2d 1305, 1307 (Pa. 1988).

The six essential prerequisites are:

(1) the petitioner must show that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

(2) the petitioner must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;

(3) the petitioner must show that the preliminary injunction would properly restore the parties to their status as it existed immediately prior to the alleged harm;

(4) the petitioner must show that the petitioner is likely to prevail on the merits;

(5) the petitioner must show that the injunction it seeks is reasonably suited to abate the offending activity; and

(6) the petitioner must show that the preliminary injunction will not adversely affect the public interest.

Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc., 828 A.2d 995, 1001 (Pa. 2003).

In this case, Glancy has not proven that an injunction is necessary to prevent immediate and irreparable harm.  Both union and non-union contractors are required to pay the same prevailing wage.

Pennsylvania case law supports that the court has no duty to grant a hearing on an application for a preliminary injunction.  In Sossong v. Shaler Area School District and Pittsburgh Regional Building Trade Council, 945 A.2d 788 (Pa. Cmwlth. 2008), the Commonwealth Court upheld Judge O'Reilly's decision denying Sossong's request for a preliminary injunction hearing on the issue of whether the project labor agreement requirement within the bid specs violated the lowest responsible bidder laws.   In Sossong, Judge O'Reilly relied on A. Pickett Constr., Inc. v. Luzerne County Convention Center Auth., 738 A.2d 20 (Pa. Cmwlth. 1999) (holding that project labor agreements between governmental entity and construction unions do not violate the lowest responsible bidder laws in Pennsylvania).

The Project Labor Agreement at issue in this case did not violate federal labor laws.  The U.S. Supreme Court has held that the National Labor Relations Act permits a

3

No.        GD 10-14783

local government entity to act as a proprietor rather than a regulator when it enforces a Project Labor Agreement.  Therefore, they concluded that the local government entity may require all contractors and subcontractors to become party to a project labor agreement with local craft unions that provides for union recognition, mandatory use of union hiring halls, grievance procedures and no work stoppages. <u>Building and Construction Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island (Boston Harbor)Building and Construction Trades Council v. Associated Builders & Contractors  Massachusetts/Rhode Island (Boston Harbor)</u>, 507 U.S. 218, 221-222 (1993).

Therefore, Glancy's Motion for an Injunction pending appeal was denied.

Attachment B

 Caution

As of: July 3, 2020 2:00 PM Z

## *Glenn O. Hawbaker, Inc. v. Commonwealth*

Commonwealth Court of Pennsylvania

October 8, 2009, Heard; November 16, 2009, Argued; December 1, 2009, Decided; December 1, 2009, Filed

No. 405 M.D. 2009

**Reporter**

2009 Pa. Commw. LEXIS 1755 *

Glenn O. Hawbaker, Inc., Daniel R. Hawbaker, Michael D. Hawbaker, New Enterprise Stone & Lime Co., Inc., James Van Buren, Poole Anderson Construction, Stephanie Schmidt, The Farfield Company, Dennis Pierce, Zartman Construction, Inc., David Zartman, Stone Valley Construction, Inc., Marie Porter DeVinney, RNR Construction, Nancy Givins, American Infrastructure, Inc., Ross Myers, James Craft and Son, Inc., James L. Craft, Howard Organization, Inc., Joseph Graham, Westmoreland Electric, Inc., Keith Impink, George J. Hayden, Inc., Electric-Communications, George J. Hayden, Kukurin Contracting, Inc., William J. Kukurin, Forefront Construction, Jeff Lawrence, Associated Builders and Contractors, Inc., Keystone Chapter, Associated Builders and Contractors, Inc., Central Pennsylvania Chapter, Associated Builders and Contractors, Inc. of Western Pennsylvania, Associated Builders and Contractors, Inc. of Southeastern Pennsylvania, Associated Builders and Contractors, Eastern Pennsylvania Chapter, Craig L. Taylor, James K. Madden, Jr., Michael D. Claar, Glenn F. Knavel, John J. Berkheimer, Scott L. Scriber, Matthew E. Hoffman, Brandon Snider, James Brooks, Vanessa Cantolina and Barry Biggans, Petitioners v. Commonwealth of Pennsylvania, Department of General Services, James P. Creedon, Individually and in his capacity as Secretary of Department of General Services, Anne Rung, Individually and in her capacity as Deputy Secretary for Administration, Department of General Services, Elizabeth A. O'Reilly, Individually and in her capacity as Deputy Secretary for Public Works, Department of General Services, Diane Hallett, Individually and in her capacity as RFP Contract Officer, for the Department of General Services and Commonwealth of Pennsylvania, Department of Corrections, Respondents

**Notice:** OPINION NOT REPORTED

**Subsequent History:** Affirmed by, Application denied by *Glenn O. Hawbaker, Inc. v. Commonwealth, 17 A.3d 319, 2011 Pa. LEXIS 143 (Pa., 2011)*

## Core Terms

contractors, bidding, non-union, bargaining, Procurement, pre-emption, injunction, plumbing, solicitation, hired, bidder, craft, entity, lowest, join, subcontractor, personnel, deadline, inmates, Steel, beds, electrical, membership, budget, enjoin, built

2009 Pa. Commw. LEXIS 1755, *1755

**Judges:** [*1] BEFORE: HONORABLE DAN PELLEGRINI, Judge.

**Opinion by:** DAN PELLEGRINI

## Opinion

MEMORANDUM OPINION BY JUDGE PELLEGRINI

Before this Court is a motion for a preliminary injunction filed by Glenn O. Hawbaker, Inc., et al[1] (collectively, Contractors) requesting us to enjoin the Commonwealth of Pennsylvania, Department of General Services (DGS) from awarding the successful bidder the design/build contract on the construction project at the State Correctional Institute (SCI) at Graterford in Montgomery County, Pennsylvania, and to enjoin all future DGS projects to execute a Project Labor Agreement (PLA).[2] For the reasons that follow, we deny the motion.

This case involves a challenge by Contractors to actions of DGS relating to the procurement process for the construction of a 4,100 bed prison at SCI-Graterford [*5] (the Skippack East and West Prison project). This construction project was authorized by "Act 41," which authorized certain prisons to be built using a design/build method of construction. Section 19 of Act 41 specified:

---

[1] Glenn O. Hawbaker, Inc. is a heavy and highway contractor. The other petitioners include: Daniel R. Hawbaker, an individual who works in the construction industry; Michael D. Hawbaker, an individual who works in the construction industry; New Enterprise Stone & Lime Co., Inc., a heavy and highway contractor and a Delaware corporation with its principal place of business located in New Enterprise, PA; James Van Buren, an individual who works in the construction industry; Poole Anderson Construction, a general contractor; Stephanie Schmidt, an individual who works in [*2] the construction industry; The Farfield Company, an electrical and mechanical contractor and a Delaware corporation with its principal place of business in Lititz, PA; Dennis Pierce, an individual who works in the construction industry; Zartman Construction, Inc., a general contractor; David Zartman, an individual who works in the construction industry; Stone Valley Construction, Inc., a women business enterprise certified by the Commonwealth; Marie Porter DeVinney, an individual who works in the construction industry; RNR Construction, a women business enterprise certified by the Commonwealth; Nancy Givens, an individual who works in the construction industry; American Infrastructure, Inc., a commercial and residential site development contractor; Ross Myers, an individual who works in the construction industry; James Craft and Son, Inc., a mechanical contractor; James L. Craft, an individual who works in the construction industry; Howard Organization, Inc., an electrical contractor; Joseph Graham, an individual who works in the construction industry; Westmoreland Electric, Inc., an electrical contractor; Keith Impink, an individual who works in the construction industry; George J. [*3] Hayden, Inc. Electric-Communications, an electrical contractor; George J. Hayden, an individual who works in the construction industry; Kukurin Contracting, Inc., a commercial general construction contractor; William J. Kukurin, an individual who works in the construction industry; Forefront Construction, a commercial heating, ventilating, air-conditioning and plumbing contractor; Jeff Lawrence, an individual who works in the construction industry; Associated Builders and Contractors, Inc. Central Pennsylvania Chapter, a PA association comprised of general contractors and subcontractors doing business in PA; Associated Builders and Contractors, Inc. Keystone Chapter, a PA association comprised of general contractors and subcontractors doing business in PA; Associated Builders and Contractors of Western Pennsylvania, Inc., a PA association comprised of general contractors and subcontractors incorporated in and doing business in PA; Southeast Pennsylvania Chapter of The Associated Builders and Contractors, Inc., a PA association comprised of general contractors and subcontractors incorporated in and doing business in PA; Associated Builders and Contractors Eastern Pennsylvania Chapters, [*4] Inc., a PA association comprised of general contractors and subcontractors incorporated in and doing business in PA; Craig L. Taylor, an individual who works in the construction industry; James K. Madden, Jr., an individual who works in the construction industry; Michael D. Claar, an individual who works in the construction industry; Glenn F. Knavel, an individual who works in the construction industry; John J. Berkheimer, an individual who works in the construction industry; Scott L. Scriber, an individual who works in the construction industry; Matthew E. Hoffman, an individual who works in the construction industry; Brandon Snider, an

Joshua Bloom

"Notwithstanding the provisions of *62 Pa. C.S. §322* (relating to specific construction powers, duties and procedures), the Department of General Services shall comply with the provisions of the act of May 1, 1913 (P.L. 155, No. 104), referred to as the Separations Act,[3] by entering into a design/build contract which requires that the Design/Build Contractor comply with the requirements of the Separations Act." Essentially, this meant that when contracting for these improvements, DGS was required to use the competitive sealed proposal method of source selection to enter into a design/build contract, and the Design/Build Contractor was required to bid subcontracts for the four separate prime contractors required by the Separation Act. On July 4, 2008, Governor Rendell signed into law Act 41 of 2008.

---

individual who works in the construction industry; James Brooks, an individual who works in the construction industry; Vanessa Cantolina, an individual who works in the construction industry; and Barry Biggans, an individual who works in the construction industry.

[2] The Building and Construction Trades Council of Philadelphia and the Greater Vicinity filed an application to intervene which was granted.

[3] Section 1 of the Act of May 1, 1913, P.L. 155, *as amended*, *71 P.S. §1618*, provides:

Hereafter in the preparation of specifications for the erection, construction, and alteration [*6] of any public building, when the entire cost of such work shall exceed four thousand dollars, it shall be the duty of the architect, engineer, or other person preparing such specifications, to prepare separate specifications for the plumbing, heating, ventilating, and electrical work; and it shall be the duty of the person or persons authorized to enter into contracts for the erection, construction, or alteration of such public buildings to receive separate bids upon each of the said branches of work, and to award the contract for the same to the lowest responsible bidder for each of said branches.

Every contract for the construction, reconstruction, alteration, repair, improvement or maintenance of public works shall comply with the provisions of the act of March 3, 1978 (P.L. 6, No. 3), known as the "Steel Products Procurement Act."

While Act 41 was winding its way through the General Assembly, on April 21, 2008, a "Letter of Commitment" was executed by James Creedon (Creedon), Secretary of DGS, and Frank Sirianni, President of the Building and Construction Trades Council, stating that DGS would retain the Keystone Research Center (Keystone), primarily comprised of board members affiliated [*7] with various unions, to conduct a study as to whether a PLA was necessary for the construction of a prison housing facility exceeding $15 million. A PLA is an agreement between a government authority and a collection of unions represented by a council, often a construction trades council, which applies to parts of a construction project. Under PLAs, "[t]he union is designated the collective bargaining representative for all employees on the project and agrees that no labor strikes or disputes will disrupt the project. The contractor must abide by certain union conditions, such as hiring through union hiring halls and complying with union wage rules." *Associated Builders & Contractors, Inc. v. Southern Nevada Water Authority, 115 Nev. 151, 979 P.2d 224, 226 (Nev. 1999)*. If [*8] the study justified a PLA, DGS would negotiate and enter into a PLA with the regional building trades in the region where the project would be constructed. This agreement was entered because the Building and Construction Trades Council intended to oppose Act 41, which, among other things, appropriated funds for the renovations of certain existing correctional facilities and the construction of several new correctional facilities.

At the time DGS entered into the "Letter of Commitment," it was waiting for funding approval for the construction project at SCI-Graterford. After receiving funding to build the new Skippack East and West Prison, DGS requested that Keystone perform a study to determine whether a PLA should be used on the SCI-Graterford project. Keystone came to

the conclusion that a PLA was appropriate to ensure that the project was completed in a timely and cost effective manner "to maintain an expedited and uninterrupted construction schedule to ensure completion and occupancy on or before the construction deadline," which had a projected opening date of fall 2011 at the earliest but possibly 2012. It also believed that a PLA would "ensure labor peace and harmony through [*9] a no-strike, no lock out commitment by all involved personnel in order to meet the construction deadline," should ensure access to the large pool of skilled, experienced labor that the project would require, and would provide that all "phases of construction would be open to both union and non-union contractors."

After agreeing that a PLA should be used because this project would cost approximately $400 million, was large and complex, and timely completion was critical, DGS issued its PLA for SCI-Graterford. The PLA Preamble stated that the PLA was undertaken to "promote the timely, efficient and successful delivery of the construction of ... SCI Graterford..." Under Arts. I and II, Governing Principles, the PLA continued to state that because the project was so large, complex and costly, effective construction scheduling and timely completion was critical to the Commonwealth's financial investment. Therefore, in order to meet the demand for a timely delivery, it was essential to obtain the craft labor needed for the project through the Philadelphia Building Trades Council and its local unions. In using those trades, all trades would be bound by the terms of the Local Union Collective [*10] Bargaining Agreements and all craft labor personnel employed on the project, whether by the Design/Build Contractor or any subcontractor, had to be hired through the local unions identified in the PLA. The SCI-Graterford project was to be bid on the competitive sealed proposal method, which was not necessarily the lowest cost

bidder. This PLA was different than some of the other PLAs utilized by DGS because it was not signed by DGS.

Due to the requirement that a PLA had to be signed by the winning Design/Build Contractor and its subcontractors, Contractors filed a petition for review in the nature of a 20-count complaint in equity, which was subsequently amended, along with a motion for a preliminary injunction. Their main contention in their petition for review is that the use of the PLA by DGS on the SCI-Graterford project is illegal because DGS requires the selected Design/Build Contractor and all subcontractors who intend to work on the SCI-Graterford project to execute a PLA which unlawfully discriminates against non-union contractors and employees because, among other things, the contractors are not guaranteed that they will be able to use only their employees, lessening their [*11] ability to compete.[4] They also contend that the Commonwealth violated the National Labor Relations Act[5] because it requires employers to recognize the union and employees to join the union. They request this court to preliminarily and permanently enjoin DGS from requiring a PLA to be required for the SCI-Graterford project and for Design/Build Contractors and their subcontractors to execute PLAs in the future on any DGS project.

A preliminary injunction hearing was held[6] where non-union contractors and a non-union employee testified how the PLA would

---

[4] Contractors also argues that the PLA violates the Procurement Code, 62 Pa.C.S. §§101-4602, numerous state statutes and the Pennsylvania Constitution.

[5] 29 U.S.C. §§151-169.

[6] The SCI-Graterford PLA had been signed by union contractors, but not by DGS. Also, no contract had been awarded by DGS for the SCI-Graterford project.

adversely affect them.[7] Creedon, Secretary of DGS, and Shirley Moore Smeal (Smeal), Deputy Secretary for the Central Region with the Pennsylvania Department of Corrections, testified regarding the urgency and necessity of the construction of SCI-Graterford due to the growing prison population.

I.

In the past, this court has approved PLAs because we have agreed with public bodies that it is a valid bid specification because it provides access to skilled labor on public jobs and completion of the work is done in a timely manner.[8] In *A. Pickett Construction, Inc. v.*

worked for the company since 1985 and employed approximately 1,400 "merit shop" employees. Kinsley Construction had performed over 1,000 projects in the Commonwealth since its inception but did not submit a bid for the SCI-Graterford [*13] project because they did not work in Philadelphia. Had he bid on the job, he would have done it as a joint venture because his company was not capable of performing a project of that size. Kinsley stated that had he bid on the job, he would have been forced to use labor that he did not have a history with and he wouldn't have been able to develop an accurate bid price not knowing their quality of work or their safety records.

Allan Ross Myers (Myers), chairman and CEO of American Infrastructure, a civil construction business in the MidAtlantic for 70 years, testified that his company presently had about 1,600 merit employees with 300 located in Montgomery County, Pennsylvania, approximately five miles from Graterford. He also stated that his company had been involved with over 1,000 projects for the Commonwealth during its existence. Myers stated that he submitted a quote as a subcontractor, but could not submit a bid because it was a PLA and because it would tie up the company's bonding and project management teams. Myers stated that his company had its own labor force and the expertise to do the Graterford project and that it would be virtually impossible for his company to deliver [*14] a schedule and control costs if he had to hire out of the union hall.

Finally, M. Dennis Steinmeyer, an equipment operator for American Infrastructure, testified that when he was "off" or not working for that company, he had worked for the Philadelphia union, Operating Engineers 542. He stated that he stayed with that union for five years but left due to its rules, regulations and the way it worked.

---

[7] In requesting an injunction, [*12] a petitioner must prove that 1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; 2) greater injury will occur from refusing to grant the injunction than from granting it; 3) the injunction will restore the parties to their status quo as it existed immediately before the alleged wrongful conduct; 4) the injunction is reasonably suited to abate the alleged wrong; 5) the petitioner's right to relief is clear; and 6) the public interest will not be harmed if the injunction is granted. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mountain, Inc., 573 Pa. 637, 828 A.2d 995 (2003)*. Contractors must meet all six prongs of this test to be awarded an injunction.

Jonathan Kinsley (Kinsley), president and chief operating officer for Kinsley Construction, testified that his company did general construction, design/build, out of York, Pennsylvania, and had been in business since the early 1960s. He had

[8] Other jurisdictions have also allowed PLAs. *See e.g., E.W. Tompkins Co., Inc. v. Board of Trs. of Clifton Park-Halfmoon Public Library, 27 A.D.3d 1046, 813 N.Y.S. 2d 789 (App. Div. 2006); Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004 (7th Cir. 2005); City of Lansing v. Carl Schlegel, Inc., 257 Mich. App. 627, 669 N.W. 2d 315 (Mich. Ct. App. 2003); Ohio Bldg & Constr. Trades v. Cuyahoga Co. Bd., 98 Ohio St. 3d 214, 2002 Ohio 7213, 781 N.E.2d 951 (Ohio 2002); Associated Builders & Contractors, Inc. v. Minnetonka Indep. Sch. Dist. No. 276, No. C2-99-837, 1999 Minn. App. LEXIS 1406 (Minn. Ct. App. Dec. 28, 1999); Queen City Construction, Inc. v. City of Rochester, 604 N.W.2d 368 (Minn. Ct. App. 1999); Associated Builders & Contractors, Inc. v. Metro. Water Dist., 59 Cal. App. 4th 1503, 69 Cal. Rptr.2d 885 (Cal. Ct. App. 1997),* [*16] *superseded by grant of review, 72 Cal. Rptr. 2d 215, 951 P.2d 1182 (Cal. 1998), rev. dismissed, case remanded to Court of Appeal (Oct. 20, 1999); Conn. Associated Builders & Contractors, Inc. v. Anson, No. CV-98-0579841-S, 1998 Conn. Super. LEXIS 3022 (Conn. Super. Ct. Oct. 26, 1998), affirmed, 251 Conn. 202, 740 A.2d 804 (1999); John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass.*

*Luzerne County Convention Center Authority, 738 A.2d 20 (Pa. Cmwlth 1999)*, the appellant argued that the use of a PLA discouraged non-union contractors from even bidding on projects because the requirement to employ union members on jobs would necessitate drastic revisions in how contractors structured the working relationship with their employees, thereby effectively restricting the pool of eligible contractors and lessening competition. This Court held that the award of a contract involved the exercise of the discretion **[*15]** by the contracting authority, and the decision of who was the lowest responsible bidder included a decision of financial responsibility, integrity, efficiency, industry experience, promptness and ability to successfully carry out the job. In *Pickett*, that meant that the Authority's reliance on a report finding that a PLA was more appropriate where an arena was being built that required a construction deadline that had to be met without disruption or stoppage than in other settings where timely, uninterrupted completion was not as critical was within its discretion.

A much more stringent PLA was at issue in *Sossong v. Shaler Area School District, 945 A.2d 788 (Pa. Cmwlth. 2008)*, **[*17]** *petition for allowance of appeal denied*, 600 Pa. 766, 967 A.2d 962 (2009), where a contractor sought a preliminary injunction enjoining a school

---

*124, 713 N.E.2d 955 (Mass. 1999)*; *Laborers Local No. 942 v. Lampkin, 956 P.2d 422 (Alaska 1998)*; *Albany Specialties, Inc. v. County of Orange (Albany Specialties II), 240 A.D.2d 739, 662 N.Y.S.2d 773 (App. Div. 1997)*; *Util. Contractors Association of New England, Inc. v. Mass. Dep't. of Public Works*, 153 LRRM 2297 (Mass. Super. Ct. 1996); *Enertech Electrical Inc. v. Mahoning County Commissioners, 85 F.3d 257 (6th Cir. 1996)*; *Master Builders of Iowa, Inc. v. Polk County, 653 N.W.2d 382 (Iowa 2002)*; *Associated Builders and Contractors, Inc. v. San Francisco Airports Commission, 21 Cal. 4th 352, 87 Cal. Rptr. 2d 654, 981 P.2d 499 (Cal. 1999)*; *Associated Builders and Contractors, Inc. v. Southern Nevada Water Authority, 115 Nev. 151, 979 P.2d 224 (Nev. 1999)*; and *Jefferson County Board of Commissioners v. The State ex rel. Associated Builders and Contractors, 106 Ohio App. 3d 176, 665 N.E.2d 723 (Ohio Ct. App. 1995)*.

---

district from awarding a contract for two school construction projects alleging that the use of a PLA by the school district when seeking bids prevented non-union contractors from bidding on the projects. The PLA precluded strikes, lockouts, work stoppages and any other disruptions of the work of the project, and required all contractors, both union and non-union, to sign and be bound by the terms of the PLA. It did not preclude any contractors, either union or non-union, from bidding on or being awarded the contract. However, it required all of the company's workers to join the union and the contractors to agree to abide by union contracts. In denying the request for an injunction, we relied on *Pickett* and the fact that the PLA stated that time was of the essence and that there would be no delays stating: "As in *Pickett*, because the PLA requirement is related to the need for prompt completion of the projects, the School District did not abuse its discretion by requiring that the lowest responsible bidder enter into the PLA." *Sossong, 945 A.2d at 794*.

The **[*18]** requirement that the contractor recognize the union and require its employees to join the construction union does not violate provisions of the National Labor Relations Act. *29 U.S.C. §§158(e)-(f)*. In *Building and Construction Trades Council of the Metropolitan District v. Association Builders & Contractors of Massachusetts/ Rhode Island, Inc. ("Boston Harbor"), 507 U.S. 218, 113 S. Ct. 1190, 122 L. Ed. 2d 565 (1993)*, the United States Supreme Court discussed PLAs in terms of business opportunities and the NLRA. In *Boston Harbor*, the Massachusetts Water Resources Authority was ordered to clean up the harbor and negotiated a contract with the Building and Construction Trades Council. The agreement required each successful bidder to abide by the labor agreement's terms. The respondent, representing non-union labor, sought to enjoin the agreement, arguing that it was pre-empted under the NLRA. The

Supreme Court held that the NLRA did not expressly pre-empt enforcement by a state authority acting as the owner of a construction project. However, it carved out two distinct implied pre-emption principles:

"Garman[9] pre-emption" forbids state and local regulation of activities that are protected by §7 of the NLRA or constitute [*19] an unfair labor practice under §8, while "Machinists pre-emption" prohibits state and municipal regulation of areas that have been left to be controlled by the free play of economic forces. These pre-emption doctrines apply only to state labor regulation, see, e.g., Machinists,[10] 427 U.S. at 144. A State may act without offending them when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking. Permitting States to participate freely in the marketplace is not only consistent with NLRA preemption principles generally but also, in this case, promotes the legislative goals that animated the passage of the NLRA's §§8(e) and 8(f)[11] exceptions regarding prehire agreements in the construction industry.

Boston Harbor, 507 U.S. at 219. The Court went on to state that it has consistently held that the NLRA was intended to supplant state labor regulation, not all legitimate state activity

_____

[9] San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959).

[10] Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976).

[11] Section 8(e) permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement. Section 8(f) explicitly permits employers in the construction industry but no other employers to enter into prehire agreements.

that affects labor, and permitting states to participate freely in the marketplace is consistent with NLRA pre-emption principles generally. However, it also noted that the state was excluded from the definition of the term "employer" under the NLRA, see 29 U.S.C. §152(2), [*20] and the state was acting as a purchaser rather than an employer. It stated:

It is evident from the fact of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry.

There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose [*21] perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely propriety interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction...Indeed, there is some force to

Joshua Bloom

petitioners' argument that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*.

*Boston Harbor, 507 U.S. at 231*.

**II**.

**A**.

Now to the case at hand. Contractors contend that the PLA at issue here unlawfully discriminates **[*22]** against non-union contractors. They argue that the PLA for SCI-Graterford is tantamount to unlawfully requiring union labor, and PLAs in general place non-union contractors at such a competitive disadvantage to union contractors that they deprive non-union contractors of bidding and of working on this project, as well as the public of receiving the same public benefit at the lowest possible cost.

Surprisingly, there is little Pennsylvania law regarding whether a public contractor can mandate that only union labor or non-union labor will be used on a construction project. The only appellate case that addressed this issue was *Daniel B. Van Campen Corporation v. Building and Construction Trades Council of Philadelphia and Vicinity, 202 Pa. Super. 118, 195 A.2d 134 (Pa. Super. 1963)*, a confusing case that did not involve contract specifications. In *Van Campen*, the Superior Court addressed a claim by a contractor seeking damages because it was a victim of an illegal secondary boycott of the unions who were attempting to force a subcontractor to be a union shop. It alleged that the city was liable because it failed to assist in taking actions in removing the boycott or attempting to have the

subcontractor become **[*23]** a union shop. In answering that question, the Superior Court stated:

> Since the City had a positive duty under the law to let contracts of this nature to the lowest bidder, *Taylor v. Philadelphia, 261 Pa. 458, 104 A. 766*, and since it would be illegal for it to distinguish between contractors employing union people from those employing people who were not organized, *Anthony P. Miller, Inc. v. Wilmington Housing Authority, D.C., 165 F.Supp. 275*; Glassman v. Philadelphia, 9 Pa.Dist. & Co.R.2d 495, we cannot read into the contract the implied provision asserted by plaintiff.

*Id., 195 A.2d at 137*.

However, in both *Pickett* and *Sossong*, we held that that the inclusion of a PLA did not violate the requirement to award the contract to the lowest responsible bidder or illegally discriminate against non-union contractors because non-union contractors were allowed to bid on the contract, and those PLAs did not contain provisions on employing individuals based on union affiliation. At the hearing and the arguments, it was apparent, though, that I had great doubts that the provisions of the SCI-Graterford PLA had taken the case "over the line" and resulted in illegal discrimination. In fact, the SCI-Graterford **[*24]** PLA provisions are very similar to those we approved in *Sossong*.[12] A comparison of the provisions in each of the PLAs are as follows:

_____

[12] Any **[*25]** claim of discrimination was also diminished by the Building and Construction Trades Council's attorney, who acknowledged that if non-union contractors were selected, their workers would be required to join the union. Despite my pointed comment that it was unusual for a union to admit members who had not gone through a union's apprentice program, he also stated that the non-union workers who were competent would be admitted to that craft union to which they applied.

⊞ *Go to table1*

⊞ *Go to table2*

Based on the approval of the past PLAs, especially in *Sossong*, I cannot say that all PLAs or this one are illegal.

**B.**

Acknowledging that similar PLAs have been approved in the past, Contractors argue that DGS abused its discretion by requiring a PLA for the SCI-Graterford project because it was not issued due to an objective determination that a PLA would benefit the project, but to get the Building and Construction Trades Council's support to get Act 41 passed. Specifically, it argues that the agreement assured that a PLA would be made part of the bid specifications because it required DGS to retain Keystone, which it alleged was union dominated, to perform studies regarding using a PLA, making the outcome a foregone conclusion.[13]

A similar claim was made in *Pickett*. In that case, the PLA report was obtained "purely for the sake of window dressing, trying to legitimize their long standing decision to use a union-only PLA for the project." This claim was supported by public remarks made by the chairman of the authority to the effect that he wanted to obtain a report which was in favor of a PLA. We held that in the absence of evidence presented to the trial court that the consultant hired to perform the PLA analysis was not credible or not competent, or in the

---

[13] Contractors **[*26]** argue that DGS abused its discretion because it delayed publishing critical information that would allow sufficient time for bidders to truly evaluate the impact of the PLA and incorporated CBAs. None of the contractors that testified were going to be the design/build bidders but at the most sub-contractors of one of the four prime contractors on the project. It is also doubtful that taxpayer standing extends to the number of days that the specifications have to be issued before the bids are due.

absence of evidence that the report itself was fundamentally flawed and that the authority's board was on notice of such a lack of competence in the consultant or **[*27]** of such flaws in the report, that a contractor could not establish that the board abused its discretion in relying upon the report in adopting the PLA.

In this case, just because the Letter of Commitment required the Commonwealth to consider PLAs in order to get Act 41 passed, the propriety of the PLA itself was not implicated because it only required DGS to include a PLA in a prison project bid specification if a study proved that it was beneficial. However, just because a study was performed by Keystone, which had union membership, does not mean that it was automatically "bad" or that the result was pre-ordained or that a particular type of PLA was to be issued. For example, the PLA for the Benner Prison project was more like the *Pickett* PLA than the *Sossong* PLA, presumably based on different labor conditions where that prison was going to be built. Moreover, other than the fact that Keystone had many union members, there was no evidence as to how that group arrived at its determination and the factors that it took into consideration. There is also no evidence that DGS had notice of such lack of competence in the consultant or of such flaws in the report. Based on that lack of evidence, **[*28]** we cannot say that DGS abused its discretion given that "Public officers are presumed to have properly performed every duty and met every requirement necessary or essential to the validity of their official acts ... This presumption is so strong that it is tantamount to presumptive proof of the antecedent acts necessary to sustain its validity." *Pickett, 738 A.2d at 25*.

**C.**

Even if the contract does not violate state law, Contractors argue that notwithstanding *Boston Harbor*, the PLA violates the provisions of the NLRA because the state was not acting as a market participant. Relying mainly on federal district court cases, they argue that the market participant doctrine is not applicable, and NLRA pre-emption applies where there is evidence of policy-motive on the part of the state. *See* *Air Transport Association of America v. San Francisco, 992 F. Supp. 1149 (ND. Calif. 1998)* (applying NLRA pre-emption analysis and the market participant exception in the ERISA context); *Associated Buildings & Contractors of R.I., Inc. v Providence, 108 F. Supp. 2d 73 (D. RI. 2000)* (NLRA pre-empted PLAs in exchange for favorable tax treatment on a construction project). They contend that DGS was acting **[*29]** as a regulator because the agreement to consider PLAs on Act 41 contracts was not made as a market participant but, rather, was an effort to get the unions' help in getting Act 41 passed. In addition, based on the enunciated policy reasons advanced by DGS, such as benefiting the local community, maximizing employment of Pennsylvania residents and ensuring a good labor force in the future, DGS was acting as a market regulator rather than a market participant.

First, those cases involve local governments, not a state. As the Supreme Court noted, the state is not an "employer" as that term is defined in the NLRA, which makes both *San Francisco* and *Providence* inapplicable. But even assuming that somehow those cases apply to the states and that the Supreme Court's statement in *Boston Harbor* that "A State may act without offending them [NLRA preemptions] when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking," *Boston Harbor, 507 U.S. at 231*, means that if it takes any act on a construction project which involves polices that advance some other interests, that

takes it outside the market participant doctrine and NLRA pre-emption applies, and nothing **[*30]** like that occurred here. To get union support for Act 41 would be an action to fund its project and is similar to what other market participants would do, such as a developer who "makes deals" with objectors to get a zoning change through so that his project can be built. As to the policy reasons, those are very akin to the one the Supreme Court approved in *Boston Harbor* where it stated that "Such conditions include, among others, the short-term nature of employment which makes post hire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry." *Id.*

**D**.

The Separations Act was originally passed in 1913. When the General Assembly passed the Commonwealth Procurement Code in 1998, it confirmed that DGS was still required to comply with the Separations Act for construction projects by stating under *Section 322(6)* of the Procurement Code that for contracts in excess of $25,000, they were subject to "the act of May 1, 1913 (P.L. 155 No. 104)," that is, the Separations Act. *Section 322(2)* of the Procurement Code also requires that when DGS enters into a design/build contract, **[*31]** the Separations Act must apply. Contractors contend that DGS is obligated to follow the Separations Act on all of its construction projects by requiring separate bids for plumbing, heating, ventilating and electrical work on any public project, and cannot delegate the requirements for separate bids to a design/build contractor.

In making the argument that DGS cannot delegate to the design/build contractor, Contractors rely on *Mechanical Contractors*

*Association of Eastern Pennsylvania, Inc. v. Southeastern Pennsylvania Transportation Authority, 654 A.2d 119 (Pa. Cmwlth. 1995)*, where we addressed the obligation of a public entity to comply with the Separations Act. We stated that our review of the language of the Separations Act indicated that it was ambiguous regarding who the contracting entity had to be. "From a reading of the statute, we cannot ascertain whether the public entity or a general contractor must be the person 'authorized to enter into contracts for the erection, construction or alteration of such public building.' Thus, we must apply the factors specified in *1 Pa. C.S. §1921(c)*. After considering these factors, we conclude that SEPTA, as a public entity, is required to **[*32]** be the contracting party." We went on to explain our reasoning — that the purpose of the Separations Act was to protect the plumbing, heating, ventilating and electrical contractors from the potential dealing of unscrupulous general contractors. "Requiring the public entity to be the direct contracting party with these contractors best accomplishes this intention." *Id. at 122*. Based on this holding, Contractors argue that DGS did not follow the Separations Act by providing in its PLA that the Design/Build Contractor could and would award the contracts to the plumbing, heating, ventilating and electrical contractors.

DGS responds by first addressing this Court's holding in *Mechanical Contractors* arguing that in that case, there was no legislative mandate that a design/build method of construction be used on the project in question. Here, Act 41 explicitly requires that DGS comply with the Separations Act by entering into a design/build contract "which requires that the design/build contractor comply with the requirements of the Separations Act." It further argues that the General Assembly is free to mandate whether and how the Separations Act applies to projects it authorizes, relying **[*33]** on

*Pleasant Hills Construction Co. Inc. v. Pub. Auditorium Authority of Pittsburgh, 567 Pa. 38, 784 A.2d 1277 (2001)*, and states that the General Assembly may vary the requirements of the Separations Act on particular projects. "The General Assembly has done just that in Act 41, providing a manner of complying with the Separations Act '[n]otwithstanding the provisions of *62 Pa. C.S. §322(6)*.' This language expressly effectuates a limited repeal of *Section 322(6)* of the [Procurement] Code[14] and, by extension, the Separations Act." (DGS' brief at 23.) Therefore, DGS contends that regardless of what the Separations Act may ordinarily require, the clear language of Act 41 mandates that the Design/Build Contractor is permitted for purposes of the Separation Act to award bids for construction projects listed in Section 19 of Act 41. As for the individual contracts — HVAC, plumbing and electrical, the Design/Build Contractor is entitled to and required to sign separate contracts for those subs to the lowest responsible bidder.

We agree with DGS that it has not violated **[*34]** Act 41. First, it is correct that there was no requirement in *Mechanical Contractors* that a design/build contract be used, so that case is not controlling in this matter. Second, the facts in *Pleasant Hills Construction* are more akin to the facts presented before us, and in that case, our Supreme Court held that the Separations Act was not violated when the public authority did not comply with the Separations Act regarding the bidding process. Specifically, the Sports and Exhibition Authority of Pittsburgh and Allegheny County (SEA) obtained public funds under the Capital Facilities Debt Enabling Act[15] (Enabling Act) to

---

[14] *62 Pa. C.S. §322(6)* provides that "All projects equal to or exceeding $25,000 shall be subject to the Separations Act."

[15] Act of February 9, 1999 (P.L. 1, No. 1), *72 P.S. §§3919.101-3919.5102*.

construct PNC Park, and the project was designated as a Redevelopment Assistance Capital Project (RACP). The SEA solicited bid for HVAC portions of the project, directing contractors to submit separate bids for plumbing and HVAC as well as a joint bid for the two types of work. The bid package indicated that the procedures to be used were subject to Section 318(f) of the Enabling Act, _72 P.S. §3919.318(f)_, which required the solicitation of a minimum of three written bids for all general contracted work in redevelopment assistance capital projects, and Senate Bill 572, **[*35]** which referenced Act 35, a Capital Budget Project Itemization Act for 1999-2000,[16] which provided the following:

> Section 22. Redevelopment assistance capital projects
> (a) Requirements for. —
>
> (1) *Notwithstanding any other law to the contrary, the requirements of section 318 of the...Capital Facilities Debt Enabling Act, shall provide the sole and exclusive requirements for bidding* for the construction or renovation of a redevelopment assistance capital project authorized in a capital budget in a capital budget itemization act on or before the effective date of this act.
> (b) Construction. — Nothing in this section shall be construed to override or abrogate any provision of the act of March 3, 1978 (P.L. 6, No. 3), known as the Steel Products Procurement Act.

Pleasant Hills Construction Company submitted a bid for the plumbing project only, but Limbach Company submitted a combined bid for the plumbing and HVAC contract and then a separate bid for the plumbing contract alone, essentially two, not three bids. The SEA awarded the combined plumbing/HVAC contract to Limbach Company. **[*36]** Pleasant

Hills filed a complaint alleging that the award to Limbach violated the Separations Act. On appeal to this Court, we held that the bidding requirements for the project were not limited to those set forth in the Enabling Act and that the SEA was obligated to comply with the bidding requirements in the Separations Act. We held that the word "bidding" in Section 22 referred only to the solicitation part of the bidding process, not to the entire public contracting process. "According to the court, to conclude otherwise would permit _Sections 318_ and 22 to repeal by implication the bidding requirements of the Separations Act...at least insofar as they applied to RACPs." *Id., 784 A.2d at 1280.*

On appeal to our Supreme Court, the issue was limited to whether the Enabling Act set forth the sole and exclusive requirements for bidding on RACPs and whether the SEA was required to comply with the bidding requirements in the Separations Act. Our Supreme Court reversed, finding that the words of _Section 318_ of the Enabling Act were clear and free from doubt. "The sole and exclusive bidding requirements on RACPs are those set forth in _Section 318_ of the CFDEA, i.e., solicitation of a minimum **[*37]** of three bids for general contract work and compliance with the Steel Products Procurement Act." It disagreed that the words "bids" mean the just the solicitation of bids, not the whole bidding process. "Interpreting 'bidding' to encompass the whole bidding process is also the only way to give meaning to Section 22's pointed retention of the Steel Products Procurement Act's applicability to RACPs....As noted above, Section 22(b) specifically states that '[n]othing in this section shall be construed to override or abrogate any provision of the ...Steel Products Procurement Act.' Importantly, the Steel Products Procurement Act applies to the procurement of steel, but contains no requirements regarding the solicitation of bids." *Id., 784 A.2d at 1281-1282.* It also was not concerned about the Separations Act being

---

[16] Act of June 25, 1999 (P.L. 237, No. 35).

repealed. "If, in fact, Section 22 'repeals' only pre-existing law relating to bid 'solicitation,' RACPs would be relieved from certain requirements of the Separations Act and not others....Thus, under that Act, in order to achieve the ultimate goal of awarding separate contracts for plumbing, heating, ventilating and electrical work, the General Assembly set forth specific directives **[*38]** regarding the solicitation of bids, i.e., how bid specifications shall be prepared and how bids shall be submitted. Accordingly, construing *Section 318* to provide the 'sole and exclusive' requirement for the 'solicitation of bids' would nullify certain necessary portions of the Separations Act, leaving the requirement that separate contracts be awarded, but providing no procedures pursuant to which that goal is to be accomplished. This result is obviously illogical and cannot be what the General Assembly intended." *Id., 784 A.2d at 1283-1284.*

Based on this reasoning, we find that Contractors' right to relief based on a violation of the Separations Act is not clear.


**E.**

Contractors then argue that Act 41 is unconstitutional pursuant to *Art. 3, §11 of the Pennsylvania Constitution* which provides:

> *§11* **Appropriation bills**
> The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

They contend that DGS bid this project pursuant to Act 41, which was a voluminous appropriations **[*39]** bill providing funding for dozens of projects, including the SCI-Graterford project, and it is clear that the

language of an appropriations act cannot change existing legislation. Contractors rely on *Uniontown Hospital v. Department of Health, 905 A.2d 560 (Pa. Cmwlth. 2006)*, where this Court held that to be constitutional, a provision in an appropriations bill must satisfy a three-part test: it must be germane to an appropriation; *it must not conflict with existing legislation*; and it must not extend beyond the life of the Appropriations Act. *Id. at 564.*

However, Contractors' argument is misplaced because *Art. 3, §11* does not apply to a capital budget itemization act like Act 41. What is now *Section 11* "was only intended to apply to the biennial appropriations made by the legislature out of the general revenues of the Commonwealth. *Commonwealth ex rel. Bell v. Powell, 249 Pa. 144, 94 A. 746, 749 (1915)*. The short title for Act 41 makes it clear that it is an act providing for the capital budget for the fiscal year 2007-2008.[17] It is not a general

---

[17] The short title for Act 41 is as follows:

An Act providing for the capital budget for the fiscal year 2007-2008; itemizing public improvement projects, furniture and equipment projects, transportation assistance projects, redevelopment assistance capital projects, flood control projects, Keystone Recreation, Park and Conservation Fund projects, Environmental Stewardship Fund projects, Motor License Fund projects, State forestry bridge projects, Pennsylvania Fish and Boat Commission projects, Manufacturing Fund projects, State ATV/Snowmobile Fund projects, State transportation enhancement funds projects and federally funded projects to be constructed or acquired or assisted by the Department of General Services, the Department of Community and Economic Development, the Department of Conservation and Natural Resources, the Department of Environmental Protection, the Pennsylvania Fish and Boat Commission and the Department of Transportation, together with their estimated financial costs; authorizing the incurring of debt without the approval of the electors for the purpose of financing the projects to be constructed, acquired or assisted by the Department of **[*41]** General Services, the Department of Community and Economic Development, the Department of Conservation and Natural Resources, the Department of Environmental Protection, the Pennsylvania Fish and Boat Commission

appropriation bill. Consequently, it does not need to meet the test set forth in *Uniontown Hospital* because a general appropriation bill **[*40]** was at issue in that case.

### III.

Contractors also cannot prove that greater injury would occur and the public would be harmed if we did not grant the injunction. The Keystone report explained:

> The project for which a PLA is under consideration consists of a 4,100 bed prison in Skippack Township, Montgomery County. The new prison will replace an existing prison which will remain in operation until the new facility is completed. Although the new prison is being built on the grounds of the existing facility the construction site will be separate from the existing prison. The new prison will include a medium and a maximum security unit which will share **[*42]** a common set of administrative and support buildings. A major component of the prototype design used to guide the design-build process includes the use of prefabricated concrete housing units which would be manufactured offsite and transported to Skippack Township.

It went on to state: "As of the end of 2008 the existing prison system was already 8% overcapacity and the Commonwealth expects the prison population to grow another 21% by 2012. The timely completion of this project is critical to meeting the state's prison capacity needs."

---

or the Department of Transportation; stating the estimated useful life of the projects; providing an exemption; providing for limitation on certain capital projects, for special provisions for certain redevelopment assistance capital projects and for preemption of local ordinances for Department of Corrections projects; making appropriations; and making a repeal.

Further, at the October 8, 2009 hearing on the injunction, Creedon, Secretary of DGS, testified that the construction of SCI-Graterford would be the construction of the largest prison ever in the Commonwealth. "It is the complete replacement of the Graterford facility as well as an addition of — I believe it's around a thousand beds; an additional capacity for the Department of Corrections in an area of the Commonwealth which has seen a high demand for inmate beds." (Notes of Testimony at 111-112.) He explained that as it currently existed, it was the most inefficient facility due to its layout because it was constructed in the early 1900s. "Clearly, there's **[*43]** the economic interests as well as the operational interests of the Department of Corrections of dealing with the Graterford issue." (Notes of Testimony at 113.) Creedon went on to state that there were numerous other construction projects in southeastern Pennsylvania, and there was a real concern over having sufficient trained labor available.[18]

Smeal, Deputy Secretary for the Central Region with the Pennsylvania Department of Corrections, testified that she had been with the Department for 23 years and was very familiar with the prison population in Pennsylvania. She stated that currently, the prison population was in an emergency situation meaning that it would optimally operate at a capacity of 42,000 inmates but had a maximum capacity of 47,000 inmates that it could comfortably house; however, it had 49,000 inmates in the system. Moreover, because of recent changes implemented by the Parole Board, the prison population by 2013 is expected to be 62,000 rather **[*44]** than the 50,500 originally forecast. The Department of Corrections was using

---

[18] He stated that there were construction projects at Temple, Penn and Drexel Universities in Philadelphia, the convention center project, the food distribution center, and that PennDot was spending $260 million on construction.

emergency housing to accommodate the inmates that were continuing to come into the system and they were soon approaching crisis numbers. This created safety and security concerns for both staff and inmates and impacted negatively on many aspects of prison life, including programming and parole. In fact, Smeal stated that the Department was looking to contract approximately 1,500 to 2,000 beds for prisoners to be housed in out-of-state facilities due to the housing problem at SCI-Graterford, but this would cause administrative problems on a grander scale. Smeal stated that the improvements to SCI-Graterford that were expected to be made were pretty significant because they would provide a net gain of 4,000 beds. However, the existing facility would not close until the new facility was opened.

Because crowded conditions at SCI-Graterford call for immediate attention in the reconstruction of that prison, the public would be harmed by granting the request for injunctive relief.

For the reasons set forth in this opinion, the Contractors' motion for injunctive relief is denied.

/s/ Dan Pellegrini

DAN PELLEGRINI, JUDGE


**ORDER**

AND **[*45]** NOW, this 1st day of December, 2009, the motion for injunctive relief filed by Glenn O. Hawbaker, Inc., et al, is denied.

/s/ Dan Pellegrini

DAN             PELLEGRINI,             JUDGE

2009 Pa. Commw. LEXIS 1755, *45

**Table1 (**_Return to related document text_**)**

| PLA (*Pickett*) | Luzerne PLA (*Sosson*) |
| --- | --- |
| Does not mandate the integration of local collective bargaining agreements | Mandates the integration of local collective bargaining agreements |
| Formula used where first craft employee could be one of contractor's core employees, the next 2 would be referred by union, 3-15 would alternate between contractor's employees and union hall, 15-35 referred by union hall with remaining alternating | All craft employees must hired maintain the union membership. Non-union employees must join the union and maintain union membership during the term of the PLA |
| Project had a hard deadline or risked losing state funding and anchor tenant | Deadline unknown |
| Project constructed by quasi-public agency which had limited restrictions in terms of bid process required to use | Project constructed by School District |
| Allows contractor to employ its own previously employed non-union personnel | Requires anyone to perform work to agree to be covered by PLA |
| Does not require contractor to sign any other agreement with a union as a condition of performing work | Contractors that are signatory to local collective bargaining agreements are bound by their terms |
| No worker under the PLA is required to join any union or pay any union fees or dues as a condition of employment | Workers must maintain union membership and pay dues |
| Bidding open to all non-union and union contractors | Bidding open to all non-union and union contractors |
| Contractor retains exclusive authority for | Contractor recognizes the union as sole and |

2009 Pa. Commw. LEXIS 1755, *45

| PLA (*Pickett*) | Luzerne PLA (*Sosson*) |
|---|---|
| control of workforce; no rules which limit productivity shall be permitted | exclusive bargaining rep of all craft employees within their respective jurisdiction on project |

**Table1 (***Return to related document text***)**

---

**Table2 (***Return to related document text***)**

| PLA (Pickett) | Shaler PLA SCI-Graterford |
|---|---|
| Does not mandate the integration of local collective bargaining agreements | Mandates the integration of local collective bargaining agreements |
| Formula used where first craft employee could be one of contractor's core employees, the next 2 would be referred by union, 3-15 would alternate between contractor's employees and union hall, 15-35 referred by union hall with remaining alternating | All craft employees required to join union hall and be hired through the local unions with the hiring hall rules |
| Project had a hard deadline or risked losing state funding and anchor tenant | In an attempt to get the earliest completion date, bidding contractor can suggest own completion date |
| Project constructed by quasi-public agency which had limited restrictions in terms of bid process required to use | Project is being constructed by agency of Commonwealth bound by restrictions of Procurement Code |
| Allows contractor to employ its own previously employed non-union personnel | Does not allow contractor to employ its own non-union personnel; all personnel must be hired through local unions |
| Does not require contractor to sign any other agreement with a union as a condition of performing work | All workers shall be bound by the terms of the local collective bargaining agreements |
| No worker under the PLA is required to join | Workers must maintain union membership and pay |

Joshua Bloom

2009 Pa. Commw. LEXIS 1755, *45

| PLA (Pickett) | Shaler PLA SCI-Graterford |
|---|---|
| any union or pay any union fees or dues as a condition of employment | dues |
| Bidding open to all non-union and union contractors | Bidding open to all non-union and union contractors |
| Contractor retains exclusive authority for control of workforce; no rules which limit productivity shall be permitted | Contractor recognizes the union as sole and exclusive bargaining rep of all craft employees within their respective jurisdiction on the project |

**Table2 (**_Return to related document text_**)**

**End of Document**

Joshua Bloom