**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Associated Builders & Contractors of Western Pennsylvania; Arrow Electric Inc.; Hampton Mechanical Inc.; Lawrence Plumbing LLC; R.A. Glancy & Sons Inc.; Westmoreland Electric Services LLC; Gregory H. Oliver Jr.; Daniel Vincent Glancy; Robert L. Casteel; Jason Phillip Boyd; Robert A. Glancy IV, | ) ) ) ) ) ) ) ) ) ) | Case No.:  2:20-cv-649 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Community College of Allegheny County; Quintin B. Bullock, in his official capacity as President of the Community College of Allegheny County; Pittsburgh Regional Building Trades Council, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

<u>**BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
PURSUANT TO RULES 12(b)(1) and 12(b)(6) BY DEFENDANTS COMMUNITY
COLLEGE OF ALLEGHENY COUNTY AND QUINTIN B. BULLOCK**</u>

Filed on behalf of Defendants Community College of Allegheny County and Quintin B. Bullock

Counsel of Record for these parties:
Eckert Seamans Cherin & Mellot, LLC
Firm no. 075
Christopher R. Opalinski, Esquire
(Pa. I.D. No. 35267)
F. Timothy Grieco, Esquire
(Pa. I.D. No. 81104)
Edward R. Noonan, Esquire
(Pa. I.D. No. 55792)
Sean J. Donoghue, Esquire
(Pa. I.D. No. 321357)
44th Floor, 600 Grant Street
Pittsburgh, PA 15219
(412) 566-6000
Fax: (412) 566-6099

## I.     STATEMENT OF FACTS

Plaintiffs' Amended Complaint only consists of citations to case law and select statutes, excerpts from and Plaintiffs' own characterizations of a project labor agreement between the Community College of Allegheny County ("College") and the Pittsburgh Regional Building Trades Council ("Building Trades") (attached to the Amended Complaint as Exhibit 1 (Doc. 33-1) (hereinafter, the "PLA")), descriptions of the parties, and conclusory arguments that the PLA is unlawful. (Am. Compl. ¶¶ 1-75). In other words, beyond citing excerpts from the PLA and setting forth allegations attempting to describe the parties, Plaintiffs make no factual allegations. Plaintiffs do not allege, for instance, that any of them even attempted to bid on a project subject to the PLA (let alone that they bid and were denied). In fact, Plaintiffs do not so much as describe a project for which the PLA is or will be used. Nor do they identify any actual expenditures in connection with any use of the PLA. And, while they claim the PLA will violate Pennsylvania's public bidding requirement to award jobs to the "lowest responsible bidder" (Am. Compl. ¶¶ 41, 64), they have not identified even one occasion in which that has happened. Plaintiffs simply ask the Court to rule on the validity of the PLA, in the abstract, claiming standing solely by virtue of their status as non-union contractors (and for Plaintiff ABC, defined infra, an organization with such non-union contractors), non-union employees, and state and county taxpayers. (Am. Compl. ¶¶ 31-41).

The PLA was entered into over nine years ago between the College and Building Trades, on February 15, 2011. (Doc. 33-1).  The College entered into the PLA, as set forth expressly therein, to ensure quality, efficiency, and timely and on-budget completion of work, by, among other things, avoiding work stoppages and strikes and ensuring a quality source of labor. (Doc. 33-1, Art. II, Sec. 2 and Art. III, Sec. 1). The PLA thus requires that contactors performing construction work for the College agree to the terms of the PLA before performing work. (Doc. 33-1, Art. I, Sec. 1). But this does not mean that the PLA excludes contractors who do not have a

pre-existing relationship with a Building Trades-affiliated union. Instead, work is open to all bidding contractors, whether union or non-union, as the PLA expressly states:

> **Section 2.      Limitation of Agreement to Project.**
> The Unions agree that this Agreement will be made available to, and will fully apply to, any successful bidder for work on the Project, without regard to whether that successful bidder performs work at other sites on either a union or non-union basis, and without regard to whether employees of such bidder are or are not members of any union.  The Unions further agree that this Agreement only applies to this Project, and that by signing this Agreement or Letter of Assent hereto, a Contractor, not previously in signed agreement with the Unions does not recognize the Unions as the bargaining representative of any of its employees or employees at any other project, site or location.  It is the intent of this Agreement that the Contractors who sign it will create a relationship with the Unions governed by the provisions of Section 8(f) of the Labor Management Relations Act, 29 U.S.C. §158(f).

(Doc 33-1, Art. I, Sec. 2).  A contractor who works on a particular project must recognize the unions as the exclusive bargaining representatives of its craft employees (but only for that particular project) pursuant to Section 8(f) of the Labor Management Relations Act, 29 U.S.C. § 158(f). (Doc. 33-1, Art VI, Sec. 1).

While the PLA requires that all contractors - - whether affiliated with a Building Trades union or not - - use a local union referral system (described below), the PLA, to accommodate contractors that do not have a pre-existing relationship with a Building Trades union, gives all contractors the exclusive right to select their craft foreman and/or general foreman, permits contractors without such a preexisting relationship to employ a certain number of "core employees" on the project who are not referred by the union referral system, and gives all contractors the right to reject any union referral for any reason.  (Doc. 33-1, Art. VI, Secs. 3, 9, and 10).

The employee referral system contemplated by the PLA requires signatory local unions to operate the referral systems in full compliance with federal and state laws, without union membership obligation or requirements:

> **Section 3.    Union Referral.** For Local Unions having a job referral system, each Contractor agrees to comply with such system, and the referral system shall be used exclusively by such Contractor, except as modified by this Article.  Such job referral system will be operated in a non-discriminatory manner and in full compliance with Federal, State, and Local laws and regulations requiring equal employment opportunities and non-discrimination, and referrals shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements. . .

(Doc. 33-1, Art. VI, Sec. 3).

Importantly the PLA does not just prohibit union membership considerations in employee referrals but expressly provides that any individual referred and hired pursuant to the PLA is <u>not</u> required to join a union, pay dues, or agency fees as a condition of employment:

> **Section 8.    Non-Discrimination.** No employee covered by this Agreement shall be required to join any Union or pay any agency fees or dues as a condition of being employed, or remaining employed on the Project. . . .

(Doc. 33-1, Art. VI, Sec. 8).  Thus, the PLA does not require any contractor employee to provide any financial support to a labor organization. While the PLA requires contractors, as a general matter, to pay into certain joint employer-union benefit plans on behalf of all employees, this requirement does not apply with respect to a non-union contractor's "core employees." (Doc. 33-1, Art. VI, Sec. 9 and Art. XI, Sec. 2).

Plaintiffs include Arrow Electric Inc., Hampton Mechanical Inc., Lawrence Plumbing LLC, R.A. Glancy & Sons Inc., Westmoreland Electric Services LLC (collectively, "<u>Plaintiff-Contractors</u>") (<u>see</u> Am. Compl. ¶ ¶ 5-9); Gregory H. Oliver (an employee of Hampton Mechanical Inc.), Daniel Vincent Glancy (an employee of Glancy & Sons Inc.), and Robert L. Casteel (an employee of Glancy and Sons Inc.) (collectively, "<u>Plaintiff-Employees</u>") (<u>see</u> Am.

Compl. ¶¶ 10-12); Associated Builders of Western Pennsylvania ("ABC"), a membership organization of contractors, which includes all of Plaintiff-Contractors (Am. Compl. ¶¶ 4-9); and, lastly, Jason Phillip Boyd and Robert A. Glancy IV (as taxpayers of Pennsylvania and Allegheny County) (collectively, "Plaintiff Taxpayers") (see Am. Compl. ¶¶ 13-14).

Plaintiffs assert four claims for relief, alleging that the terms of the PLA violate (1) the First and Fourteenth Amendments (Am. Compl. ¶¶ 42-48 (entitled "Claim for Relief No. 1")), (2) the National Labors Relations Act (Am. Compl. ¶¶ 49-57 (entitled "Claim for Relief No. 2")), (3) "the antitrust laws" (Am. Compl. ¶¶ 58-63) (entitled "Claim for Relief No. 3"), and lastly, (4) "state competitive bidding laws" (Am. Compl. ¶¶ 64-74) (entitled "Claim for Relief No. 4")).

## II.   ARGUMENT

### A.   Rule 12(b)(1) Dismissal For Lack Of Standing and Ripeness

#### 1.   Plaintiffs Lack Article III Standing.

As set forth below, neither Plaintiff-Contractors, Plaintiff-Employees, ABC, nor Plaintiff-Taxpayers has alleged an injury sufficient to invoke Article III standing.

##### a.   Plaintiff-Contractors and Plaintiff-Employees Lack Standing.

A plaintiff must prove three elements to establish Article III standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and alterations omitted).

Here, Plaintiff-Contractors and Plaintiff-Employees cannot satisfy the threshold Article III standing inquiry: injury-in-fact. This is not a case where the Plaintiff-Contractors have submitted

a bid but were denied. Nor is this a case where the terms of the PLA ban participation in the bidding process by Plaintiff-Contractors or their employees (which include the Plaintiff-Employees). To the contrary, this is a case where the Plaintiff-Contractors have not so much as described a project to which the PLA applies, let alone allege that they have attempted to bid on such a project. Thus, any purported injury the Plaintiff-Contractors and their employees contend to have suffered is merely hypothetical, and there is no basis upon which to infer that they have or will suffer an individual, particularized injury.

Analogous cases in the public bidding context confirm this point. There is a line of cases from the early 1990s that addressed a contractor's standing to challenge bidding requirements on public jobs that called for a certain percentage of minority participation. In one such case, a district court within the Third Circuit held that contractors who either attempted to meet the minority bidding requirements but failed or actually bid and were rejected satisfied the Article III injury in fact requirement, while those that merely submitted requests for bids but failed to actually submit a bid did not. Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia, 735 F.Supp. 1274, 1283-1284 (E.D. Pa. 1990), aff'd in pertinent part, vacated and remanded on other grounds, 945 F.2d 1260, 1268 (3d Cir. 1991). Likewise, in Hunt Paving Co., Inc. v. City of Indianapolis, another district court held that a contactor did not have standing to challenge an affirmative action program - - even though it had bid the subject project and been denied - - because the denial was not based on the contractor's failure to comply with the challenged affirmative action program but, rather, another, unrelated bidding requirement. 800 F. Supp. 740, 749 (S.D. Ind. 1992). In reaching this conclusion, the court surveyed similar cases, finding that "[o]ther decisions considering the issue of standing in this context have required that the plaintiff (1) actually bid for a contract subject to a rigid percentage set-aside requirement, or (2) bid for and lose a contract because of a substantive

provision of the affirmative action program." Id. (collecting cases). As the court noted, the prevailing rationale in such cases was that, to have standing to challenge the bidding requirements, the "party must demonstrate actual injury from an actual application of the substantive portions of law [i.e., the challenged bidding requirement]." Id. at 748. The mere existence of the challenged bidding requirement, in itself, was insufficient to confer Article III standing. Id.

The rationale from these cases applies with equal force here. Having not so much as bid on a project subject to the PLA, Plaintiff-Contractors and their employees, like the Plaintiff-Employees, have not and cannot allege that the terms of the PLA were applied to their detriment. Thus, these Plaintiffs simply have not - - and cannot - - allege injury-in-fact.

Nor can Plaintiff-Contractors or Plaintiff-Employees demonstrate that any purported injury is "fairly traceable to defendant's challenged conduct." Nothing on the face of the PLA precludes the Plaintiff-Contractors from bidding for or ultimately performing any work,[1] nor does the PLA bar the use of non-union employees. Thus, any "injury" suffered by Plaintiff-Contractors or the Plaintiff-Employees is traceable to the Plaintiff-Contractors' choice not to bid a project subject to the PLA.

Having failed to satisfy Article III's standing requirements, Plaintiff-Contractors and Plaintiff-Employees' claims fall outside of this Honorable Court's jurisdiction.

**b.    ABC Lacks Standing Because Its Members Lack Standing.**

The viability of associational standing hinges on whether the organization is associated with individual members which have "standing in their own right" under Article III. Curto v. A Country Place Condo. Ass'n, Inc., 921 F.3d 405, 410 n.2 (3d Cir. 2019). The only members of

---

1.    To the contrary, that PLA plainly states that it is "available to . . . any successful bidder for work on the project, without regard to whether that successful bidder performs work at other sites on either a union or non-union basis, and without regard to whether employees of such bidder are or are not members of any union." (Doc. 33-1, Art. 1, Sec. 2).

ABC that Plaintiffs have identified in the Amended Complaint are Plaintiff-Contractors, which, as set forth above, do not have standing in their own right to pursue the claims asserted herein. Because ABC has failed to allege the identity of a member with standing in its own right, ABC has failed to establish it has associational standing under Article III.

### c.   Plaintiff-Taxpayers Lack Standing.

Plaintiff-Taxpayers, who claim standing by virtue of paying "county and state" taxes, likewise cannot establish Article III standing. An individual's capacity as a "state" taxpayer is insufficient, as a matter of law, to confer Article III standing. Nichols v. City of Rehoboth Beach, 836 F.3d 275, 280 (3d Cir. 2016) ("Federal and state taxpayers cannot show Article III standing based on their status as taxpayers 'because the alleged injury is not concrete and particularized, but instead a grievance the taxpayer suffers in some indefinite way in common with people generally.'" (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 346 (2006)). As to whether the Plaintiff-Taxpayers' alleged status as "county" taxpayers, confers Article III standing, they must, at the very least, set forth allegations supporting the plausible inference "that more than a de minimis amount of tax revenue has been expended on the challenged practice itself." Id. at 281. Plaintiffs have failed to do so, and their conclusory assertion that the PLA will result an expenditure of "more than a de minimis amount of tax revenue" (see Am. Compl. ¶ 41) is the exact type of "naked assertion devoid of further factual enhancement" that is insufficient to defeat a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). Plaintiff-Taxpayers vague assertion that they will suffer injury "by the College awarding projects to someone other than the lowest responsible bidder" (Am. Compl. ¶ 41) provides no further support, as, tellingly, Plaintiffs fail to identify or describe one such instance in which this has happened (or will happen).

### 2.   Plaintiffs' Claims Are Not Ripe.

Because Plaintiffs have failed to so much as identify a project subject to the PLA for which they have attempted to submit a bid, Plaintiffs have left this Court to speculate as to contingent events - - like the submission of a bid by Plaintiff-Contractors on a project covered by the PLA - - that may or may not happen, and their claims are therefore unripe and must be dismissed accordingly. Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985) (under the ripeness doctrine, federal courts "will not decide a case where the claim involves contingent future events that may not occur as anticipated, or indeed may not occur at all."); see also Peachlum v. City of York, 333 F.3d 429, 433-34 (3d Cir. 2003) (quoting Babbit v. United Farm Workers National Union, 442, U.S. 289, 298 (1979)).

### B.      Rule 12(b)(6) Dismissal Of Claim For Relief No. 1

The gist of Plaintiffs First Amendment and Fourteenth Amendment claim is that, by imposing a union-hall hiring requirement on contractors awarded bids subject to the PLA, the PLA forces employees of non-union contractors to relinquish their supposed First Amendment rights to refrain from joining or financially supporting a union as a condition of employment, in purported violation of the Supreme Court's holding in Janus v. Am. Fedn. of State, County, and Mun. Employees, Council 31, 138 S. Ct. 2448 (2018). This theory must fail, as a matter of law, for several reasons.

First, this theory of relief is based on Plaintiffs' assertion that local unions involved in the job-referral system (i.e., the union-hall hiring component of the PLA) will "not refer non-members through their hiring halls." (Am. Compl. 29). Plaintiffs, however, do not so much as cite one instance in which such discrimination has occurred, nor do they otherwise set forth facts permitting the inference that it will occur. Such a "naked assertion, devoid of further factual enhancement" is plainly insufficient to defeat a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Second, Plaintiffs' assertions that the PLA forces contractor-employees to join a union, pay union fees, and that the unions will not refer non-members through their hiring halls are completely contradicted by the plain terms of the PLA. The PLA expressly states that no employee subject to the PLA "shall be required to join any Union or pay agency fees or dues as a condition of being employed," and, further, that the job referral system will be operated in a "non-discriminatory manner," with referrals unaffected by "obligations of union membership." (Doc. 33-1, Art. VI, Sec. 3; Art. VI, Sec. 8). Plaintiffs' unsupported assertions to the contrary cannot be credited in the face of these clear commitments. As the Supreme Court held long ago, "discrimination cannot be inferred from the face of the instrument when the instrument specifically provides there will be no discrimination . . . because of the presence or absence of union membership." Teamsters Local 357 v. NLRB, 365 U.S. 667, 675 (1961) (enforcing hiring hall provision in collective bargaining agreement that stated referrals would be made "irrespective of whether such employee is or is not a member of the Union.").

Third, Plaintiffs' assertion that the PLA implicates First Amendment rights rests on a misapplication of the Supreme Court's decision in Janus. In Janus, the Court held that a state cannot require its "public-employees" to pay agency fees to public unions because doing so violated "the free speech rights of nonmembers by compelling them to subsidize private speech on matters of public concern." Janus, 138 S. Ct. at 2460. The Court specifically grounded its decision in the distinction between the public and private sectors, reasoning that collective bargaining in the public sector, unlike collective bargaining in the private sector, is an inherently political process because it involves matters like public spending on wages and other public employee benefits. Id. at 2480. The Court also took issue with the fact that it was the public employer (i.e., the state) who was extracting the fees. Id. at 2465 (framing discussion of the constitutional standard

9

of review as "whether a government employer could reasonably believe that the exaction of agency fees serves its interests.").[2]

Janus is clearly distinguishable from the present case. First, it is clear that the holding in Janus applies only to public sector employees, not private sector employees. Plaintiffs, however, do not (and, in fact, cannot) allege that the College is or would be the employer of the Plaintiff-Contractors' employees or otherwise allege or explain how the employees of the Plaintiff-Contractors are somehow public-sector employees. To the contrary, the Complaint concedes that the employees work for private, not public, employers.[3] Second, Janus dealt with an express mandate that required employees (public employees) to pay union fees. In contrast, the PLA in the present case does not compel any employees to pay union fees, and, quite to the contrary, actually states at Section 8 of Article VI (see Doc 1-2) that no project employee is required to join the union or pay anything to it.[4] The Janus decision, upon which Plaintiffs' alleged claim for violation of the First Amendment rests, does not apply.

_____

2.      Critically, the Court specifically declined to extend its holding to the private-sector and actually expressed skepticism that it would apply in that context due to concerns over insufficient governmental action, a necessary ingredient to any alleged First Amendment violation. Id. at 2479 n.24 ("No First Amendment issue could have properly arisen in those cases unless Congress's enactment of a provision allowing, but not requiring, private parties to enter into union-shop arrangements was sufficient to establish governmental action. That proposition was debatable when Abood was decided, and is even more questionable today.").

3.      This distinction is important for another reason. Specifically, any issue that private employees subjected to the PLA could have with the agreement is traceable to their employer's decision to bid on a public job subject to a project labor agreement, as nothing requires its private employer to bid on such a job. See Boston Harbor, 507 U.S. at 231 (when a public project uses a project labor agreement, "those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA.]").

4.      It bears noting that even if the PLA did require the employees of a contractor awarded the bid to pay fees (which it does not), this type of arrangement would be expressly permitted by the NLRA. Any contractor that becomes a party to the PLA - - which would not occur but for its completely voluntary decision to bid on a College project in the first place - - is

### C.     Rule 12(b)(6) Dismissal of Claim For Relief No. 2 (NLRA Claim)

Claim for Relief No. 2 alleges that the use of the PLA violates Section 8(a) of the NLRA. This claim is baseless and must be dismissed as a matter of law.

First, the College is not subject to NLRA Section 8(a)[5] because public entities such as the College are expressly excluded from coverage under the NLRA and, therefore, cannot violate it. See 29 U.S.C. § 152(2) (expressly excluding "any State or political subdivision thereof" from NLRA's definition of "employer"); see also Bldg. & Constr. Trades Council v. Associated Builders & Contrs. , 507 U.S. 218 (1993) at 231 ("Boston Harbor") (a government cannot violate Section 8(e) the NLRA because it is not an employer under the NLRA).[6]

Second, the Supreme Court has held that where, as here, a government entity acts as a market participant (as opposed to a regulator), it has the right to require its construction contractors to abide by a project labor agreement, even those which (more restrictive than the PLA at issue here) have union security clauses.  Boston Harbor, 507 U.S. at 221-222. As the Court reasoned, since a private-developer is permitted to use a pre-hire agreement on privately funded construction

---

still a private employer, and, in the private sector, the NLRA permits private employers, like the Plaintiff-Contractors, and unions to agree to require employees to pay dues and/or representational costs as a condition of employment, provided the representational costs are whittled to their financial core and are germane to collective bargaining administration and negotiation. Communication Workers v. Beck, 487 U.S. 735, 740, 763-64 (1988); see also Marquez v. Screen Actors Guild, 525 U.S. 33, 36 (1998). Plaintiffs' First Amendment theory would, if credited, undermine and effectively overrule this longstanding interpretation of the NLRA.

5.     The Section 7 rights purportedly infringed in this case (see Am. Compl. ¶¶ 48-50) are enforced through Section 8(a) of the NLRA.

6.     To the extent that the Complaint could be read to allege that the Community College is a private entity, Claim for Relief No. 2 must be dismissed because the National Labor Relations Board has exclusive and primary jurisdiction to resolve claims of violations of Sections 7 and 8 of the NLRA. San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959).

projects, a public entity should also have the right to do the same when it acts as a market participant. Id. at 231-232.

The Third Circuit follows a two-part test to determine whether a government entity acts as a "market participant" in this context: (1) whether the challenged condition serves to advance or preserve the public entity's proprietary interest in a project or a transaction, or as in investor, owner, or financier; and (2) whether the scope of the condition is specifically tailored to the proprietary interest. Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, LLC, 390 F.3d 206, 215-216 (3d Cir. 2004).

Here, the College easily satisfies this test. The PLA only applies when the College is the owner of a construction project (satisfying element one), and applies only and strictly for the purpose of streamlining the construction work, ensuring efficiency and quality, and avoiding delays (satisfying element two). Because the College is using the PLA as a market participant - - not a regulator - - its use of the PLA is authorized under Boston Harbor.

This conclusion finds overwhelming support in post-Boston Harbor jurisprudence, as federal courts applying this test have routinely found that when a public entity uses a project labor agreement for construction projects, it is acting as a "market participant" and, thus, that the use of a project labor agreement does not interfere with the rights guaranteed by the NLRA. See, e.g., Johnson v. Racho Santiago Community College District, 623 F.3d 1011 (9th Cir. 2010) (public school PLA for all construction projects costing over $200,000 lawful); Building Industry Electrical Contractors Association v. City of New York, 678 F.3d 184 (2d Cir. 2012) (New York City's use of PLAs on construction projects lawful); see also Associated Builders & Contrs. of W. Pa. v. Cty. of Westmoreland, 2020 WL 571691 (Jan. 21, 2020 W.D.Pa.) (report and recommendation) (Westmoreland County acted as a market participant when it entered into

and enforced a project labor agreement with the defendant herein, the Building Trades), <u>report and recommendation adopted by</u> <u>Associated Builders & Contrs. of W. Pa. v. Cty. of Westmoreland</u>, 2020 WL 571031 (Feb. 5, 2020 W.D.Pa.).

Consistent therewith, the Court of Common Pleas of Allegheny County has already found that the College was acting a market participant rather than a regulator when it entered into and enforced a project labor agreement that is virtually identical to the PLA in this case. <u>See</u> <u>R.A. Glancy & Sons v. Community College of Allegheny County</u>, GD-10-014783 (C.C.P. Allegheny Cnty.) (Opinion dated April 29, 2011) (citing <u>Boston Harbor</u>).[7] The case should be no different this time around.

### D.    Rule 12(b)(6) Dismissal Of Claim For Relief No. 3

Plaintiffs' Amended Complaint includes a cryptic, six-paragraph "Claim for Relief No. 3," alleging, without explanation, that the PLA "restrains competition in violation of the antitrust laws."  (Am. Compl. at 14). Citing as examples, but not even quoting, Sections 1 and 2 of the Sherman Act (<u>id.</u> ¶58 ("<u>See</u>, <u>e.g.</u>, 15 U.S.C. §§1-2")), Plaintiffs allege only that the PLA "restrains competition by disqualifying contractors and subcontractors from working on the college's construction projects . . . ." (Am. Compl. ¶¶ 59-60). For several reasons, Plaintiffs' claim must fail.

#### 1.    Plaintiffs Fail To Plead Any Antitrust Cause of Action

First, the core allegation upon which Plaintiffs' purported antitrust claim is based - - that the PLA "disqualifies contractors and subcontractors from working on the college's construction projects . . ." is contradicted by the plain terms of the PLA, which allows bidding on College

---

7.    A true and correct copy of this opinion is attached hereto as Exhibit A.

projects by union and non-union affiliated contractors alike.[8] And, in any event, this allegation is nothing more than a "naked assertion devoid of further factual enhancement" that is plainly insufficient to defeat a motion to dismiss. Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Plaintiffs have not, for instance, alleged that any of them has attempted to bid on a College project, let alone bid on a project but was rejected. Thus, there is no factual allegation to support the assertion - - one which is contradicted by the terms of the PLA in any event - - that underlies Plaintiffs' purported antitrust claim.

Second, Plaintiffs otherwise fail to allege any facts supporting a cause of action under the Sherman Act. Sherman Act Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. §1. The Supreme Court, however, long ago recognized that "every contract is a restraint of trade," but only contracts that are "unreasonable restraints of trade" are unlawful. See, e.g., NCAA v. Board of Regents, 468 U.S. 85, 98 (1984). Thus, under Section 1, "the plaintiff must show concerted action, antitrust injury, evidence that the conspiracy produced 'adverse, anti-competitive effects within the relevant product and geographic markets,' and evidence 'that the objects of and the conduct pursuant to the conspiracy were illegal.' . . . The plaintiff may satisfy its burden by showing either actual anti-competitive effects or proof of the defendant's market power . . . defined as the ability to raise prices above those that would exist in a competitive market." Race Tires America, Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 74 (3d Cir. 2010) (quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003)).

---

8.     See, e.g., Am. Compl., Ex. 1 (Doc. 33-1), Art. I, Sec. 2 (The PLA is "made available to, and will fully apply to, any successful bidder for work on the Project without regard to whether that successful bidder performs work at other sites on either a union or a non-union basis, and without regard to whether employees of such bidder are or are not members of any union.").

Plaintiffs' "claim for relief" includes none of these elements, with the possible exception of alleging the mere existence of an agreement, the PLA. The Amended Complaint does not explain how the PLA constitutes an anticompetitive or otherwise unlawful agreement, nor does it include allegations purporting to define a relevant product or service and geographic market or explain how there are anticompetitive effects within any such market. These deficiencies are inexcusable but understandable. Plaintiffs' claims exist in a pure vacuum: For example, Plaintiffs allege no specific project that is or ever has been subject to the PLA; they allege a supposed violation by a single potential construction project owner, the College; and they allege no facts that could even suggest that the PLA harms competition in any identifiable market. In toto, nothing in the Amended Complaint approaches pleading a Section 1 claim.

Plaintiffs likewise fail to allege any facts supporting a cause of action under Sherman Act Section 2. It is a violation of Section 2 to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of . . . trade or commerce . . . ." 15 U.S.C. §2. Monopolization requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). Conspiracy to monopolize requires an agreement between two or more parties to monopolize a relevant market, an overt act in furtherance of the conspiracy, specific intent to monopolize, and a causal connection between the conspiracy and the alleged injury. See, e.g., Howard Hess Dental Laboratories, Inc. v. Dentsply

Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010). These causes of action require inquiry into, *inter alia,* a relevant product or service and geographic market and the defendant's market power and unlawful, exclusionary conduct in that market. Hoosier Racing, 614 F.3d at 75.

Plaintiffs allege no facts that could support any of these elements. For instance, there are no allegations that the College (or any Defendant) has -- or has a dangerous probability of achieving or the specific intent to acquire -- monopoly power in any relevant market; that such alleged monopoly power was willfully achieved or maintained; or that any kind of predatory conduct or overt act has occurred, that has been recognized to support a Section 2 violation.

Not only have Plaintiffs failed to plead facts supporting a Section 1 or 2 claim against the College, but any such claim would make no sense. Any anticompetitive conduct in a construction-related market would be inimical to the College's interests as a buyer in such a market, as the College would be forced by such a restraint to pay higher prices than it would pay in a competitive market.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 593 (1986) (claim is implausible "if the claim is one that simply makes no economic sense"; "courts should not permit factfinders to infer conspiracies when such inferences are implausible"). In reality, Plaintiffs' antitrust "claim for relief" is nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. See also Twombly v. Bell Atl. Corp., 550 U.S. 544, 555-558 (2007) (emphasizing importance of pleading requirements in antitrust cases). Because Plaintiffs fail to plead any facts in support of a claim under Section 1 or 2 of the Sherman Act, their purported Claim for Relief No. 3 must be dismissed. See, e.g., Howard Hess Dental Laboratories, 602 F.3d at 253-58 (Sections 1 and 2 claims properly dismissed for failure to state a claim because plaintiffs did not "allege facts plausibly suggesting" an unlawful agreement or requisite specific intent; "It is an axiom of antitrust law . . . that merely saying so does not make

it so for pleading-sufficiency purposes."); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436-42 (3d Cir. 1997) (Rule 12(b)(6) motion properly granted dismissing Section 2 clams for failure to plead "a valid relevant market"; "Plaintiffs have the burden of defining the relevant market.").

**2.      Plaintiffs Fail To Plead Antitrust Injury And Antitrust Standing.**

In addition to Plaintiffs' complete failure to allege any facts plausibly suggesting any violation of Sherman Act Sections 1 or 2, they likewise ignore two other prerequisites for pleading a viable antitrust claim. First, Plaintiffs do not allege antitrust injury.  Since Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), a plaintiff in an antitrust case "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  Id. at 489 (emphasis in original).  See also Philadelphia Taxi Ass'n, Inc. v. Uber Technologies, Inc., 886 F.3d 332, 344 (3d Cir. 2018) ("harm to Appellants' business does not equal harm to competition"). Here, no such antitrust injury has been alleged. Not only have Plaintiffs pleaded no specific violation of any antitrust statute, but they also have not alleged any facts to show that any harm suffered by any Plaintiff is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. at 343 (quoting Brunswick, 429 U.S. at 489).  For this reason, Plaintiffs' antitrust claim should be dismissed.

Second, antitrust injury is part of a separate, and broader, antitrust standing prerequisite to plead and prove an antitrust claim. See, e.g., Ethypharm S.A. Fr. v. Abbott Laboratories, 707 F.3d 223, 232 (3d Cir. 2013). In Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 529-546 (1983), the Supreme Court identified the factors to be considered when deciding whether a plaintiff has satisfied the antitrust standing requirement:

17

"(1) The causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages."

Ethypharm, 707 F.3d at 232-33 (quoting In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144, 1165-66 (3d Cir. 1993)). Most of these standing requirements apply when, as in this case, a plaintiff seeks injunctive relief. See, e.g., Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 321-22 (3d Cir. 2007) ("[h]ypothetical anticompetitive conduct, speculative monopoly power, and remote injuries do not merit" equitable remedies); City of Pittsburgh v. West Penn Power Corp., 147 F.3d 256, 269 (3d Cir. 1998) (injunctive relief not proper without "a significant threat of injury from an impending antitrust violation"); Lucas v. Bechtel Corp., 800 F.2d 839, 846-47 (9th Cir. 1986) (even if plaintiffs claimed injury from challenged labor agreements "was proximately caused by the alleged antitrust violation, we must still be able to find that their injury is cognizable in equity.  This we are unable to do.").[9]

In this case, Plaintiffs' nondescript "antitrust" claim, entirely untethered to any facts, cannot satisfy the antitrust standing requirement. No direct connection between any alleged antitrust violation and any Plaintiff is pleaded with respect to the entirely hypothetical -- indeed, imaginary -- claims of each group of Plaintiffs.  As already shown, Plaintiffs have not alleged, and cannot allege, antitrust injury, and any alleged injury would be entirely speculative, extremely remote and indirect in any event. Such an "antitrust"

---

9.     Antitrust standing is separate and distinct from Article III standing, discussed in Section II(A)(1), supra.

claim should be dismissed at the outset for this reason.  See Ethypharm, 707 F.3d at 232

(lack of antitrust standing "prevents a plaintiff from recovering under the antitrust laws").[10]

### E.   Rule 12(b)(6) And 12(b)(1) Dismissal Of Claim For Relief No. 4
#### 1.   Rule 12(b)(6) Dismissal Of Claim For Relief No. 4
##### a.   Lack Of Ordinary Standing Under State Law

To establish standing to sue under Pennsylvania's competitive bidding laws, a plaintiff

must meet the requirements for taxpayer standing under Pennsylvania law.[11] Conti Enterprises,

Inc. v. S.E. Pennsylvania Transp. Auth., 2003 WL 22594327, at *3 (E.D. Pa. Oct. 14, 2003). This

does not simply mean that a plaintiff must show s/he pays state taxes, but, instead, that a plaintiff

must show s/he is a taxpayer who also has a "substantial, direct, and immediate interest" in the

subject of the litigation. Id. at *4 (citing Nunemacher v. Borough of Middletown, 759 A.2d 57, 61

(Pa. Commw. Ct. 2000); In re Biester, 409 A.2d 848, 851 (Pa. 1979)). This is because "the

---

10.     Plaintiffs incorrectly allege without explanation that "[t]he labor exemption to the federal antitrust laws is inapplicable to the [PLA]" (Am. Compl. ¶61). To the contrary, the nonstatutory labor exemption would bar any conceivable antitrust claim Plaintiffs might allege in this case. The College therefore adopts and incorporates by this reference Argument Section 3.c. in the brief of Defendant Pittsburgh Regional Building Trades Council in support of its motion to dismiss the Amended Complaint. In addition, the alleged "nonlabor party" in this instance, the College, is a public institution of higher education established pursuant to Pennsylvania statute. See Pennsylvania Community College Act or 1963, 24 P.S. §§19-1901A, et seq. Thus, there is no allegation -- nor could there be -- that the College competes "in a business market" with regard to that exemption. (See Am. Compl. ¶ 61). Because of Plaintiffs' failure to allege any Sherman Act violation, it is impossible to discern what other grounds for dismissal of Claim for Relief No. 3 otherwise might exist. The College notes, however, that any such claim likely would be subject to state action immunity because of the College's status as a public institution of higher education. See, e.g., Edinboro College Park Apts. v. Edinboro Univ. Found., 850 F.3d 567, 579-81 (3d Cir. 2017) (university's on-campus residency requirement protected under state action doctrine as foreseeable result of state authorization to provide student living facilities).

11.     Standing to pursue a claim under state law, on the one hand, and Article III standing, on the other (addressed above), are separate inquiries. See Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1175-1176, 1178 (3d Cir 1997) (distinguishing between a disappointed bidder's Article III standing and a low bidder's right to relief under Pennsylvania's competitive bidding statutes).

prevention of waste of tax revenue alone has been correctly held to be an interest which is too remote, since [the taxpayer] is not directly or specifically affected by the loss . . . That interest is merely the same interest all citizens have in having others comply with the law or the constitution." Id. (citing Nunemacher, 759 A.2d at 61; Biester, 409 A.2d at 851).

In the present case, ABC, Plaintiff-Contractors, and Plaintiff-Employees have no standing to pursue the purported violations of Pennsylvania's competitive bidding laws simply by virtue of the fact that they are not alleged to be taxpayers. And while Plaintiff-Taxpayers allege to have paid taxes to Pennsylvania and Allegheny County, they must suffer the same fate, because Plaintiff-Taxpayers, having failed to so much as alleged to have submitted a bid on a project subject to the PLA, cannot establish the requisite "substantial, direct, and immediate interest" in this litigation to satisfy the taxpayer standing inquiry.

The case law lends overwhelming support for this position. Specifically, Pennsylvania courts have held that taxpayers who have actually bid on - - but were not awarded public projects for failure to conform to bid specifications - - did not establish the requisite nexus between themselves and the funds being spent for purposes of establishing taxpayer standing under Pennsylvania law. See, e.g., C.O. Falter Constr. Corp. v. Towanda Mun. Auth., 614 A.2d 328, 329-330 (Pa. Commw. 1992) (disappointed taxpayer who bid on but was not awarded project for failure to conform to bid requirements "lack[ed] direct, immediate and substantial interest and the causal connection necessary to provide standing."); Conti Enters. v. SEPTA, 2003 WL 22594327 at *3, *4 (E.D. Pa. Oct. 14, 2003) (accord) (explaining that disappointed taxpayer-bidder's "interest in this case is, however, no different from that of all other taxpayers in having SEPTA minimize its expenditures by selecting the lowest bidder.").

Here, because Plaintiff-Taxpayers have failed to so much as allege to have submitted a bid on a project that is subject to the PLA, their relationship to the disposition of any funds relative to the PLA (funds which they fail to identify in the first place) is even further removed from those taxpayer-plaintiffs in Towanda and Conti, supra, who actually bid on the projects but nevertheless were deemed to lack standing to assert a challenge under Pennsylvania's competitive bidding laws. Thus, it stands to reason that Plaintiff-Taxpayers lack the sufficient nexus to the funds at issue to establish taxpayer standing under Pennsylvania law.

In that same breath, the requisite nexus is lacking for another reason - - the Plaintiffs' Amended Complaint fails to identify any expenditure that is at issue (or even identify a specific project to which the PLA applies) and, thus, there is no basis to infer that any of taxes purportedly paid by Plaintiffs are at stake, as required to establish taxpayer standing. See Towanda Mun. Auth., 614 A.2d at 330 (explaining that "a taxpayer whose funds are not at stake has no standing." (citations and quotations omitted)).[12]

### b. Even So, The PLA Does Not Violate Pennsylvania Competitive Biddings Laws As A Matter Of Law.

The Commonwealth Court of Pennsylvania has repeatedly held that the use of project labor agreements on public projects does not violate Pennsylvania's competitive bidding laws. See, e.g., A. Pickett Constr.,Inc. v. Luzerne County Convention Center Auth., 738 A.2d 20 (Pa. Cmwlth. 1999); Sossong v. Shaler Area Sch. Dist., 945 A.2d 788 (Pa. Cmmw. 2008); Glenn O. Hawbaker, Inc. v. Commonwealth, 2009 Pa. Commw. LEXIS 1755 (Pa. Commw. Dec. 1, 2009). In Pickett, the Court specifically held that the use of a project labor agreement that, like the one in this case,

---

12. As set forth in Section II(A)(1)(c), supra, the allegation that the PLA will result in an expenditure of "more than a de minimis amount of tax revenue" (see Am. Compl. ¶ 41) is a "naked assertion devoid of further factual enhancement" that cannot be credited on a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

provided a union-hall hiring exception for core employees did not unlawfully discriminate against non-union contractors, notwithstanding the fact that the project labor agreement at issue in that case, like all project labor agreements, called for hiring a certain percentage of employees through union halls. A. Pickett Const., Inc., 738 A.2d at 25-26.

And in Sossong and Hawbaker, the Commonwealth Court held that the use of far more restrictive project labor agreements - - both of which, unlike in Pickett and here, did not contain exception to the union-hall hiring requirement for core employees - - was permissible and did not violate Pennsylvania's competitive bidding laws. Sossong, 945 A.2d at 793-794; Glenn O. Hawbaker, Inc., 2009 Pa. Commw. LEXIS 1755 at *12. In fact, in the prior action involving a project labor agreement between the College and the Building Trades with virtually identical terms to the PLA at issue in this case, the Court of Common Pleas of Allegheny County rejected arguments by many of the same plaintiffs herein that the project labor agreement ran afoul of Pennsylvania's competitive bidding laws. See R.A. Glancy & Sons v. Community College of Allegheny County, GD-10-014783 (C.C.P. Allegheny Cty.) (Order dated March 18, 2011) (finding that it was unlikely that plaintiffs would "succeed on the merits" because "Project Labor Agreements similar to the Agreement in question have been upheld in [Sossong] and [Pickett].").[13]

The prevailing rationale in many of these types of cases is that the project labor agreements at issue did not unlawfully discriminate against non-union bidders because all bidders had to abide by the same requirements for the job. See A. Pickett Const., Inc. v. Luzerne County Conv. Ctr. Auth., 738 A.2d 20, 26 (Pa. Cmmw. 1999) (reasoning that PLA was valid because it "simply requires any person or entity as a condition for being engaged to perform work on the project to

---

13. A true and correct copy of this order is attached hereto as Exhibit B.

agree to be bound by the same rules and restrictions as all others similarly engaged.") (citations omitted).[14]

Allan Myers, L.P. v. Dept. of Transportation, 202 A.3d 205, 215 (Pa. Cmmw. 2019), the lone case where Commonwealth Court held that the use of a project labor agreement violated Pennsylvania's competitive bidding laws, dealt with the exact opposite situation, where, unlike in Pickett, not all contractors were playing by the same rules.[15] There, by the terms of the bid, all bidders affiliated with one specific union, the United Steelworkers, were exempt from having to sign-on to the project labor agreement's hiring requirement, while contractors affiliated with other unions and non-union contractors were required to hire their labor through the collection of local unions that made up the Building and Construction Council of Philadelphia. The Commonwealth Court held that such preferential treatment of a specific union (i.e., United Steelworkers), by itself, rendered the use of the project labor agreement discriminatory. Id. at 215 ("The PLA favored contractors under agreement with United Steelworkers, and for this reason alone, there is no

---

14.      Notably, other jurisdictions that have addressed the issue are in accord. See, e.g., Enertech Elec, Inc. v. Mahoning County Comm'rs, 85 F.3d 257, 260 (6th Cir. 1996); Minn. Chapter of Associated Builders & Contrs., Inc. v. County of St. Louis, 825 F. Supp. 238, 244 (D. Minn. 1993); Laborers Local #942 v. Lampkin, 956 P.2d 422, 436 (Alaska 1998); Associated Builders and Contrs. v. S.F. Airports Comm'n, 981 P.2d 499, 509 (Cal. 1999); Master Builders of Iowa, Inc., v. Polk County, 653 N.W.2d 382, 396 (Iowa 2002); John T. Callahan & Sons, Inc. v. City of Maiden, 713 N.E 2d 955, 964 (Mass. 1999); Queen City Constr., Inc. v. City of Rochester, 604 N.W.2d 368,  378 (Minn. Ct. App. 1999); Associated Builders and Contrs. v. So. Nevada Water Auth., 979 P.2d 224, 229 (Nev. 1999); New York State Chapter, Inc. v. New York State Thruway Auth., 666 N.E.2d 185, 191-92 (N.Y. 1996); Ohio ex rel. Associated Builders and Contrs. v. Jefferson County Bd. of Comm'rs, 665 N.E.2d 723, 727 (Ohio Ct. App. 1995); Associated Builders & Contrs. of R.I., Inc. v. Dep't of Admin., 787 A.2d 1179, 1187-89 (R.I. 2002).

15.      Plaintiffs cite several cases in purported support of their claim for "violation of state competitive bidding laws." (See Am. Compl. ¶¶ 65-70). None of these cases addressed the use of a project labor agreement, except Allan Myers, L.P. v. Dept. of Transportation, 202 A.3d 205, 215 (Pa. Cmmw. 2019), which, for the reasons set forth herein, is easily distinguishable from this case.

common standard on which bids are based."). In other words, because some bidders needed to abide by all the terms of the project labor agreement, while others (i.e., those with an affiliation to the United Steelworkers) did not, the use of a project labor agreement was discriminatory. Id. Significantly, the Commonwealth Court distinguished Pickett, Sossong, and Hawbaker, the cases in which it deemed the use of a project labor agreement appropriate, on the following grounds:

> In Pickett, the PLA did not mandate the integration of local collective bargaining agreements and permitted nonunion contractors to employ their core personnel in ranges of 20% to 50% of the whole workforce. Here, the PLA integrates the local collective bargaining agreements "and any successor agreements or amendments" and requires that nonunion contractors hire all craft labor personnel through the Local Unions. R.R. 27a. The PLAs in Pickett, Sossong and Hawbaker did not contain an exemption for certain contractors with a specific union affiliation. Here, by contrast, the PLA permits United Steelworkers contractors to use their normal workforce but requires nonunion contractors to hire through the Local Unions. In sum, Pickett, Sossong, and Hawbaker are factually distinguishable.

Allan Myers, L.P. v. Dept. of Transportation, 202 A.3d 205, 215 (Pa. Cmmw. 2019).

Thus, it remains true that, as in Pickett and here, the use of a project labor agreement that contains an exception to the union-hall-hiring-requirement for core employees and otherwise applies to all bidders alike, is lawful and well-within the bounds of Pennsylvania's competitive bidding laws.  Accordingly, Plaintiffs' purported Claim for Relief No. 4 must be dismissed.

## 2.      Rule 12(b)(1) Dismissal For Lack of Supplemental Jurisdiction

Should this Honorable Court agree that Plaintiffs' federal claims (Claims for Relief Nos. 1, 2, and 3) must be dismissed, then it must also dismiss Plaintiffs' state law claim (Claim for Relief No. 4) pursuant to 28 U.S.C. § 1367(c)(3) because no "extraordinary circumstances" exist to justify the continued exercise of jurisdiction over this claim. See DeForte v. Borough of Worthington, 2020 WL 2487133, at *3 (W.D. Pa. May 14, 2020) ("Though § 1367(c) generally provides some discretion, when the federal claim drops out before trial, our Court of Appeals has held that the district court must decline to exercise jurisdiction over the remaining state claims

absent extraordinary circumstances.") (citing <u>Borough of W. Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995)).

     Section 1367(c)(1) - - which authorizes a district court to decline to exercise supplemental jurisdiction over a state law claim if "the claim raises a novel or complex issue of State law" - - also warrants dismissal of Plaintiffs' state law claim. No Pennsylvania court has ever declared a project labor agreement with a hiring exception for core employees invalid, as Plaintiffs ask this Court to do, and granting such relief would be tantamount to creating a <u>per se</u> ban on the use of project labor agreements, which, again, is something no Pennsylvania court has ever done. Because it presents a novel issue of state law, this Court should decline to exercise jurisdiction over Plaintiffs' state law claim. <u>See</u>, <u>e.g.</u>, <u>Carroll v. Acme Truck Line, Inc.</u>, 992 F. Supp. 2d 512, 533 (W.D. Pa. 2014) (finding that novel issue of state law existed where Pennsylvania court had not recognized exception to law urged by plaintiff's complaint and dismissing state law claim accordingly).

## III.    CONCLUSION

     For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety, with prejudice.

                          Respectfully submitted,

                          */s/ F. Timothy Grieco*
                          F. Timothy Grieco, Esquire

                          Eckert Seamans Cherin & Mellott
                          44th Floor, 600 Grant Street
                          Pittsburgh, Pa 15219

                          *Attorneys for Defendants*
                          *Community College of Allegheny County*
                          *and Quintin B. Bullock*