# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSOCIATED BUILDERS & CONTRACTORS OF WESTERN PENNSYLVANIA, et. al. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 20-cv-649-WSH |
| COMMUNITY COLLEGE OF ALLEGHENY COUNTY, et. al. | ) ) ) ) | |
| Defendants. | ) | |
| ASSOCIATED BUILDERS & CONTRACTORS OF WESTERN PENNSYLVANIA, et. al. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 20-cv-1933-WSH |
| PLUM BOROUGH, et. al. | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINTS

*\* See list of counsel, next page*

Christopher R. Opalinski, Esquire
PA 35267
F. Timothy Grieco, Esquire
PA 81104
Sean J. Donoghue, Esquire
PA 321357
Eckert Seamans Cherin & Mellott
44th Floor, 600 Grant Street
Pittsburgh, Pa 15219
412/566-6000

*Counsel for Defendants Community College
of Allegheny County and Quintin B. Bullock*

Craig H. Alexander, Esquire
PA 62938
Dayne Dice, Esquire
PA 319293
Bruce E. Dice & Associates, P.C.
787 Pine Valley Drive, Suite E
Pittsburgh, PA  15239
724/733-3080

*Counsel for Plum Borough*

Joshua M. Bloom, Esquire
PA 78072
Joshua M. Bloom & Associates, P.C.
2201 Liberty Avenue, Suite 204
Pittsburgh, PA 15222
412/288-6000

Victoria L. Bor, Esquire
DC 288852
Jonathan D. Newman, Esquire
DC 449141
Sherman Dunn, P.C.
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
202/785-9300

*Counsel for Defendant Pittsburgh Regional
Building Trades Council, AFL-CIO*

**Table of Contents**

I.      STATEMENT OF FACTS………………………………………………..…1

A.      The PLAs………………………………………………………………………1

        1.      *ABC I – The PLA Between CCAC and the Building Trades*..………………....1

        2.      *ABC II – The PLA Between the Building Trades and Plum Borough*…………....2

B.      The Plaintiffs………………………………………………………………...4

        1.      *ABC I*………………………………………………………………………4

        2.      *ABC II*………………………………………………………………...6

II.     ARGUMENT……………………………………………………………..…7

A.      Introduction………………………………………………………………..7

B.      The Consolidated Complaints Must be Dismissed Pursuant to
        FRCP 12(b)(1) for Lack of Subject Matter Jurisdiction…………………………….…8

        1.      *The Plaintiffs Lack Standing*…………………………………………8

                a.      *ABC and the Plaintiff Contractors Lack Standing*………………….....9

                b.      *The Plaintiff Employees Lack Standing*…….……………………...…13

                c.      *The Plaintiff Taxpayers Lack Standing*………………………….…....14

        2.      *The Plaintiffs' Claims are not Ripe*………………………………….…16

C.      The Consolidated Complaints Must be Dismissed Pursuant to
        FRCP 12(b)(6) for Failure to State a Claim for which Relief can be Granted…………..…17

        1.      *The Consolidated Complaints Fail to State any Claims Under the First or
                Fourteenth Amendments to the U.S. Constitution*………………………………17

                a.      *The Complaints Fail to State a Claim that the PLAs Violate the Plaintiff
                        Employees' Right not to Join or Support the Unions*……………...…..18

                b.      *The Complaints Fail to State a Claim that the PLAs Violate the Plaintiff
                        Employees' Rights of Association*……………………………...…...20

        2.      *The Consolidated Complaints Fail to State a Claim Under the NLRA*………..…21

*3.*      *The Consolidated Complaints Fail to State Antitrust Claims*……………….…..26

        *a.*      *The Nonstatutory Exemption Bars Plaintiffs' Antitrust Claims*…………....……27

        *b.*      *Plaintiffs Fail to Plead Any Sherman Act Violation*..……………..…….30

        *c.*      *Plaintiffs Have Failed to Plead Antitrust Standing*...…………………..33

*4.*      *The Consolidated Complaints Fail to State Claims for Violations of State*
        *Competitive-Bidding Laws*……………………………………………………34

        *a.*      *The Plaintiff-Taxpayers have Failed to Establish Standing*…………..34

        *b.*      *The PLAs Do Not Violate Pennsylvania Competitive Bidding Laws*……36

        *c.*      *The Pendant State Law Claims Must be Dismissed*…………………..38

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>:**

*A. Pickett Constr. Inc. v. Luzerne County Convention Center Auth.*,
738 A.2d 20 (Pa. Cmwlth.1999)……………………………………………….…passim

*ABC of W. Pa. v. Cty. of Westmoreland*, 2020 U.S. Dist. LEXIS 19163
(Feb. 5, 2020 W.D. Pa.)……………………………………………………………....25

*ABC of W. Pa. v. Cty. of Westmoreland*, 2020 U.S. Dist. LEXIS 10143
(Jan. 21, 2020 W.D. Pa.)……………………………………………………….....…25

*ABC v. City of Jersey City*, 836 F.3d 412 (3d Cir. 2016)……………………………24, 26

*ABC v. City of Seward*, 966 F.2d 492 (9th Cir. 1992)…………………………………......28

*ABC v. Cty. of Northampton*,
376 F. Supp.3d 476 (E.D. Pa. 2019)………………………………………………..38

*ABC v. S.F. Airports Comm'n*, 981 P.2d 499 (Cal. 1999)…………………………..………37

*ABC v. So. Nevada Water Auth.*, 979 P.2d 224 (Nev. 1999)…………………………….……37

*ABC v. Dep't of Admin.*, 787 A.2d 1179 (R.I. 2002)………………………………....……...37

*Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967)………………………………………17

*Allan Myers, L.P. v. DOT,* 202 A.3d 205 (Pa. Cmwlth. 2019)………………..………….37, 38

*Animal Sci. Prods v. China Minmetals Corp.*, 34 F. Supp. 3d 465 (N.J.D.C. 2014)………....…30

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)……………………………………….…………..passim

*ACLU-NJ v. Twp. of Wall,* 246 F.3d 258 (3d Cir. 2001)………………………..…………15

*Babbit v. United Farm Workers Nat'l Union,* 442 U.S. 289 (1979)…………..………...16, 17

*Ballentine v. United States,* 486 F.3d 806 (3d Cir. 2007)………………………………..……8

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)…………………………..…..passim

*Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012)…………………………………..…………….30

*Bognet v. Pennsylvania*, 980 F.3d 336 (3d Cir. 2020)……………………………………passim

*Borough of West Mifflin v. Lancaster*, 45 F.3d 780 (3d Cir. 1995)………………..……38

*Brown v. Pro Football*, 518 U.S. 231 (1996)……………………………………….…….…..27

*Building. & Constr. Trades Council v. Associated Builders & Contrs.*,
507 U.S. 218 (1993)……………………………………………………………………passim

*Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002)……………..……24

*Bldg Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184 (2d Cir. 2012)…...passim

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013)……………………..…………………9, 10

*C.O. Falter Constr. Corp. v. Towanda Mun. Auth.,* 614 A.2d 328 (Pa. Cmwlth. 1992)…......35, 36

*Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,*
421 U.S. 616 (1975)……………………………………………………………...…………27

*Conti Enterprises, Inc. v. S.E. Pennsylvania Transp. Auth.*,
2003 WL 22594327 (E.D. Pa. Oct. 14, 2003)……………………………………………35

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006)…………………………….………15

*Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429 (1952)………………………..……15

*Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238 (7th Cir. 1996)…….passim

*Enertech Elec, Inc. v. Mahoning County Comm'rs*, 85 F.3d 257 (6th Cir. 1996)…………..……37

*Ethypharm S.A. Fr. v. Abbott Labs*, 707 F.3d 223 (3d Cir. 2013)………………..…………33, 34

*Frothingham v. Mellon,* 262 U.S. 447 (1923)……………………………………….……..15

*Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019)……………………………...…...passim

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1982)………………………22

*Hawbaker v. Commonwealth,* 2009 Pa. Commw. LEXIS 1755……………….…………36, 38

*Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources,*
*L.L.C.*, 390 F.3d 206 (3d Cir. 2004)………………………………………………………...23

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333 (1977)…….....…………9, 13

*Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth.*,
103 F.3d 1165 (3d Cir. 1997)………………………………………………………………34

*In re Application of Biester,* 409 A.2d 848 (Pa. 1979)…………………………………………..35

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)……………...……………33

*Janus v. American Federation of State, County, and Municipal Employees, Council 31,* 138 S.Ct. 2448 (2018)……………………………………………………………….…………20

*John T. Callahan & Sons, Inc. v. City of Maiden,* 713 N.E 2d 955 (Mass. 1999)………..……..37

*Johnson v. Rancho Santiago Cmty. Coll.*, 623 F.3d 1011 (9th Cir. 2010)1………………...passim

*Laborers Local #942 v. Lampkin,* 956 P.2d 422 (Alaska 1998)……………………….….……...37

*Lambda Phi Fraternity, Inc. v. University of Pittsburgh,* 229 F.3d 435 (3d Cir. 2000)…………20

*Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323 (3d Cir. 2018)…………………...passim

*Livadas v. Bradshaw*, 512 U.S. 107 (1994)………………………………………….……..22

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)………………………………………8, 11

*Machinists v. Wisconsin Employment Relations Council*, 427 U.S. 132 (1976)…………….…..22

*Master Builders of Iowa, Inc., v. Polk County*, 653 N.W.2d 382 (Iowa 2002)……………….……37

*Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676 (1965)…………………………………………27

*Mine Workers v. Pennington*, 381 U.S. 657 (1965)…………………………………..………27

*Minn. Chapter of Associated Builders & Contrs., Inc. v. County of St. Louis,* 825 F. Supp. 238 (D.Minn. 1993)……………………………………………….……………37

*NCAA v. Board of Regents*, 468 U.S. 85 (1984)…………………………………..……….30

*New York State Chapter, Inc. v. New YorkState Thruway Auth.*, 666 N.E.2d 185 (N.Y. 1996)…………………………………………………………..37

*Nichols v. City of Rehoboth Beach,* 836 F.3d 275 (3d Cir. 2016)………………………...……15

*Northeastern Florida Chapter, AGC v. City of Jacksonville,* 508 U.S. 656 (1993)……..……passim

*Nunemacher v. Borough of Middletown*, 759 A.2d 57 (Pa. Cmwlth. 2000)……………………35

*Ohio ex rel. Associated Builders and Contrs. v. Jefferson County Bd. of Comm'rs,* 665 N.E.2d 723 (Ohio Ct. App. 1995)……………………………………………..……37

vii

*Peachlum v. City of York,* 333 F.3d 429 (3d Cir. 2003)……………………………………………16

*Phila. Taxi Ass'n, Inc. v. Uber, Inc.,* 886 F.3d 332 (3d Cir. 2018)………………...………33

*Queen City Constr., Inc. v. City of Rochester,*
604 N.W.2d 368 (Minn. Ct. App. 1999)………………………………………...…………37

*Raines v. Byrd,* 521 U.S. 811 (1997)…………………………………...…………………….8

*Regents of the University of California v. Bakke,* 438 U.S. 265 (1978)……………...……..…12

*Renne v. Geary,* 501 U.S. 312 (1991)……………………………………………………...8

*Road-Con, Inc. v. City of Philadelphia,* 449 F.Supp. 3d 476 (E.D. Pa. 2020)………………25, 29

*Roberts v. Mentzer,* 382 Fed. Appx. 158 (3d Cir. 2010)………………………………....…20

*Roberts v. U.S. Jaycees,* 468 U.S. 609 (1984)………………………………………………20

*Salvation Army v. Dep't of Cmty Affairs of N.J.,* 919 F.2d 183 (3d Cir. 1990)…………..………21

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959)……………..……..…….22

*Shaffer v. Bd. of Sch. Dirs. of the Albert Gallatin Area Sch. Dist.,*
730 F.2d 910 (3rd Cir. 1984)…………………………………………………...…………38

*Schuylkill Energy Resources, Inc. v. Pa. Power & Light Co.,*
113 F.3d 405 (3d Cir. 1997)……………………………………...………………………33

*Sossong v. Shaler Area School District & Pittsburgh Regional Building Trade Council,*
945 A.2d 788 (Pa. Cmwlth. 2008)……………………………………………….……….passim

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.,*
181 F.3d 410 (3d Cir. 1999)……………………………………………………………5

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016)…………………………………………..passim

*Teamsters Local 357 v. NLRB,* 365 U.S. 667 (1961)…………………………...…………19, 20

*Thomas v. United Carbide Agric. Prods. Co.,* 473 U.S. 568 (1985)…………..……………16, 17

*Toll Bros. v. Twp. of Readington,* 555 F.3d 131 (3d Cir. 2009)………………...……………8

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)…………………………………..……..38

*United States v. Grinnell Corp.,* 384 U.S. 563 (1966)……………………………...……..32

*Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100 (3d Cir. 2018)……………………17

*Warth v. Seldin,* 422 U. S. 490 (1975)……………………………………..………………8, 10

**Statutes**:

15 U.S.C. §1………………………………………………….………………………26, 30

15 U.S.C. §2………………………………………………………………….………26, 32

29 U.S.C. § 152………………………………………………………………….………..22

29 U.S.C. § 158……………………………………………………………….………..passim

29 U.S.C. § 1367……………………………………………………………..………38

42 U.S.C. § 1983…………………………………………………...………….passim

**Rules**:

Fed. R. Civ. P. 8……………………………………………………………..passim

Fed. R. Civ. P. 12……………………………………………………………...…..passim

**Treatises**:

13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 (1984)…….....16

Associated Builders & Contractors of Western Pennsylvania ("ABC") and various of its contractor members and their employees have filed lawsuits challenging project labor agreements ("PLAs") between the Pittsburgh Regional Building Trades Council ("the Building Trades") and two public entities, the Community College of Allegheny County ("CCAC") and Plum Borough (hereinafter collectively "the Public Entities").  This Court has consolidated the two cases – *ABC v. CCAC* ("*ABC I*") and *ABC v. Plum Borough* ("*ABC II*") – for purposes of deciding the Defendants' Motions to Dismiss. The Defendants are filing this Memorandum in support of their joint Motion to Dismiss the Consolidated Cases.

The PLAs in the two cases are similar, and the Plaintiffs' substantive legal claims are identical:  In both cases, the Plaintiffs seek to invalidate the PLAs on the grounds they violate the U.S. Constitution, the National Labor Relations Act ("NLRA"), the Sherman Antitrust Act and Pennsylvania competitive bidding laws.  In addition, the *ABC II* Plaintiffs claim to be acting on behalf of classes of contractors and employees and to be seeking damages for past injuries. Because the Complaints in both cases fail to establish this Court's subject matter jurisdiction or to state claims upon which relief can be granted, both actions should be dismissed in their entirety.

## I.  STATEMENT OF FACTS

## A.  The PLAs

### 1.  *ABC I – The PLA Between CCAC and the Building Trades*

CCAC entered into the PLA with the Building Trades on February 15, 2011.  *ABC I* First Amended Complaint, ECF No. 33 ("*ABC I* Compl.") ¶ 21.[1]  The College agreed to the PLA to

---

[1]  A PLA is a pre-hire collective bargaining agreement that establishes the terms and conditions of employment for an entire construction project. "Such agreements are common in the construction industry, where the short-term nature of employment impedes post-hire collective

ensure the efficient, safe, quality, timely, and on-budget completion of its construction projects.

*See* CCAC PLA, Exhibit to *ABC I* Compl., ECF No. 33-1 ("CCAC PLA"), Art. I, § 1.  CCAC

determined it could achieve those goals by agreeing to a PLA that would:

    a)  avoid[] potential work stoppages, sympathy strikes, jurisdictional strikes, slowdowns, walkouts, picketing, handbilling and other disruptions or interference with work, and promot[e] labor harmony and peace for the duration of the Project;

    b)  standardiz[e] terms and conditions governing the employment of labor on the Project;

    c)  permit[] a wide flexibility in work scheduling and shift hours and starting times;

    d)  achiev[e] negotiated adjustments as to work rules and staffing requirements from those which otherwise might obtain;

    e)  provid[e] comprehensive and standardized mechanisms for the settlement of work disputes including jurisdictional disputes;

    f)  ensur[e] a reliable source of skilled and experienced labor; and

    g)  further[] the public policy objectives, to the extent lawful, as to improved employment opportunities for Minority Business Enterprises, [and] Women Business Enterprises.

*Id.*, Art. III, § 1.

The PLA expressly provides that any contractor can bid for covered work, regardless

whether it performs work elsewhere on a union or non-union basis or whether its employees are

union members.  *Id.*, Art. I, § 2.  All contractors on a covered project must execute and become

bound to the PLA while working on that project – but *only* on that project – and recognize the

local unions affiliated with the Building Trades as the exclusive bargaining representatives of

their craft employees working on that project.  *Id.*, Art. I, § 2; Art. VI, § 1.

With one exception, where the local union representing the contractor's craft operates a

referral system ("hiring hall"), the PLA requires the contractor to look first to that hiring hall to

---

bargaining, and where contractors need predictable costs and a steady supply of skilled labor."
*Johnson v. Rancho Santiago Cmty. Coll.*, 623 F.3d 1011, 1016 n. 1 (9th Cir. 2010).

secure its employees, while requiring the unions to exert their best efforts to recruit sufficient numbers of skilled craft workers to fulfill the contractor's needs. *Id*., Art. VI, §§ 3 and 7. The agreement requires the local unions to operate their referral systems "in a non-discriminatory manner" and to make referrals without regard to any "obligations of union membership." *Id.*, Art. VI, § 3. The PLA also expressly states that employees will *not* be required "to join a union or to pay dues or agency fees as a condition of being employed, or remaining employed" on a covered Project. *Id*., Art. VI, § 8.

The PLA makes an exception from the referral system for any contractors that do not have a preexisting relationship with one of the affiliated unions, permitting those contractors to employ a certain number of core employees not referred by the unions. *Id*., Art. VI, § 9. The PLA also makes clear that all contractors retain the right to determine the competency of their employees, to reject any referral for any just reason, and to select their craft foreman and/or their general foreman. *Id.*, Art. VI, § 2, 3, 10. If the unions fail to provide a contractor with satisfactory referrals within 48 hours, the contractors are free to hire from other sources. *Id.,* Art. VI, § 5.

### 2. *ABC II – The PLA Between the Building Trades and Plum Borough*

While CCAC's PLA generally covers its construction projects on an on-going basis, Plum Borough's agreement has a more limited scope: By its terms, it "applies exclusively to the onsite construction of the new borough building ("the Project")." *ABC II,* Complaint Exhibit 1, ECF No. 1-1 ("*ABC II* PLA"), Art. I, § 1. Like CCAC, the Borough chose to use a PLA to ensure the efficient, timely and economical completion of the Project. *Id.* And like CCAC, the Borough believed it could accomplish those goals by negotiating a PLA that would, *inter alia,* avoid work stoppages, standardize terms and conditions of employment, permit flexibility in

3

scheduling, establish dispute resolution mechanisms, ensure a reliable supply of skilled labor, and enable the Borough to further various public policy goals.  *Id.*, Art. III, § 1.

In all respects material to the issues in these cases, the Borough's PLA is identical to CCAC's agreement: Work on the Project is available to any contractor willing to become bound by the agreement.  *Id.,* Art. I, § 2.  The PLA's terms apply in the same manner to all contractors, except that non-union contractors may bring with them a certain number of "core" employees. *Id.,* Art. VI, § 9.  Otherwise, where the appropriate local unions operate referral systems, union and non-union contractors alike must look first to those hiring halls to secure their employees, while retaining the right to reject any referral and to look elsewhere if the locals fail to satisfy their hiring requirements.  *Id.,* Art. VI, §§ 2-5.  The PLA expressly requires the unions to "exert their utmost efforts" to find skilled workers to satisfy the contractors' needs, to operate their hiring halls in a "non-discriminatory manner," and to refer employees without regard to any "obligations of union membership, policies or requirements."  *Id.,* Art. VI, §§ 3, 7.  Finally, the PLA unequivocally states that, "[t]he employees covered by this agreement will not be required to join a union or pay dues or agency fees as a condition of being employed, or remaining employed on the Project."  *Id.* Art. IV, § 8.[2]

## B.   The Plaintiffs

### 1.   ABC I

---

[2]   Both PLAs also require contractors to pay their workers prevailing wage and benefit rates and to contribute to benefit plans on behalf of all employees other than "core employees;" establish mandatory dispute resolution procedures; prohibit any type of work stoppage or slow-down; prescribe uniform work hours and a drug and alcohol testing procedure; and prohibit discrimination.

In 2010, ABC, R.A. Glancy & Sons, Inc. ("Glancy & Sons"), and Westmoreland Electric, Inc., sued to enjoin CCAC from applying an earlier PLA to the College's construction projects. *See Glancy & Sons v. CCAC*, No. GD10-14783 (Ct. Com. Pl. 2011) (Attachment A hereto).[3] The court denied the plaintiffs' motions for a hearing date and preliminary injunction, finding the plaintiffs were unlikely to prevail on the merits and were unable show immediate and irreparable harm based upon either federal or state law. *Id.* Relying on *Building. & Constr. Trades Council v. Associated Builders & Contrs.* ("*Boston Harbor*"), 507 U.S. 218, 221-22 (1993), the court held that the PLA did not violate federal law because CCAC was acting as a proprietor rather than a regulator when it enforced the PLA. The court also held that the PLA did not violate Pennsylvania's lowest responsible bidder laws, relying upon *A. Pickett Constr. Inc. v. Luzerne County Convention Center Auth.*, 738 A.2d 20 (Pa. Commw. Ct. 1999), and *Sossong v. Shaler Area School District & Pittsburgh Regional Building Trade Council*, 945 A.2d 788 (Pa. Commw. Ct. 2008), *Appeal Denied*, 967 A.2d 962 (Pa. 2009). *Id.*

On May 1, 2020, approximately ten years after they filed their first lawsuit, ABC, Glancy & Sons, and Westmoreland Electric, now joined by eight new Plaintiffs, filed *ABC I*. Plaintiff ABC is a membership organization of contractors that "operate in Western Pennsylvania." *ABC I,* AC ¶¶ 4, 31; *see also ABC II* Compl. ¶¶ 4, 25. Plaintiffs Arrow Electric, Hampton Mechanical, Lawrence Plumbing, Glancy & Sons, and Westmoreland Electric ("*ABC I* Contractors") are non-union contractor members of the ABC. *Id.* ¶¶ 5-9. They complain that the PLA requires them to: (1) recognize a Building Trades affiliated union as their employees'

---

[3] Courts may take judicial notice of public records, judicial proceedings, and another court's opinion when determining a motion to dismiss. *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

exclusive representative; (2) hire employees from the union's job-referral system; and (3) contribute to the union's pension and health-care funds.  *Id.* ¶¶ 35, 39.

Plaintiffs Oliver, Glancy, and Casteel ("*ABC I* Employees") are workers employed by Hampton Mechanical and Glancy & Sons.  *Id.* ¶¶ 10-12.  They are not members of any union, and they allege the PLA prevents them from working on CCAC's construction projects because they have chosen not to be union members and the agreement compels them to obtain employment through the unions' hiring halls.  *Id.* ¶ 40.

Plaintiffs Boyd and Glancy IV ("*ABC I* Taxpayers") are residents and taxpayers in Allegheny County and the Commonwealth of Pennsylvania.  *Id.* ¶¶ 13-14.  They allege CCAC's enforcement of its PLA causes the College to award its construction projects to "someone other than the lowest bidder."  *Id.* ¶ 41.

### 2.    *ABC II*

Not only is there substantial overlap between the claims in the two cases; there is substantial overlap among the plaintiffs.  ABC is again joined by Hampton Mechanical, Lawrence Plumbing, and Glancy & Sons ("*ABC II* Contractors"),[4] who now claim they are "likely to apply for onsite construction work from Plum Borough in the reasonably foreseeable future and [are] ready and willing to apply for that work."  *ABC II* Compl., ¶¶ 25, 30, 34. Notwithstanding the PLA's plain terms, they assert the agreement has prevented them from "obtaining onsite construction work" from the Borough, for which they are seeking damages.  *Id.* ¶ 35.  They are, moreover, purporting to represent a class of between 50 and 70 contractors that are either non-union or recognize unions that are not Building Trades affiliates and that "would

---

[4] The Contractors in both cases will be referred to collectively as the "Plaintiff Contractors"; the Employees in both cases as the "Plaintiff Employees"; and the Taxpayers in the two cases as the "Plaintiff Taxpayers."

have applied, or would be likely to apply in the reasonably foreseeable future," for the Borough's construction work. *Id.* ¶¶ 74, 75.

*ABC I* Employee Casteel is now joined by Anthony Scarpine, a Hampton Mechanical employee, in asserting standing both as non-union employees prevented by the PLA from working on Borough construction projects, *id.* ¶ 36 (hereinafter "*ABC II* Employees"), and as injured taxpayers, *id.* ¶ 38 (hereinafter "*ABC II* Taxpayers"). The *ABC II* Employees purport to represent a class of between 500 and 1,000 employees similarly harmed by the Borough's enforcement of its PLA. *Id.* ¶ 36, 37, 83.

## II.   ARGUMENT

## A.   <u>Introduction</u>

Rule 8 of the Federal Rules of Civil Procedure requires Plaintiffs' Complaint to provide "short and plain statements" of the basis for the Court's jurisdiction and the nature of their claims. Fed. R. Civ. P. 8(a).

> To satisfy the rule, a complaint must make a showing sufficient to justify moving past the pleading stage. "[T]his obligation is not burdensome, but it is nonetheless an essential obligation. The claim must have "facial plausibility," which means that the "plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." . . . Rule 8 thus requires that the pleading "possess enough heft" to demonstrate an entitlement to relief.

*Garrett v. Wexford Health,* 938 F.3d 69, 92-93 (3d Cir. 2019) (internal citations omitted). Moreover, "the sufficiency of a complaint must be determined on a case-by-case basis," based on such factors as "the nature of the action, the relief sought, the availability of information and other practical considerations." *Id.* at 93 (internal citations omitted). A complaint must "possess enough heft" to demonstrate . . . entitlement to relief," *id.* at 92,

7

quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007), something the

Consolidated Complaints fail to accomplish.

**B.      The Consolidated Complaints Must be Dismissed Pursuant to
         FRCP 12(b)(1) for Lack of Subject Matter Jurisdiction**

"No principle is more fundamental to the judiciary's proper role in our system of

government than the [Article III] constitutional limitation of federal court jurisdiction to actual

cases or controversies." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (*citing Raines v.

Byrd,* 521 U.S. 811, 818 (1997)).  The case or controversy requirement is enforced through

justiciability doctrines, including standing and ripeness. *Toll Bros. v. Twp. of Readington,* 555

F.3d 131, 137 (3d Cir. 2009).  Federal courts are presumed to lack subject matter jurisdiction

unless it appears affirmatively from the record. *Renne v. Geary,* 501 U.S. 312, 316 (1991).  And

the Plaintiffs bear the burden of establishing subject matter jurisdiction. *Id.; Ballentine v. United

States,* 486 F.3d 806, 810 (3d Cir. 2007).

*1.      The Plaintiffs Lack Standing*

At the pleading stage, the Plaintiffs bear the burden of "clearly . . . alleg[ing] facts

demonstrating" each of the three elements necessary to meet Article III's "irreducible

constitutional minimum of standing:" that they "have (1) suffered an injury in fact, (2) that is

fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

by a favorable judicial decision." *Spokeo,* 136 S.Ct. at 1547, *quoting Warth v. Seldin,* 422 U. S.

490, 518 (1975), and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  Foremost

among these elements is injury in fact, for which "the party invoking federal jurisdiction must

establish three sub-elements: first, the 'invasion of a legally protected interest'; second, that the

injury is both 'concrete and particularized'; and third, that the injury is 'actual or imminent, not

conjectural or hypothetical." . . .  *Bognet v. Pennsylvania,* 980 F.3d 336, 348, 352 (3d Cir. 2020),

*quoting Spokeo,* 136 S.Ct. at 1548.  Moreover, "when a plaintiff alleges future injury, such injury must be 'certainly impending.'  Allegations of 'possible' future injury simply aren't enough." *Id.* at 348, *quoting Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013).  None of the Plaintiffs in either of the Consolidated Cases has gone beyond making "bald assertions" to present the kind of well-pleaded facts necessary to establish this Court's jurisdiction.  *Id.* at 362.

### a.   *ABC and the Plaintiff Contractors Lack Standing*

ABC asserts it has associational standing to challenge the two PLAs.  *ABC I* Compl. ¶ 38; *ABC II* Compl. ¶ 27.  The Plaintiff Contractors in the two cases, on the strength of whose standing ABC must rely,[5] allege they are injured by the enforcement of the PLAs because their employees' "exercise of their constitutional right to decline union membership" has rendered each of the Contractors

> ineligible to work on the college's construction projects unless it: (1) recognizes a union that belongs to the Pittsburgh Regional Building Trades Council as the exclusive representative of its employees – even though its employees have exercised their constitutional and statutory rights to decline union representation; (2) hire[s] employees from the [sic] a union's job-referral systems rather than use its own employees to perform work on college's projects; and (3) contribute[s] to that union's pension and health-care funds.

*ABC I* Compl. ¶ 39; *ABC II* Compl. ¶ 33.  However, none of the Contractors has alleged harm that is either "concrete and particularized" or "actual or imminent." *Spokeo,* 136 S. Ct. at 1547.

In *Northeastern Florida Chapter, AGC v. City of Jacksonville,* 508 U.S. 656 (1993), the Supreme Court addressed similar claims by construction contractors that alleged that a government policy precluded from them from bidding on public works contracts.  The Court held that to establish standing, the plaintiffs must "demonstrate that [they are] able and ready to

---

[5] ABC's associational standing is dependent upon it showing that "its members would otherwise have standing to sue in their own right."  *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

bid on contracts and that a discriminatory policy prevents [them] from doing so on an equal basis." *Id.* at 666.  Critical to the Court's conclusion that the association in that case had alleged sufficiently concrete harm was the allegation "that its members regularly bid on construction contracts in Jacksonville and that they would have bid on contracts set aside pursuant to the city's ordinance were they able to do so." *Id.* at 668.  The Court distinguished its earlier decision in *Warth v. Seldin,* 422 U.S. 490 (1975), in which "the construction association . . . did not allege that 'any member ha[d] applied . . . for a building permit or a variance with respect to a current project.' Thus, unlike the association in *Warth,* [the *City of Jacksonville*] petitioner has alleged an 'injury . . . of sufficient immediacy . . . to warrant judicial intervention.'" *Id.*, *quoting Warth,* 422 U.S. at 516.

Unlike the *City of Jacksonville* petitioner, but like the petitioner in *Warth,* the *ABC I* Contractors nowhere allege the College has ever used a PLA on any particular project on which they bid and were denied work because of the PLA.  Nor do they even allege that the College used a PLA on a particular project on which they *would have* bid but could not, because of the PLA.  And their Complaint contains no allegations that CCAC's future use of the PLA is "certainly impending." *Clapper,* 568 U.S. at 409.

The *ABC II* Contractors fare no better.  They, at least, assert that they "have been prevented from obtaining past onsite construction work from Plum Borough on account of the borough's project labor agreement" and "are likely to apply for onsite construction work from Plum Borough in the reasonably foreseeable future and each of them is ready and willing to apply for that work." *ABC II* Compl. ¶¶ 34, 35.  By its terms, however, the undated PLA appended to the Complaint applies to a single project: the new borough building.  PLA, Art. I, § 1.  The *ABC II* Contractors' nebulous allegations neither identify when or if this project has

taken or is taking place; identify "past onsite construction" on which they either bid unsuccessfully because of the PLA, or would have bid, but were precluded from doing so by the PLA; nor identify any work the Borough is scheduled to undertake "in the reasonably foreseeable future" on which they are "ready and willing" to bid.  "Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury" the Constitution requires. *Lujan,* 504 U.S. at 564.  Like the *ABC I* Contractors, the *ABC II* Contractors' allegations rest on "bald assertions that rest on mere speculation" and "allegations of 'possible' future injury," which are insufficient to support standing.  *Bognet,* 980 F.3d at 362.

The Plaintiff Contractors have thus failed to demonstrate that they have suffered the kind of "concrete and particularized," "actual and imminent" injury in fact to satisfy the first element of Article III's "irreducible constitutional minimum."  *Spokeo,* 136 S.Ct. at 1547.  They have additionally failed to establish the second element: That the injury they claim to have suffered "is fairly traceable to the challenged conduct of the defendant[s]."  *Id.*  The Contractors assert they are injured by the defendants' enforcement of the two PLAs.  *ABC I* Compl. ¶ 39; *ABC II* Compl. ¶ 33.  Yet, nowhere do they allege that either CCAC or Plum Borough has rendered any of their public works projects unavailable to them.

In this respect, too, the allegations in both Complaints fail to satisfy the criteria the Court set forth in *City of Jacksonville*: that in addition to demonstrating they are "ready and able" to bid on contracts, plaintiffs claiming to be harmed by a discriminatory contracting policy must allege that the policy prevents them from bidding on an equal basis as members of another group. 508 U.S. at 666.  In *City of Jacksonville,* the plaintiff alleged the city's minority set-aside requirements made a certain percentage of contracts unavailable to its members.  *See also,*

*Regents of the University of California v. Bakke,* 438 U.S. 265 (1978) (plaintiff claimed law school that reserved sixteen places for minority students precluded him from competing for all seats).  In these Consolidated Cases, by contrast, nothing on the face of either PLA precludes any of the Plaintiff Contractors from bidding for and being awarded work on a covered project on precisely the same terms as any other bidder.  To the contrary, the PLAs plainly make the agreements "available to . . . any successful bidder for work on [covered projects], without regard to whether that successful bidder performs work at other sites on either a union or non-union basis, and without regard to whether employees of such bidder are or are not members of any union."  *ABC I* PLA, Art. I, Sec 2; *ABC II* PLA, Art. I, § 2.  Moreover, except for the core employee provision – which advantages non-union contractors like the plaintiffs – both PLAs apply in the same manner to all contractors working under the agreements.[6]

The Plaintiff Contractors' real complaint is that the PLAs in these cases contain certain provisions to which they object – provisions project agreements "will often" include.  *ABC I* Compl. ¶¶ 19, 35, 39; *ABC II* Compl. ¶¶ 13, 29, 33.  In fact, the PLA in *Boston Harbor* similarly required contractors to utilize the signatory local unions as their employees' exclusive bargaining representatives, utilize the unions' hiring halls, contribute to fringe benefit funds and follow uniform work rules, all provisions the Supreme Court, like the Contractors here, regarded as typical in the construction industry.  507 U.S. at 221-22.  In response to the contractors' complaints in that case, the Supreme Court observed that when a public entity chooses to utilize a PLA on its construction projects, "those contractors who do not normally enter such

---

[6] For example, as explained above, when it comes to hiring, the PLAs require "each Contractor" working on a covered project to utilize the unions' referral system, if one exists, or otherwise to permit the union 48 hours to find suitable applicants, then permits "the Contractor" to hire directly if the union is unable to satisfy its needs. "The Contractor" may also reject anyone the unions refer.

agreements are faced with a choice.  They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a [PLA]."  *Id.* at 231.  Thus, whether the *ABC I* and *ABC II* Plaintiff Contractors have chosen not to bid on projects covered by the PLA or are precluded from doing so "because their employees have exercised their constitutional right to decline union membership," *ABC I* Compl. ¶ 39; *ABC II* Compl. ¶ 33, any injury the Contractors face is not "fairly traceable" to the defendants.  Instead, it is the result of choices made by themselves or others.

Because the Plaintiff Contractors in both cases have failed to allege that they are suffering actual or imminent harm, or to establish any causal connection between their asserted harm and the defendants' conduct, they lack standing to pursue either case.  And because ABC's members do not "otherwise have standing in their own right," *Hunt,* 432 U.S. at 343, ABC lacks standing as well.

### b.      *The Plaintiff Employees Lack Standing*

The Plaintiff Employees allege that the PLAs prevent them from working on covered projects because they have exercised their rights "to decline union membership, and [the agreements] compel[] them to obtain employment through the unions' hiring halls if they want to perform any onsite construction work."  *ABC I* Compl. ¶ 40; *ABC II* Compl. ¶ 36.  The *ABC II* Employees also allege that the Plum Borough PLA has prevented them from "obtaining past construction work."  *ABC II* Compl. ¶ 37.  Like the Plaintiff Contractors, the Employees have failed to allege the injury in fact or causality necessary to establish standing.

First, like the Contractors, the Employees fail to allege "actual or imminent harm," that is, any specific on-going or imminent projects on which they have sought work or even, if not for the PLA, would be seeking work.  And the *ABC II* Employees have failed to identify any

13

"concrete and particularized" past projects on which the Plum Borough PLA hindered their employment. They have therefore failed to establish "injury in fact." *Bognet,* 980 F.3d at 348 (to establish injury in fact, "the party invoking federal jurisdiction must establish," *inter alia,* "the injury is both 'concrete and particularized' . . . [and] 'actual or imminent'").

Second, the Plaintiff Employees fail to establish that any injuries they may suffer are "fairly traceable" to the defendants' enforcement of the PLAs.  Nothing in either PLA interferes with their right "to decline union membership."  Instead, both PLAs explicitly provide that no employee will be required to join any union or pay any agency fees to work on a covered project or use the unions' referral systems.  CCAC PLA, Art. VI, §§ 3, 8; Plum Borough PLA, Art. §§ 3, 8.  Nor would they necessarily have to use the referral system to obtain work on a covered project.  As explained, the PLAs establish various means through which employees can seek and obtain work on a covered project: An employer must only use the referral system as its first means of securing employees if the union representing members of the particular trade has one; if not, or if the union fails to deliver an adequate number of acceptable employees in a specified period of time, the employer can hire directly; and even for a trade for which the union has a referral system, a non-union employer can hire a number of core employees.  CCAC PLA, Art. VI §§ 2-9; Plum Borough PLA, Art. VI §§ 2-9.

### c.      *The Plaintiff Taxpayers Lack Standing*

The *ABC I* Taxpayers assert standing as taxpayers to the Commonwealth of Pennsylvania and Allegheny County "to challenge CCAC's violation of Pennsylvania's competitive-bidding laws and other constitutional violations that arise from the college's project labor agreement."  *ABC I* Compl. ¶¶ 13, 14, 41.  The *ABC II* Taxpayers, as taxpayers to Plum Borough, are asserting standing to challenge the borough's violation of the State's competitive

bidding laws and "other constitutional violations that arise from the borough's [PLA]." *ABC II* Compl. ¶¶ 8, 9, 38.  The Plaintiff Taxpayers allege that the defendants' enforcement of the PLAs inflicts injury on "taxpayers by awarding projects to someone other than the lowest responsible bidder, . . . and increasing the costs of the [covered] construction projects by more than a de minimis amount of tax revenue." *ABC I* Compl. ¶ 41; *ABC II* Compl. ¶ 38.

It is well-settled that "state taxpayers have no standing . . . to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 346 (2006).  While "a municipal taxpayer may, in some cases, challenge municipal expenditures," the taxpayer's right to do so "is not unlimited." *Nichols v. City of Rehoboth Beach,* 836 F.3d 275, 280 (3d Cir. 2016) (*citing Frothingham v. Mellon,* 262 U.S. 447, 487 (1923)).  The Third Circuit instead applies "good faith pocketbook requirements."  To establish municipal taxpayer status, the plaintiff "must show (1) that he pays taxes to the municipal entity, and (2) that more than a de minimis amount of tax revenue has been expended on the challenged practice itself." *Id.* at 280-81 (*citing Doremus v. Board of Ed. of Hawthorne,* 342 U.S. 429, 434 (1952)); *see also ACLU-NJ v. Twp. of Wall,* 246 F.3d 258, 262, 263 n.2 (3d Cir. 2001).

Plaintiff Taxpayers have done nothing more than assert conclusory allegations to support their standing. In alleging that by "awarding projects to someone other than the lowest responsible bidder," CCAC and Plum Borough have increased their construction costs by "more than a de minimis amount," the Plaintiff Taxpayers are simply reciting what *Nichols* has identified as a requisite element of municipal taxpayer standing.  As noted earlier, the Plaintiffs have failed to identify any projects on which CCAC or the Borough has enforced the PLAs, much less any projects on which either Public Entity has awarded projects to someone other than

the lowest responsible bidder. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), *quoting Twombly,* 550 U.S. at 557 (internal citations omitted).  Nor is a complaint that contains nothing more than "'naked assertion[s]' devoid of any 'further factual enhancement'" sufficient to escape a motion to dismiss.  *Id.* at 678.  The Complaints therefore fail to allege the "good faith pocketbook requirements" necessary to demonstrate municipal taxpayer status.

### 2.    The Plaintiffs' Claims are not Ripe

Federal courts "will not decide a case where the claim involves contingent future events that may not occur as anticipated, or indeed, may not occur at all."  *Thomas v. United Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81 (1985) (*quoting* 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 (1984)).  Plaintiffs must show that they have been genuinely aggrieved and that there is substantial controversy that is "definite and concrete."  *Peachlum v. City of York,* 333 F.3d 429, 433-34 (3d Cir. 2003) (*quoting Babbit v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979).

The *ABC I* Plaintiffs broadly allege that CCAC has been using the PLA on its construction projects since 2011 and "will continue imposing this PLA on its future construction work unless it is enjoined from doing so."  *ABC I* Compl. ¶ 23.  The *ABC II* Plaintiffs also vaguely assert that the borough "has been imposing this project labor agreement on the onsite construction work" and that it will continue to impose the PLA "on its future onsite construction work unless it is enjoined from doing so."  *ABC II* Compl. ¶ 17.  Once again, however, neither Complaint identifies any projects on which either of the Public Entities intends to use their PLA. Rather than presenting a "definite and concrete dispute," each Complaint simply presents claims that are "hypothetical [and] abstract."  *Babbit,* 442 U.S. at 298 (internal quotations and citations

omitted).  Moreover, absent any allegations that any of the defendants are about to enforce either PLA on a particular project, the Plaintiffs have not alleged that they would suffer any hardship if the Court withheld consideration in either of the consolidated cases.  *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967) (ripeness turns on fitness of issues for determination and hardship on parties of withholding consideration).  Instead, because any impact of the PLA on the Plaintiffs' rights involves "future events that may not occur as anticipated, or indeed, may not occur at all," *Thomas,* 473 U.S. at 580-81, this case is not ripe.

**C.    The Consolidated Complaints Must be Dismissed Pursuant to FRCP 12(b)(6) for Failure to State any Claims for which Relief can be Granted**

> **1.    *The Consolidated Complaints Fail to State any Claims Under the First or Fourteenth Amendments to the U.S. Constitution***

Plaintiffs' Claim for Relief No. 1 asserts that the Public Entities are violating the U.S. Constitution's First and Fourteenth Amendments "by requiring its contractors to hire their employees through the job-referral systems operated by unions affiliated with the [Building Trades]," and thereby "compel[ling] workers to join, pay, or associate with a union."  *ABC I* Compl. ¶¶ 27, 46; *ABC II* Compl. ¶ 21, 43.  The PLAs do, in fact, require contractors to look first to the union's hiring halls when seeking employees in trades represented by unions that operate referral systems.  However, the PLAs expressly state that no employee will be required to join or pay anything to a union as a condition of employment, and that the "job referral system will be operated in a non-discriminatory manner," with referrals unaffected by any "obligations of membership."  CCAC PLA, Art. VI, §§ 3, 8; Plum Borough PLA, Art. VI, §§ 3, 8.[7]  Yet,

_____

[7] Although the Court is generally required to consider well-pleaded allegations as true in ruling on a Rule 12(b)(6) motion, the Plaintiff's exhibits control when, as here, they contradict the allegations in the complaint. *Vorchheimer v. Philadelphian Owners Ass'n,* 903 F.3d 100, 112 (3d Cir. 2018).

Plaintiffs claim the agreements' "'non-discrimination provision[s are] disingenuous," asserting – without providing any factual basis – that "[t]he requirement that contractors and subcontractors hire their employees from the unions' job-referral systems compels workers to join and pay those unions as a condition of performing any onsite work for the [Public Entities], because the unions will not refer non-members through their hiring halls." *ABC I* Compl. ¶ 29; *ABC II* Compl. ¶ 23. They accordingly allege that PLAs require the contractors' employees "to relinquish their First Amendment rights" to refrain from joining or financially supporting or associating with a union as a condition of employment. *ABC I* Compl. §§ 42-46; *ABC II* Compl. §§ 39-43. These allegations, however, fail to state a claim that the Public Entities have violated either the Plaintiff Employees' right to refrain from joining or financially supporting the unions or to refrain from associating with them.

> **a.** ***The Complaints Fail to State a Claim that the PLAs Violate the Plaintiff Employees' Right not to Join or Support the Unions***

The Plaintiffs' First Amendment claim rests in part on the bald, unsupported assertion that the unions will operate their referral systems in contravention of the clear language of the PLA and the requirements of federal law. Although Rule 8 does not require a complaint to contain "detailed factual allegations, . . . it demands more than an unadorned the-defendants-unlawfully-harmed-me accusation. . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of and 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678, *quoting Twombly* (internal citations omitted). Here, Plaintiffs do not even assert "the-defendants-unlawfully-harmed-me." In fact, neither Complaint contains a single allegation that one of the Building Trades' affiliated local unions has refused to refer any of the Plaintiff Employees – or anyone else, for that matter – unless the Employee joins the union. Instead, the Plaintiffs basically assert that "everyone knows" unions are bad actors. In the face of PLAs that clearly set

out the unions' obligations *not* to harm the Plaintiffs, this "completely naked assertion[,] . . . devoid of *any* . . . factual enhancement" whatsoever, is simply insufficient to satisfy Rule 8. *See Garrett,* 938 F.3d at 93 (sufficiency of pleading must be determined on a case-by-case basis, taking into account the nature of the claim, the availability of information and other practical considerations) (emphasis added).

This is particularly true in this context because the Supreme Court long ago rejected the concept that Plaintiffs advance here: that misconduct in the operation of a hiring hall can be assumed. The collective bargaining agreement in *Teamsters Local 357 v. NLRB* contained a hiring hall provision that, like the PLAs in these cases, stated that referrals would be made "irrespective of whether such employee is or is not a member of the Union." 365 U.S. 667, 668 (1961). The National Labor Relations Board ("NLRB") nonetheless found the hiring-hall arrangement *per se* unlawful as "inherent[ly] and unlawful[ly] encourag[ing] union membership." *Id.* at 671 (internal quotations omitted). The Supreme Court disagreed, finding that "surely discrimination cannot be inferred from the face of the instruments when the instrument provides there will be no discrimination . . . because of the presence or absence of union membership." *Id.* at 675.

The same rule applies here. The PLAs expressly state that the unions will operate their referral systems in a non-discriminatory manner, without regard to union membership and without requiring anyone to join the union or pay dues as a condition of employment. The Plaintiffs have offered no facts to contradict those terms. Indeed, they offer only empty assertions that the non-discrimination provisions are "disingenuous." Having alleged no factual basis for "assum[ing] that [the] union[s will] conduct[ their] operations in violation of law or that the parties to this contract did not intend to adhere to its express language," *Teamsters,* 365 U.S.

at 676, the Plaintiffs have failed to state a claim that the PLAs implicate their First Amendment rights to refrain from joining or financially supporting the unions.[8]

> ### b.    The Complaints Fail to State a Claim that the PLAs Violate the Plaintiff Employees' Rights of Association

Plaintiffs' allegation that they must "associate" with the unions in their hiring halls similarly fails to state a First Amendment claim.  The Constitution protects freedoms of association "in two distinct senses":  intimate association and expressive association.  *Roberts v. U.S. Jaycees,* 468 U.S. 609, 617-18 (1984).  The first protects "choices to enter into and maintain certain intimate human relationships," like marriage, child-rearing and cohabitation, which "by their very nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life."  *Id.* at 619-20.  The contact the Plaintiff Employees would have with the unions to secure a job is simply not the kind of "close[] and most interpersonal of human relationships" that qualifies as "intimate association."  *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh,* 229 F.3d 435, 441-42 (3d Cir. 2000).  *See, e.g., Roberts,* 468 U.S. at 620 (category does not reach large corporate entities); *Roberts v. Mentzer,* 382 Fed. Appx. 158, 163 (3d Cir. 2010) (finding no authority "indicating that any type

---

[8] *Janus v. American Federation of State, County, and Municipal Employees, Council 31,* 138 S.CT. 2448 (2018), which the Plaintiffs cite for the proposition that "[t]he Constitution . . . forbids a public employer to require its employees to join or financially support a union as a condition of employment," *ABC I* Compl. ¶ 43; *ABC II* Compl. ¶ 40, has no relevance to the issues in this case.  That is, even assuming, *arguendo,* that proposition had any bearing on a situation in which a public entity includes such a requirement in a project labor agreement, as just demonstrated, neither PLA in these cases contains any such requirement.

of employment, much less . . . public employment . . . , automatically gives rise to an 'intimate association.'")

Nor does the required use of the referral system implicate the Plaintiffs' right to expressive association, *i.e.,* the "right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for redress of grievances, and the exercise of religion." *Roberts,* 468 U.S. at 618. "[T]here is no constitutional right to associate for a purpose that is not protected by the First Amendment." *Salvation Army v. Dep't of Cmty Affairs of N.J.,* 919 F.2d 183, 199 (3d Cir. 1990). In designating the unions as the referral source, the Public Entities are doing nothing more than if they had hired a private recruiter to find skilled tradespeople to staff their projects. The fact that the Plaintiff Employees may dislike the recruiter – whether it is a company or a union – does not implicate any of their First Amendment rights. Accordingly, requiring them to use a union's referral services does not violate their expressive association rights.

As the Plaintiffs have failed to state any claim that the PLAs violate their First or Fourteenth Amendment rights, the Claim for Relief No. 1 in the Consolidated Complaints must be dismissed.

### 2.      *The Consolidated Complaints Fail to State a Claim Under the NLRA*

Plaintiffs' Claim for Relief No. 2 asserts a claim under 42 U.S.C. § 1983, based on allegations that by enforcing the PLAs, the Public Entities are interfering with the Plaintiff Employees' NLRA Section 7 rights to decide whether they want union representation and to be free from discrimination based on union membership and the Plaintiff Contractors' NLRA rights to decline to recognize a union that their employees have not chosen as their representative. *ABC I,* Compl. ¶¶ 49-57; *ABC II,* Compl. ¶¶ 47-55.

The NLRA does not directly apply to the Public Entities.  *See* 29 U.S.C. § 152(2) (defining "employer" as excluding "any State or political subdivision thereof").  However, the Supreme Court has nonetheless held that a plaintiff may bring a claim under 42 U.S.C. § 1983 when a state interferes with rights secured by the NLRA.  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108-09 (1982).  A claim is cognizable under § 1983 when the governmental conduct at issue is preempted by the NLRA.  *Id.*; *Livadas v. Bradshaw*, 512 U.S. 107, 132-33 (1994) (plaintiff can seek redress under §1983 for state policy preempted by the NLRA).  Here, the state action alleged, *i.e.*, the Public Entities' use of PLAs, is not preempted by the NLRA, and the Plaintiffs therefore fail to state a claim under § 1983.

The Court explained in *Boston Harbor* that, "[w]hen we say the NLRA pre-empts state law, we mean that the NLRA prevents a State from *regulating* within a protected zone, whether it be a zone protected and reserved for market freedom, *see Machinists [v. Wisconsin Employment Relations Council*, 427 U.S. 132 (1976)], or for NLRB jurisdiction, *see* [*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959)]."  507 U.S. at 227 (emphasis added).  As the Court went on to explain,

> A State does not regulate . . . simply by acting within one of these protected areas.  When a State owns and manages property, for example, it must interact with private participants in the marketplace.  In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to *regulation*.

507 U.S. at 227 (emphasis in original).

In *Boston Harbor*, the Supreme Court rejected an almost identical challenge to a PLA.  In that case, the Massachusetts Water Resources Authority decided to use a PLA to "maintain worksite harmony, labor-management peace, and overall stability throughout the duration of [its construction] project."  507 U.S. at 221.  The PLA required all contractors and subcontractors operating on the massive project to agree to be bound to the agreement, required contractors to

obtain workers from the hiring halls of the local unions affiliated with the building trades council, contained a union security clause and exclusive recognition provision, required contractors to contribute to fringe benefit trust funds, and established uniform work rules, all provisions the Court regarded as typical in the construction industry.  *Id.* at 221-22.[9]  Finding "no reason to expect the[] defining features of the construction industry to depend upon the public or private nature of the entity contracting services," the Court concluded that "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous conduct would be permitted [under NLRA Sections 8(e) and 8(f)], this Court will not infer such a restriction."  *Id.* at 231-32.[10]

In *Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, L.L.C.*, 390 F.3d 206 (3d Cir. 2004), the Third Circuit applied *Boston Harbor* and articulated a two-part test to determine whether a public entity is acting in pursuit of its proprietary interests (*i.e.*, as a "market participant") and therefore escapes preemption review: (1) whether the challenged condition serves the public entity's proprietary interest in a project or a transaction, as in investor, owner, or financier; and (2) whether the scope of the funding condition is specifically tailored to the proprietary interest, *i.e.*, whether it applies only to the projects at issue.  *Id.* at 215-16.  A procurement decision that "satisfies these two steps . . .

---

[9] Unlike the PLA in *Boston Harbor*, as set forth *supra,* neither the CCAC's PLA nor Plum Borough's PLA has a union security clause, *i.e.*, a provision requiring employees to join or pay fees to the union.

[10] NLRA Section 8(f), 29 U.S.C. § 158(f), permits unions and employers in the construction industry to enter into "prehire" collective bargaining agreements, before any employees are hired. The construction industry proviso to Section 8(e), id. § 158(e), permits construction industry unions and employers to agree to restrict contracting and subcontracting on a construction site.

reflects the government's action as a market participant and escapes preemption review," while a funding condition that "sweeps more broadly" than the government's "proprietary economic interest . . . must submit to review under labor law preemption standards." *Id.* at 216. Applying this test, the Court found that the city was acting as a market participant in requiring all developers receiving its TIF funding to sign union neutrality agreements, because in providing bond financing for a development project, the city's proprietary interest was the same as that of any other investor, and because the neutrality requirement applied only to the project for which the city had invested funds. *Id.* at 217-18.

In reaching its conclusion, the Court relied, in part, on *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), in which the D.C. Circuit upheld an executive order prohibiting PLAs, which "applied to *all* federally funded contracts [but] applied *only* to those contracts." *Id*. at 215 (emphasis added). It is thus immaterial whether the public entity is imposing particular conditions on a single project – like the Plum Borough PLA and as in *Boston Harbor* – or on a series of projects – like the CCAC PLA and as in *Allbaugh* – as long as the condition serves the public entity's proprietary purpose[11] and has no impact on private parties' conduct elsewhere. *See also Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011 (9th Cir. 2010) (public school acted as market participant when it used a PLA for all of its construction projects costing over $200,000); *Bldg Indus. Elec. Contractors Ass'n v. City of New*

---

[11]  In this regard, the Third Circuit reaffirmed its two-part "market participant" test in *ABC v. City of Jersey City*, 836 F.3d 412, 418-21 (3d Cir. 2016), but found the city was not acting in its proprietary capacity in conditioning tax abatements on the developers' agreement to abide by a PLA, because the city neither owned, managed, nor funded the construction projects, but was instead engaged in "assessment and computation of taxes – a primeval government activity."  *Id.* at 420-21 (internal citations and quotations omitted).

*York*, 678 F.3d 184 (2d Cir. 2012) (New York City acted as market participant in requiring use of a PLA on approximately half of all of its construction projects).

Where, as here, a public entity enters into a PLA for its own construction projects, state and federal courts in Pennsylvania have had little difficulty finding that the public entity acts as a market participant.  In fact, when ABC, Glancy & Sons, and Westmoreland Electric challenged CCAC's earlier PLA, the Court of Common Pleas of Allegheny County denied their motions for a hearing date and preliminary injunction, based in part on its conclusion that CCAC was acting as a market participant rather than a regulator in entering into the PLA.  *See* Attachment A. Similarly, in *Road-Con, Inc. v. City of Philadelphia,* 449 F.Supp. 3d 476, 488-490 (E.D. Pa. 2020), the district court dismissed the plaintiffs' identical NLRA challenge to a PLA the City of Philadelphia applied to all its projects worth more than $3 million.  The court found the preemption claim foreclosed by the Supreme Court's conclusion that the public entity in *Boston Harbor* was acting as a market participant in adopting a project agreement with "the same operative provisions as [Philadelphia's] agreement." *Id.* .[12]  And U.S. District Judge Horan adopted U.S. Magistrate Judge Lenihan's Opinion and found that Westmoreland County acted as a market participant in entering into a PLA with the Building Trades for all of its construction projects costing more than $150,000.  *ABC of W. Pa. v. Cty. of Westmoreland*, 2020 U.S. Dist. LEXIS 19163 (Feb. 5, 2020 W.D. Pa.), *adopting report and recommendation in ABC of W. Pa. v. Cty. of Westmoreland*, 2020 U.S. Dist. LEXIS 10143 (Jan. 21, 2020 W.D. Pa.) (*citing ABC v. City of Jersey City*, 836 F.3d 412, 418 (3d Cir. 2016)).

---

[12] While dismissing the NLRA preemption claim, the court in *Road-Con* denied the defendants' motion to dismiss the plaintiffs' First Amendment challenge to the PLA's requirement that all employees working under the PLA join or pay dues to the signatory unions. *Id.*.  The court's holding on that issue has no bearing on the issues in these cases since, as discussed *supra,* both the CCAC and Plum Borough PLAs expressly disclaim any such requirement.

The conclusion can be no different here.  As to the first element of the market participant test, both CCAC and Plum Borough entered into their PLA's to serve their proprietary interests as owners. The agreements are intended to ensure their projects are completed efficiently and successfully by, *inter alia,* prohibiting work stoppages, standardizing working conditions, establishing effective procedures for resolving disputes, and securing reliable sources of skilled and experienced labor.  *CCAC* PLA Art. III § 2; Plum Borough PLA, Art. III § 1.  As to the second element, both PLAs are "specifically tailored" to Public Entities' proprietary interests. The PLAs clearly state that they apply only to construction projects the Public Entities own, and neither Complaint contains any allegations that either CCAC or Plum Borough has ever applied its agreement more broadly.  In fact, both Complaints specifically acknowledge that PLAs apply to the Public Entities' "onsite construction work." *ABC I,* Compl. ¶¶ 22, 23 (CCAC PLA applies to "the college's 'onsite construction work;'" and college has been and will continue to impose the agreement on "onsite construction work that it . . . provide[s] to contractors" unless enjoined); *ABC II* Compl., ¶¶ 16, 17 (same with respect to Plum Borough's "onsite construction work").  Because these PLAs are clearly intended to serve the Public Entities' proprietary interests in successfully completing their own construction projects and are narrowly tailored to serve that purpose, there is no question the Public Entities acted as market participants in entering into these PLAs.  Accordingly, NLRA preemption principles do not apply, and Plaintiffs therefore fail to state a claim under 42 U.S.C. § 1983.

### 3.     *The Consolidated Complaints Fail to State Antitrust Claims*

Claims for Relief Nos. 3 allege, without explanation, that the PLAs "restrain[] competition in violation of the antitrust laws," citing as examples, Sections 1 and 2 of the Sherman Act.  *ABC I* Compl. ¶ 58; *ABC II* Compl. ¶56 ("*see, e.g*., 15 U.S.C. §§1-2").  Plaintiffs

allege only that the PLAs "restrain[] competition by disqualifying contractors and subcontractors from working on the [Public Entities'] construction projects" by requiring them to comply with various provisions to which they object.  *ABC I* Compl. ¶¶ 59-60; *ABC II* Compl. ¶¶57-58. Plaintiffs' barebones antitrust claims must be dismissed.

> **a.      The Nonstatutory Exemption Bars Plaintiffs' Purported Antitrust Claims.**

Although the antitrust laws make unlawful "unreasonable" restraints on trade, the nonstatutory exemption "interprets the labor statutes . . . as limiting an antitrust court's ability to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice."  *Brown v. Pro Football*, 518 U.S. 231, 236-37 (1996).  As the Supreme Court explained in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*,

> The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions.

421 U.S. 616, 622 (1975) (*citing Mine Workers v. Pennington*, 381 U.S. 657, 666 (1965); *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 691-693 (1965) (the nonstatutory exemption applies to labor agreements concerning compensation and working conditions that are consistent with national labor policy).

PLAs are labor agreements concerning compensation and working conditions, which are unquestionably consistent with national labor policy.  In *Boston Harbor*, the Supreme Court held that, although public entities are not technically subject to the terms of the NLRA, permitting them to enter into PLAs, which are commonly used in the construction industry, "promotes the

legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry." 507 U.S. at 230-31.  In fact, according to the Court, when a public entity, "acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it [exemplifies] the workings of the market forces that Congress expected to find." *Id.* at 233 (internal citations and quotation marks omitted). *See also Rancho Santiago Cmty. Coll. Dist.,* 623 F.3d 1011 (public college PLA consistent with federal labor policy); *Bldg Indus. Elec. Contractors Ass'n,* 678 F.3d 184 (city PLA consistent with federal labor policy). Clearly, the kind of labor agreement explicitly authorized by Congress and exemplifying "the workings of the market forces" that Congress expected to find cannot, at the same time, be an arrangement "the antitrust laws were intended to prevent." *Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 331 (3d Cir. 2018).

In *ABC v. City of Seward*, 966 F.2d 492 (9th Cir. 1992), the court of appeals followed this logic in applying the nonstatutory exemption to an agreement between a city and a construction union, which limited subcontracting to contractors that were already signatory with that union. The court of appeals "recognize[d] that, since the City of Seward is not an employer under section 2(2), neither the general prohibition against hot cargo agreements nor the exemption in section 8(e) applies to it."  The court nonetheless found that because the agreement, if between private parties, would have been "an agreement permitted by law[, i]t would be inconsistent to approve such an agreement under labor law, but strike it down under antitrust law." *Id.* at 499.

The Seventh Circuit also applied the non-statutory exemption to an agreement in the private sector, between a utility company acting as an owner of a construction project and a union, which required all subcontractors to be union signatories. *Ehredt Underground, Inc. v.*

28

*Commonwealth Edison Co.*, 90 F.3d 238, 240 (7ᵗʰ Cir. 1996) (*citing Boston Harbor*, 507 U.S. at 230-232; 29 U.S.C. §§ 158(e), (f)).

The Plaintiffs make the legal assertion in their Complaints that the nonstatutory exemption does not to apply to PLAs, citing *Connell*. *ABC I* Compl. ¶ 61; *ABC II* Comp. ¶ 59. In *Connell*, the union unlawfully shut down jobsites to coerce general contractors to agree to subcontract work only to firms with contracts with the union, thereby attempting to "indiscriminately exclude[] nonunion subcontractors from a portion of the market." 421 U.S. at 624. In the Court's view, the agreements the union sought did not serve any of the policies that animated the Act: They were not limited to jobsites on which the union's members would be working and did nothing to alleviate jobsite friction. *Id.* at 631. The Court therefore found that the agreements violated Section 8(e) of the NLRA, and thus, were not shielded by the nonstatutory antitrust exemption. *Id.* at 635.

Here, by contrast, the Defendants have entered into the kind of prehire collective bargaining agreements that the Supreme Court specifically and expressly endorsed in *Boston Harbor. See Road-Con, Inc. v. City of Philadelphia,* 449 F.Supp. 3d 476, 489-490 (E.D. Pa. 2020) (*Connell*'s holding inapplicable to PLAs found to be lawful pursuant to the Supreme Court's later decision in *Boston Harbor*). Unlike the agreement in *Connell,* the PLAs at issue here expressly permit any contractor to work on the covered projects, without regard to whether it is otherwise union or nonunion. The PLAs' terms apply directly and exclusively to the wages and working conditions of the employees working on the covered jobsites, and only on the covered jobsites. And unlike the agreements in *Connell*, these PLAs apply to all employees working on the projects, thus alleviating job-site friction. Like the agreement in *Boston Harbor*,

29

the PLAs are consistent with federal labor policy, and therefore, the non-statutory exemption

bars the Plaintiffs' federal antitrust claims.

> **b.      *Plaintiffs Fail to Plead Any Sherman Act Violation.***

Even if the nonstatutory labor exemption did not apply, Claims for Relief No. 3 would

have to be dismissed because the Plaintiffs have failed to sufficiently plead a cause of action

under the Sherman Act.  A "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do . . . ."  *Twombly*, 550 U.S. at 555 (2007) (quoting (former) Fed. R.

Civ. P. 8(e)(2)). "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions." *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019)

(quoting *Iqbal*, 556 U.S. at 678-79); *See also Animal Sci. Prods v. China Minmetals Corp.*, 34 F.

Supp. 3d 465, 483-484 (N.J.D.C. 2014) (quoting *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir.

2012) (when reviewing an antitrust complaint specificity is required; the court must "peel away"

conclusory allegations and only consider "well-plead factual allegations").  As the Plaintiffs here

do not even offer "[t]hreadbare recitals of the elements of [their antitrust] causes of action,"

*Iqbal*, 556 U.S. at 678, these claims must be dismissed.

Sherman Act Section 1 "declare[s] illegal" "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  The

Supreme Court long ago held that although every contract is a "restraint of trade," only contracts

that are "unreasonable restraints of trade" are unlawful.  *See, e.g., NCAA v. Board of Regents*,

468 U.S. 85, 98 (1984).  Thus, to state a Section 1 claim, the Plaintiffs must, at a minimum,

"allege (1) an agreement (2) to restrain trade unreasonably." *Lifewatch Servs. Inc.*, 902 F.3d at

331 (internal citations omitted).  There are various ways a plaintiff can satisfy "the unreasonable-

restraint element," but each requires the complaint, at a minimum, "to allege a relevant market." *Id.* at 336-37.

The Complaints allege an agreement – the PLAs – but fail otherwise to satisfy these minimum pleading requirements, because they fail either to sufficiently allege unreasonable restraints on trade or to identify a relevant market and any anticompetitive effects within any such market.  Plaintiffs allege that by disqualifying them from bidding for and/or working on the Public Entities' construction projects unless they agree to terms to which they object, the PLAs unreasonably restrain competition.  *ABC I* Compl. ¶¶ 59, 60; *ABC II* Compl. ¶¶ 57, 58.  The Public Entities have made agreeing to abide by the PLAs' terms a condition of working on a covered project.  However, the PLAs unambiguously provide that *any* contractor can bid on the construction projects, regardless of whether it otherwise has a contract with a labor union, and *any* worker can obtain work on a covered project, without having to join or pay any fees to a union.  And, as the Supreme Court made clear in *Boston Harbor,* any arguable restraint the PLAs place on competition is not "unreasonable."

In *Boston Harbor*, the Supreme Court specifically held that just as private developers can use pre-hire agreements on their privately funded construction projects, public entities have the right to do the same as market participants.  *Id.* at 231-232.  As noted earlier, the Court explained that PLAs simply provide the Plaintiffs the choice to "alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement." *Id.* at 231.  The Court further held that there is *no* harm to any of the workers whether they are union, non-union, or a member of a different union on a construction project covered by a PLA because Section 8(f) of the NLRA, which allows pre-hire agreements in the construction industry, also allows employees' to follow the NLRA's

procedures in Section 9 to cancel the union recognition after they have been hired, and/or select a different union if they desire. *Id.* at 230-231.

To state a Section 1 claim the Plaintiffs must, in addition to alleging an agreement that unreasonably restrains trade, identify the "relevant market" where the alleged unreasonable restraint had occurred. *Lifewatch Services*, 902 F.3d at 336-37.  Thus, Plaintiffs "bear[] the burden of defining both a relevant geographic and a relevant product market." *Id.* at 337.  The Complaints in these cases do not define any "relevant market" whatsoever, which is hardly surprising, since a single construction owner's projects could not possibly be a "relevant market" for antitrust purposes.  To paraphrase the Seventh Circuit in *Ehredt Underground, Inc.,* "what 'market' could that be, given that [Plaintiffs] remained free to sell [their services to other developers]? It would not make sense to speak of 'the market in [construction services for particular construction customer].'"  90 F.3d at 240 (finding antitrust plaintiffs failed to allege a relevant market when they complained they the lost the opportunity to dig trenches for a power company).

Plaintiffs' Section 2 claims fail for the same reasons.  Section 2 of the Sherman Act forbids a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of . . . trade or commerce."  15 U.S.C. § 2.  To state a monopolization claim, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Moreover, to survive a motion to dismiss, the complaint must plausibly allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3)

32

a dangerous probability of achieving monopoly power." *Phila. Taxi Ass'n, Inc. v. Uber, Inc.,* 886 F.3d 332, 339 (3d Cir. 2018).  As with a Section 1 claim, this standard requires the Plaintiffs, at the pleading stage, to define the relevant market, which, as just explained, they have failed to do. *Schuylkill Energy Resources, Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 415 (3d Cir. 1997) (to evaluate the claim, "we must consider the scope of the relevant market").

Moreover, rather than alleging that the Defendants engaged in "predatory or anticompetitive conduct" intended "to monopolize" a market, the Complaints' Exhibits demonstrate that the Defendants entered into their PLAs -- prehire collective bargaining agreements of a type common in the construction industry, *Boston Harbor*, 507 U.S. at 229 -- "to promote efficiency in the construction of [their projects] and to provide for the peaceful settlement of any and all labor disputes and grievances without strikes or lockouts, thereby promoting the public interest in assuring the timely and economical completion of [its projects]." CCAC PLA Art. I, § 1; Plum Borough PLA Art. I, § 1.  Thus, the Plaintiffs' Complaints directly refute any possible implication that the Defendants' conduct or motive violated the antitrust laws.

### c. *Plaintiffs Have Failed to Plead Antitrust Standing.*

The Plaintiffs have also failed sufficiently to allege antitrust standing.  A plaintiff "must also allege antitrust standing, including that its 'injury [is] of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Lifewatch Servs.*, 902 F.3d at 331 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).[13]  As discussed above, even if the Plaintiffs had alleged that they were somehow injured

---

[13] Antitrust standing is a prudential concept, separate and distinct from Article III standing. *Ethypharm S.A. Fr. v. Abbott Labs*, 707 F.3d 223, 232 (3d Cir. 2013).

by the PLA, the antitrust exemption necessary to accommodate federal labor law dispels any notion that the Plaintiffs have suffered the type of injury the antitrust laws were intended to prevent.  But more to the point, the Plaintiffs have not alleged that they suffered *any* injury that flows from the Defendants' action, much less *antitrust* injury, "a necessary . . . condition of antitrust standing." *Ethypharm v. Abbott Labs*, 707 F.3d at 232 (If antitrust injury is "lacking," the court need not address any other elements of standing).

Plaintiffs allege that the PLAs disqualify them from bidding for or working on the Public Entities' construction projects unless they agree to terms to which they object.  However, as demonstrated, the PLAs make it clear that any contractor can bid for a work on a covered construction project, regardless whether the contractor otherwise has a contract with a labor union, and any worker can obtain work on a covered project, without having to join or pay any fees to a union.  Any "injury" Plaintiffs may suffer thus flows not from the Defendants' actions, but from their own choices. They therefore lack standing to pursue their antitrust claims.  For all of these reasons, Claim No. 3 in the two Complaints must be dismissed.

### 4.      The Consolidated Complaints Fail to State Claims for Violations of State Competitive-Bidding Laws

Plaintiffs' Claims for Relief Nos. 4 allege violations of Pennsylvania state competitive bidding laws.  These claims must be dismissed as well.

### a.      The Plaintiff-Taxpayers have Failed to Establish Standing[14]

To establish standing to sue under Pennsylvania's competitive bidding laws, the Plaintiff-Taxpayers must not only allege they pay taxes, but also that they have a "substantial, direct, and

---

[14] Plaintiffs' obligation to establish standing to pursue a claim under Pennsylvania's competitive bidding law is separate and distinct from Article III standing.  *Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175-1176, 1178 (3d Cir. 1997).

immediate interest in the contract award which interest is greater than that of a common taxpayer." *C.O. Falter Constr. Corp. v. Towanda Mun. Auth.,* 614 A.2d 328, 331-332 (Pa. Comwlth. 1992); *In re Application of Biester,* 409 A.2d 848, 851 (Pa. 1979).  This is because "the prevention of waste of tax revenue alone has been correctly held to be an interest which is too remote, since [the taxpayer] is not directly or specifically affected by the loss . . . .  That interest is merely the same interest all citizens have in having others comply with the law or the constitution." *Conti Enterprises, Inc. v. S.E. Pennsylvania Transp. Auth*., 2003 WL 22594327, at *4 (E.D. Pa. Oct. 14, 2003) (citing *Nunemacher v. Borough of Middletown*, 759 A.2d 57, 61 (Pa. Commw. Ct. 2000); *In re Biester*, 409 A.2d at 851).

The Plaintiff-Taxpayers in these cases have failed to allege the requisite "substantial, direct, and immediate interest" to satisfy the taxpayer standing inquiry.  None of them has alleged that they submitted a bid on a project subject to either PLA.  Yet, Pennsylvania courts have consistently held that taxpayers with a far greater connection to the contracts they were challenging – *i.e.,* contractors that bid on but were not awarded contracts – failed to establish the requisite nexus between themselves and the expended funds to establish taxpayer standing.  *See, e.g., Falter Constr.,* 614 A.2d at 329-330 (disappointed bidder that failed to conform to bid requirements "lack[ed] direct, immediate and substantial interest and the causal connection necessary to provide standing."); *Conti Enterprises,* 2003 WL 22594327 at *3-4 (disappointed bidder's interest is "no different from that of all other taxpayers in having SEPTA minimize its expenditures by selecting the lowest bidder").  As the Plaintiff-Taxpayers in these consolidated cases fail to allege they submitted bids on any projects covered by challenged PLAs, their interest in these projects is even more attenuated than that of the disappointed bidders in *Falter*

*Constr.* and *Conti.*  They thus lack the sufficient nexus to any funds the Public Entities may have expended under the PLAs to establish taxpayer standing under Pennsylvania law.

Moreover, the Plaintiff-Taxpayers have failed to identify any expenditures by the Public Entities or any project on which application of either PLA "increase[ed] the costs of [any] construction project by more than a de minimis amount."  *ABC I* Compl. ¶ 41; *ABC II* Compl. ¶ 38.  They have thus provided no basis for inferring that any of the taxes they purportedly pay are at stake, a minimum requirement to establish taxpayer standing.  *See Falter Const.,* 614 A.2d at 330 ("a taxpayer whose funds are not at stake has no standing").

### b.      *The PLAs Do Not Violate Pennsylvania Competitive Bidding Laws*

The Commonwealth Court of Pennsylvania has repeatedly found the use of PLAs on public projects to be fully consistent with Pennsylvania's competitive bidding laws.  As the Court explained in *Pickett Const. v. Luzerne Co. Conv. Ctr.,* 738 A.2d at 26, PLAs are valid when they "simply require any person or entity as a condition for being engaged to perform work on the project to agree to be bound by the same rules and restrictions as others similarly engaged." (Citations omitted).  On that basis, the Court in *Pickett* specifically held that a PLA that, like those at issue in these consolidated cases, generally required contractors to secure their employees through the unions' hiring halls but provided a core employee exception for non-union contractors, did not unlawfully discriminate against non-union contractors.  *Id.* at 25-26.

In *Sossong v. Shaler Area Sch. Dist.,* 945 A.2d at 793-94, and *Hawbaker v. Commonwealth,* 2009 Pa. Commw. LEXIS 1755 at * 12, the Commonwealth Court held that using far more restrictive PLAs – both of which, unlike *Pickett* and the PLAs here, did not contain core employee provisions – was permissible and did not violate the state's competitive bidding laws.  In fact, in the prior action involving a virtually identical PLA between CCAC and

the Building Trades, the Court of Common Pleas of Allegheny County rejected the arguments of many of the same *ABC I* Plaintiffs that the agreement ran afoul of Pennsylvania's competitive bidding laws. *Glancy & Sons v. CCAC*, No. GD10-14783 (finding it unlikely the plaintiffs would "succeed on the merits" because similar PLAs were upheld in *Sossong* and *Pickett*).[15]

    *Allan Myers, L.P. v. DOT,* 202 A.3d 205, 215 (Pa. Cmwlth. 2019), the lone case in which the Commonwealth Court found a PLA to violate the state's competitive bidding laws, dealt with the exact opposite situation, where contractors were not all playing by the same rules. The court in *Allan Myers* understood the PLA to provide special treatment to contractors that recognized a Steelworkers local union, by exempting them from the PLA's hiring hall and no-strike provisions. The court held that such preferential treatment rendered the use of the PLA discriminatory, writing "the PLA favored contractors under agreement with the United Steelworkers, *and for this reason alone,* there is no common standard on which bids are based." *Id.* at 215-16 (emphasis added); *see also id.* at 215 (distinguishing *Sossong* and *Pickett,* which "did not contain an exemption for certain contractors with a specific union affiliation.")

---

[15] Other jurisdictions that have addressed the issue under their own competitive bidding laws are in accord. *See, e.g., Enertech Elec, Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996); *Minn. Chapter of Associated Builders & Contrs., Inc. v. County of St. Louis*, 825 F. Supp. 238, 244 (D.Minn. 1993); *Laborers Local #942 v. Lampkin*, 956 P.2d 422, 436 (Alaska 1998); *Associated Builders and Contrs. v. S.F. Airports Comm'n*, 981 P.2d 499, 509 (Cal. 1999); *Master Builders of Iowa, Inc., v. Polk County*, 653 N.W.2d 382, 396 (Iowa 2002); *John T. Callahan & Sons, Inc. v. City of Maiden*, 713 N.E 2d 955, 964 (Mass. 1999); *Queen City Constr., Inc. v. City of Rochester*, 604 N.W.2d 368, 378 (Minn. Ct. App. 1999); *Associated Builders and Contrs. v. So. Nevada Water Auth.*, 979 P.2d 224, 229 (Nev. 1999); *New York State Chapter, Inc. v. New YorkState Thruway Auth.*, 666 N.E.2d 185, 191-92 (N.Y. 1996); *Ohio ex rel. Associated Builders and Contrs. v. Jefferson County Bd. of Comm'rs*, 665 N.E.2d 723, 727 (Ohio Ct. App. 1995); *Associated Builders & Contrs. of R.I., Inc. v. Dep't of Admin.*, 787 A.2d 1179, 1187-89 (R.I. 2002).

Accordingly, under well-established Pennsylvania law, the PLAs in these consolidated cases, like those in *Pickett, Sossong and Hawbaker,* and unlike the PLA in *Allen Myers,* are lawful, and Claim for Relief No. 4 must be dismissed.

### c.    The Pendant State Law Claims Must be Dismissed

Finally, because as demonstrated above, all the Federal claims in these consolidated cases must be dismissed, this Court should dismiss the state law claims as well.  Under 29 U.S.C. § 1367(c)(3), once a court dismisses all the Federal claims, the court "should decline to exercise jurisdiction over [these] pendant state claims unless extraordinary circumstances are present." *Associated Builders & Contractors, et. al. v. Cty. of Northampton*, 376 F. Supp.3d 476, 492 (E.D. Pa. 2019) (internal quotations omitted) (*citing Shaffer v. Bd. of Sch. Dirs. of the Albert Gallatin Area Sch. Dist*., 730 F.2d 910, 912 (3rd Cir. 1984)).  In fact, the Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims, unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added; *citing United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.")). Plaintiffs have alleged no facts that even suggest the presence of "extraordinary circumstances." Nor could they, given the abstract and conjectural nature of their claims. And given the early stage of this litigation and the fact all the parties are in Pennsylvania, there are no practical reasons for retaining federal jurisdiction over the state claims.

## CONCLUSION

For the reasons stated in this memorandum, the complaints in these Consolidated Cases should be dismissed, with prejudice, in their entirety.

Respectfully submitted,

Christopher R. Opalinski, Esquire
PA 35267
F. Timothy Grieco, Esquire
PA 81104
Sean J. Donoghue, Esquire
PA 321357
Eckert Seamans Cherin & Mellott
44th Floor, 600 Grant Street
Pittsburgh, Pa 15219
412/566-6000

*Counsel for Defendants Community College
of Allegheny County and Quintin B. Bullock*

Craig H. Alexander, Esquire
PA 62938
Dayne Dice, Esquire
PA 319293
Bruce E. Dice & Associates, P.C.
787 Pine Valley Drive, Suite E
Pittsburgh, PA  15239
724/733-3080


*Counsel for Plum Borough*

/s/ *Joshua M. Bloom*
Joshua M. Bloom, Esquire
PA 78072
Joshua M. Bloom & Associates, P.C.
2201 Liberty Avenue, Suite 204
Pittsburgh, PA 15222
412/288-6000

Victoria L. Bor, Esquire
DC 288852
Jonathan D. Newman, Esquire
DC 449141
Sherman Dunn, P.C.
900 Seventh Street, N.W.  Suite 1000
Washington, D.C.  20001
202/785-9300

*Counsel for Defendant Pittsburgh Regional
Building Trades Council, AFL-CIO*