**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Associated Builders & Contractors of<br>Western Pennsylvania; Arrow Electric Inc.;<br>Hampton Mechanical Inc.; Lawrence<br>Plumbing LLC; R.A. Glancy & Sons Inc.;<br>Westmoreland Electric Services LLC;<br>Gregory H. Oliver Jr.; Daniel Vincent<br>Glancy; Robert L. Casteel; Jason Phillip<br>Boyd; Robert A. Glancy IV, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 20-649 |
| Community College of Allegheny County;<br>Quintin B. Bullock, in his official capacity<br>as President of the Community College of<br>Allegheny County; Pittsburgh Regional<br>Building Trades Council, | ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Associated Builders & Contractors of<br>Western Pennsylvania; Hampton<br>Mechanical Inc., Lawrence Plumbing LLC,<br>and R.A. Glancy & Sons Inc., as individuals<br>and on behalf of others similarly situated;<br>Robert L. Casteel; Anthony Scarpine,<br>as individuals and on behalf of others<br>similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 20-1933 |
| Plum Borough; Pittsburgh Regional<br>Building Trades Council, | ) ) ) | |
| Defendants. | ) | |

_____

1

## <u>MEMORANDUM OPINION</u>

These consolidated cases involve claims brought by Plaintiff Associated Builders & Contractors of Western Pennsylvania ("ABC") and some of its contractor members and their employees, challenging project labor agreements ("PLAs") entered into by Defendant Pittsburgh Regional Building Trades Council (the "Building Trades Council") and two public entities, Defendant Community College of Allegheny County ("CCAC") and Defendant Plum Borough (collectively, the "Public Entities"). Plaintiffs seek to invalidate the PLAs, alleging that they violate the United States Constitution, the National Labor Relations Act, the Sherman Antitrust Act, and Pennsylvania competitive bidding laws, while the ABC II Plaintiffs further allege that they are acting on behalf of classes of contractors and employees. Plaintiffs also seek damages for past injuries.

On December 22, 2020, the Court issued an Order to Show Cause why ABC I and ABC II should not be consolidated or otherwise coordinated for pre-trial proceedings because counsel for Plaintiffs had listed *Associated Builders & Contractors of Western Pennsylvania et al. v. Community College of Allegheny County et al.* (Civil Action No. 20-649 ("ABC I")[1] as a related case on the associated Civil Cover Sheet when filing the Complaint in *Associated Builders & Contractors of Western Pennsylvania et al. v. Plum Borough et al.* (Civil Action No. 20-1933 ("ABC II")), and because both cases had been assigned to this member of the Court. (Docket No. 55).[2] On January 21, 2021, the Court – noting that both cases also involve many of the same Plaintiffs and a common Defendant, that they raise nearly identical issues arising from language

---

[1] The ABC I Plaintiffs also name Quintin B. Bullock, in his official capacity as President of CCAC, as a defendant, although his name does not appear anywhere else in the ABC I Amended Complaint.

[2] Since identical documents have been filed in both ABC I and ABC II, the Court's citations will refer to the record in ABC I ("Docket"), unless otherwise indicated. In instances where documents have been filed in only one case, the Court will cite to "ABC I Docket" or "ABC II Docket."

contained in the PLAs, and that the parties had indicated in response to the Court's order to show cause that they do not oppose coordinating or consolidating these actions for purposes of deciding motions to dismiss – found that ABC I and ABC II involve common questions of law and fact and that it is in the interests of judicial economy to decide all motions to dismiss in these actions in a single consolidated proceeding.  (Docket No. 61).  Accordingly, the Court ordered that ABC I and ABC II be consolidated for purposes of deciding any motions to dismiss filed therein.  (*Id.*).

Presently before the Court is Defendants' Joint Motion to Dismiss Consolidated Complaints Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and brief in support (Docket Nos. 65, 66), as well as Plaintiffs' brief in opposition thereto (Docket No. 69) and Defendants' reply (Docket No. 72).  The Court heard oral argument in the matter on January 12, 2022.  (Docket Nos. 76, 77 (Transcript of Proceedings, hereinafter "Tr.")).  For the reasons set forth herein, Defendants' motion is granted in part and denied in part.

I.  **Background**

A.  **The ABC I PLA Between CCAC and the Building Trades Council**

As Plaintiffs allege, on February 15, 2011, CCAC and the Building Trades Council entered into the PLA at issue in *ABC I*.  (ABC I Docket No. 33, ¶ 21).  According to that PLA, CCAC entered into the agreement in order to ensure the efficient, safe, quality, timely, and on-budget completion of its construction projects.  (ABC I Docket No. 33-1 (the "CCAC PLA"), Art. I, § 1). The CCAC PLA provides that it was intended to achieve a timely and on-budget completion of the Project by:

    a)    avoiding the costly delays of potential strikes, sympathy strikes,
          jurisdictional strikes, slowdowns, walkouts, picketing, handbilling
          and any other disruptions or interference with work, and promoting
          labor harmony and peace for the duration of the Project;

      b)     standardizing terms and conditions governing the employment of labor on the Project;

      c)     permitting a wide flexibility in work scheduling, shift hours and starting times;

      d)     achieving negotiated adjustments as to work rules and staffing requirements from those which otherwise might obtain;

      e)     providing comprehensive and standardized mechanisms for the settlement of work disputes;

      f)     ensuring a reliable source of skilled and experienced labor; and

      g)     furthering public policy objectives, to the extent lawful, as to improved employment opportunities for Minority Business Enterprises, [and] Women Business Enterprises.

(*Id.* Art. III, § 1).

The CCAC PLA provides that any contractor can bid for covered work, regardless of whether it performs work elsewhere on a union or non-union basis or whether its employees are union members. (CCAC PLA, Art. I, § 2). However, all contractors on a covered project must execute and become bound to the PLA while working on that project, and they must recognize the local unions affiliated with the Building Trades Council as the exclusive bargaining representatives of their craft employees working on that project. (*Id.* Art. I, § 2; Art. VI, § 1). Also, where the local union representing a contractor's craft operates a referral system ("hiring hall"), the CCAC PLA requires the contractor to look first to that hiring hall to secure its employees, and the unions are to exert their best efforts to recruit sufficient numbers of skilled craft workers to fulfill the contractor's needs. (*Id.* Art. VI, §§ 3, 7). According to the CCAC PLA, the local unions are to operate their hiring halls "in a non-discriminatory manner" and to make referrals without regard to any "obligations of union membership." (*Id.* Art. VI, § 3). The CCAC PLA also states that employees will not be required "to join any Union or pay any agency fees or dues as a condition

of being employed, or remaining employed," on a covered Project.  (*Id.* Art. VI, § 8).  The CCAC

PLA makes an exception from the referral system for any contractors that do not have a preexisting

relationship with one of the affiliated unions, and it permits those contractors to employ a certain

number of "core employees" not referred by the unions.  (*Id.* Art. VI, § 9). The CCAC PLA also

provides that contractors retain the right to determine the competency of their employees, to reject

any referral for any just reason, and to select their craft foreman and/or their general foreman.  (*Id.*

Art. VI, §§ 2, 3, 10).  Further, if the unions fail to provide a contractor with satisfactory referrals

within 48 hours, the contractors may hire from other sources.  (*Id.* Art. VI, § 5).  Additionally, the

CCAC PLA requires contractors and subcontractors to contribute to the unions' pension and

health-care funds.  (*Id.* Art. XI, § 2).

### B.   The ABC II PLA between Plum Borough and the Building Trades Council

Unlike the CCAC PLA, which covers CCAC construction projects generally, the PLA at

issue in ABC II between Plum Borough and the Building Trades Council states that it "applies

exclusively to the onsite construction of the new borough building (the 'Project')."  (ABC II

Docket No. 1-2 (the "Borough PLA"), Art. I, § 1).  Similar to the CCAC PLA, the Borough PLA

provides that it is intended to ensure the timely and on-budget completion of the Project.  (*Id.*).

Also like the CCAC PLA, the Borough PLA provides that it is intended to foster the achievement

of completion of the Project by avoiding potential strikes, standardizing terms and conditions of

employment, permitting flexibility in scheduling, establishing dispute resolution mechanisms, and

ensuring a reliable supply of skilled labor.  (*Id.* Art. III, § 1).

In all other respects material to the consolidated cases, the Borough PLA is identical to the

CCAC PLA.  The Borough PLA is available to and will apply to any successful bidder for work

on the Project.  (Borough PLA, Art. I, § 2).  The Borough PLA's terms apply to all contractors,

but non-union contractors may bring with them a certain number of "core" employees.  (*Id.* Art. VI, § 9).  However, where the appropriate local unions operate referral systems, union and non-union contractors must both look first to those hiring halls to secure their employees, while retaining the right to reject any referral and to look elsewhere if the local unions fail to satisfy their hiring requirements.  (*Id.* Art. VI, §§ 2-5).  The Borough PLA states that unions "will exert their utmost efforts" to find skilled workers to satisfy the contractors' needs, to operate their hiring halls in a "non-discriminatory manner," and to refer employees without regard to any "obligations of union membership, policies, or requirements."  (*Id.* Art. VI, §§ 3, 7).  Finally, the Borough PLA unequivocally states that, "[t]he employees covered by this agreement will not be required to join a union or to pay dues or agency fees as a condition of being employed, or remaining employed on the Project."  (*Id.* Art. VI, § 8).  Additionally, the Borough PLA requires contractors and subcontractors to contribute to the unions' pension and health-care funds.  (*Id.* Art. XIII, § 2).

### C.  <u>The Consolidated Complaints</u>

The First Amended Complaint in ABC I (ABC I Docket No. 33 ("Amended Complaint")) was filed on July 27, 2020, and the Complaint in ABC II (ABC II Docket No. 1) was filed on December 12, 2020 (collectively, the "Consolidated Complaints").  According to the Consolidated Complaints, Plaintiff ABC is a membership organization of contractors that operate in Western Pennsylvania.  (ABC I Docket No. 33, ¶¶ 4, 31; ABC II Docket No. 1, ¶¶ 4, 25).  Plaintiffs Arrow Electric Inc., Hampton Mechanical Inc., Lawrence Plumbing LLC, R.A. Glancy & Sons Inc., and Westmoreland Electric Services LLC (the "ABC I Contractors") are non-union contractor members of ABC.  (ABC I Docket No. 33, ¶ 5-9, 39).  The ABC I Contractors contend that the CCAC PLA requires them to: (1) recognize a Building Trades Council affiliated union as their employees' exclusive representative; (2) hire employees from the union's job-referral system; and

(3) contribute to the union's pension and health-care funds.  (*Id.* ¶¶ 35, 39).  Plaintiffs Gregory H. Oliver Jr. is a worker employed by Hampton Mechanical, and Daniel Vincent Glancy and Robert L. Casteel are workers employed by R.A. Glancy & Sons.  (*Id.* ¶¶ 10-12).  Mr. Oliver, Mr. Glancy, and Mr. Casteel (the "ABC I Employees") are not members of any union, and they allege that the CCAC PLA prevents them from working on CCAC's construction projects because they have chosen not to be union members, and that the agreement compels them to obtain employment through the unions' hiring halls.  (*Id.* ¶ 40).  Plaintiffs Jason Phillip Boyd and Robert A. Glancy IV (the "ABC I Taxpayers") are residents of, and taxpayers in, Allegheny County and the Commonwealth of Pennsylvania.  (*Id.* ¶¶ 13-14).  They allege that the enforcement of the CCAC PLA causes CCAC to award its construction projects to "someone other than the lowest responsible bidder."  (*Id.* ¶ 41).

Plaintiffs in ABC II are ABC, Hampton Mechanical, Lawrence Plumbing, and R.A. Glancy & Sons (the "ABC II Contractors"), which claim they are "likely to apply for onsite construction work from Plum Borough in the reasonably foreseeable future, and each of them is able and ready to apply for that work."  (ABC II Docket No. 1, ¶¶ 25, 30, 34).  The ABC II Contractors assert that the Borough PLA has prevented them from "obtaining past onsite construction work from Plum Borough," for which they seek damages.  (*Id.* ¶ 35).  They also purport to represent a class of between 50 and 70 contractors that are either non-union or recognize unions that are not Building Trades Council affiliates and "would have applied, or would be likely to apply in the reasonably foreseeable future," for Plum Borough's construction work.  (*Id.* ¶¶ 74, 75).  Plaintiffs Robert L. Casteel (an employee of R.A. Glancy & Sons) and Anthony Scarpine (an employee of Hampton Mechanical) assert standing both as non-union employees prevented by the Borough PLA from working on Plum Borough construction projects, *id.* ¶ 36 (the "ABC II Employees"), and as injured

resident taxpayers of Plum Borough, *id.* ¶ 38 (the "ABC II Taxpayers"). The ABC II Employees purport to represent a class of between 500 and 1,000 employees similarly harmed by Plum Borough's enforcement of the Borough PLA. (*Id.* ¶¶ 36, 37, 83, 84).

The ABC I Amended Complaint contains four Claims for Relief: (I) violation of the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983; (II) violation of the National Labor Relations Act; (III) violation of federal antitrust laws; and (IV) violation of Pennsylvania competitive bidding laws. The ABC II Complaint contains the same four Claims for Relief, but also purports to sue on behalf of a class of contractors and a class of employees. As discussed, *supra*, the Court consolidated ABC I and ABC II for purposes of deciding motions to dismiss, and Defendants thereafter filed their joint motion to dismiss. The motion has been fully briefed and is now ripe for decision.

## II. <u>Standards of Review</u>

### A. <u>Rule 12(b)(1) of the Federal Rules of Civil Procedure</u>

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the "court's 'very power to hear the case.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). There is a crucial difference between a Rule 12(b)(1) motion that attacks a complaint on its face, and a Rule 12(b)(1) motion that attacks the existence of subject matter jurisdiction in fact – apart from any pleadings. *See Mortensen*, 549 F.2d at 891. With a facial attack, a court must consider the allegations of a complaint as true, as with a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(6), discussed *infra*. *See id.* With a factual attack, however, the Court ordinarily is not required to limit its inquiry to the facts as they are pled in the complaint because a presumption of truth is not attached to the plaintiff's allegations, and

8

the plaintiff bears the burden of proving that jurisdiction over the subject matter at issue exists. *See id.*; *see also Brown v. Tucci*, 960 F. Supp. 2d 544, 561-62 (W.D. Pa. 2013) (citing *Dev. Fin. Corp. v. Alpha Hous. & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995)).

### B.   Rule 12(b)(6) of the Federal Rules of Civil Procedure

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (additional internal citation omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

It should be further noted, therefore, that in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard "'does not impose a probability

requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation omitted)).

### III.  Legal Analysis

#### A.  Rule 12(b)(1) and Article III Standing

Defendants first argue that the Consolidated Complaints should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) because Plaintiffs all fail to establish that they have standing to bring the claims alleged therein.  To establish standing at the pleading stage, Plaintiffs must clearly allege facts demonstrating that the three elements required to meet Article III's "irreducible constitutional minimum" of standing are met.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Specifically, Plaintiffs have the burden of establishing that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*  Further, to plead "injury in fact," Plaintiffs must establish three sub-elements:  (1) the invasion of a legally protected interest, (2) that the injury is concrete and particularized, and (3) that the injury is actual or imminent, not conjectural or hypothetical.  *See Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 348, 352 (3d Cir. 2020), *cert. granted, judgment vacated on other grounds by Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  Additionally, while imminence is an "elastic concept," such injury must be "certainly impending," rather than simply "possible future injury." *Id.* at 348.

In considering a facial attack on standing under Rule 12(b)(1), the Court applies "the same

standard as on review of a motion to dismiss under Rule 12(b)(6)."  *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625,633 (3d Cir. 2017).  "Consequently, we accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor."  *Id.* (footnote omitted). "Nevertheless, '[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "We disregard such legal conclusions."  *Id.* "Thus, '[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter,' that would establish standing if accepted as true." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Watley v. Pennsylvania, 516 F. Supp. 3d 423, 427 (M.D. Pa. 2021)

Plaintiffs in this case fall into three groups:  (1) ABC, the ABC I Contractors, and the ABC II Contractors (collectively, the "Contractors"); (2) the ABC I Employees and the ABC II Employees (collectively, the "Employees"); and (3) the ABC I Taxpayers and the ABC II Taxpayers (collectively, the "Taxpayers").

### 1.  **The Contractors**

Defendants first argue that the Contractors lack standing to pursue their claims.  According to the Consolidated Complaints, ABC – based on its relationship with the ABC I Contractors and the ABC II Contractors – has associational standing to challenge the CCAC PLA and the Borough PLA.[3]  (ABC I Docket No. 33, ¶ 33; ABC II Docket No. 1, ¶ 27).  *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (explaining that associational standing is dependent on a party showing that "its members would otherwise have standing to sue in their own right," "the interests it seeks to protect are germane to the organization's purpose," and "neither the claim asserted nor the relief requested requires the participation of individual members in the

---

[3]     The Court notes that Defendants do not appear to object to ABC's assertion of associational standing, but they do disagree that ABC's members have the requisite standing in their own right.

lawsuit").  The Consolidated Complaints allege that, because the Contractors' employees "have exercised their constitutional right to decline union membership," the Contractors are ineligible to work on construction projects unless they:

> (1) recognize[] a union that belongs to the [Building Trades Council] as the exclusive representative of [their] employees – even though [their] employees have exercised their constitutional and statutory rights to decline union representation; (2) hire employees from the [sic] a union's job-referral systems rather than use [their] own employees to perform work on [the projects at issue]; and (3) contribute to that union's pension and health-care funds.

(ABC I Docket No. 33, ¶ 39; ABC II Docket No. 1, ¶ 33).  The Consolidated Complaints conclude, "This inflicts injury in fact."  (*Id.*).  Further, the Consolidated Complaints aver that "[t]his injury is caused by" Defendants' "enforcement of" the PLAs, and that "it will be redressed by declaratory and injunctive relief that prevents the defendants from enforcing the PLA[s]."  (*Id.*).

Defendants argue, however, that the Contractors lack standing to pursue any of their claims because they fail to allege past harm or future harm adequately in the Consolidated Complaints.

### i.  **The ABC I Contractors**

Defendants assert in their initial brief that the ABC I Contractors do not allege that the CCAC PLA was used on any particular project on which they bid and were denied work because of that PLA, nor do they allege that the CCAC PLA was used on any particular project on which they *would have bid* but could not because of that PLA, nor do they allege some impending future use of the CCAC PLA.  Defendants argue that the ABC I Contractors' Amended Complaint therefore fails to allege either "concrete or particularized" harm or "actual or imminent" harm.

In response, Plaintiffs assert that the allegations in the ABC I Amended Complaint are sufficient to establish both past and future injury.  Plaintiffs argue that they do not need to identify either a specific past project that the ABC I Contractors declined to bid on because of the CCAC

PLA or a specific future project on which they will bid.  Nevertheless, even though they maintain that it is unnecessary to do so, Plaintiffs attach to their response Declarations from four of the five ABC I Contractors stating that they wanted to bid, and would have bid, on past projects, but did not do so because of the CCAC PLA.  (Docket Nos. 69-1, ¶ 9; 69-2, ¶ 9; 69-3, ¶ 9; 69-4, ¶ 8).  These Declarations also state that those four Contractors are certain or likely to bid on CCAC projects in the reasonably near future if the CCAC PLA is removed, and that they are able and ready to apply to such future projects.  (Docket Nos. 69-1, ¶ 11; 69-2, ¶ 11; 69-3, ¶ 11; 69-4, ¶ 11).  Plaintiffs conclude that the ABC I Contractors' Declarations clearly add sufficient factual allegations to establish both past and future injury.

Upon review of the ABC I Amended Complaint, the Court agrees with Defendants that it alone does not allege sufficient facts to establish the ABC I Contractors' past or future injury.[4] However, upon review of the ABC I Amended Complaint along with the Declarations submitted in support, the Court finds that most of the ABC I Contractors do allege sufficient facts to show both past and future injury.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (noting that district courts may allow a plaintiff "to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of" standing).

With regard to *past* injury, the ABC I Amended Complaint alleges that the enforcement of the CCAC PLA causes the ABC I Contractors harm, and the Declarations include statements from certain Contractors that they would have bid on specific past CCAC projects but for that PLA. The Court therefore finds that sufficient facts are alleged to establish particularized, actual harm

---

[4]    Defendants point out that the ABC I Amended Complaint describes the action as a "suit to enjoin [CCAC] and its officials from enforcing their [PLA]," and that it specifically seeks injunctive relief but not compensatory damages.  (ABC I Docket No. 33 at 1).  In their brief and at oral argument, however, Plaintiffs argued that the ABC I Amended Complaint also alleges past injury and – although not specifically requested – preserves a claim for nominal and compensatory damages.  (Docket No. 69 at 9-10; Tr. at 13).

to the ABC I Contractors which submitted such Declarations, namely, R.A. Glancy & Sons, Westmoreland Electrical Services, and Hampton Mechanical. However, Lawrence Plumbing does not indicate in its Declaration that it would have submitted a bid for a past CCAC project (and refers only to wanting to bid on the Borough project in its Declaration), and Arrow Electric has submitted no Declaration at all in support of its claims, so the Court finds that these two parties have not established standing to sue for past injury based on the CCAC PLA.

With regard to *future* injury, the Court likewise notes that the ABC I Amended Complaint alleges that the enforcement of the CCAC PLA causes the ABC I Contractors injury and that CCAC will continue imposing the CCAC PLA in future construction projects, and the Declarations include statements that certain Contractors are "certain" (or, in one case, "likely") to bid on some contracts from CCAC in the future if the CCAC PLA is not used. (ABC I Docket Nos. 33, ¶¶ 23, 39; 69-1, ¶ 11; 69-2, ¶ 11; 69-3, ¶ 11; 69-4, ¶ 11). The Court therefore finds that sufficient facts are alleged to establish imminent harm (because of the CCAC PLA) to the ABC I Contractors who submitted such Declarations, namely, R.A. Glancy & Sons, Westmoreland Electrical Services, Hampton Mechanical, and Lawrence Plumbing. However, one of the Contractors, Arrow Electric, has not submitted such a Declaration, nor is there any allegation in the ABC I Amended Complaint that Arrow Electric has any intention to bid on a CCAC project in the future, so the Court finds that Arrow Electric has not alleged facts to establish future harm based on the CCAC PLA.[5]

_____

[5]    Additionally, Plaintiffs contend that they are not required to show that each Plaintiff has standing, arguing that they instead only need to show that one Plaintiff in each case has Article III standing to seek prospective relief. Plaintiffs further argue that if one Plaintiff has shown standing to seek prospective relief, then none of the other Plaintiffs should be dismissed on standing grounds. Plaintiffs' argument in this respect is unsupported, however, since the cases cited in support specifically involved intervenors of right under Fed. R. Civ. P. 24(a)(2), who were not required to show independent Article III standing if the relief they sought was not broader than or different from the party that invoked a court's jurisdiction. *See Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020); *Town of Chester, N.Y. v. LaRoe Estates, Inc.*, 137 S. Ct. 1645, 1650-52 (2017).

### ii.  The ABC II Contractors

With regard to ABC II, Defendants argue in their initial brief that the Borough PLA explicitly applies only to the Project specifically referenced therein, and that the ABC II Contractors do not allege whether that Project has already taken place or is currently taking place, nor do they identify any other specific projects on which they plan to bid in the future.  Defendants conclude that the ABC II Contractors' allegations are therefore "bald assertions that rest on mere speculation" or "allegations of possible future injury," which are insufficient to support standing. *Bognet*, 980 F.3d at 362.

In response, the ABC II Contractors (Hampton Mechanical, Lawrence Plumbing, and R.A. Glancy & Sons) argue that they do adequately allege both past and future injury because they are not required to plead the level of detail that Defendants assert is missing from the Complaint. Thus, the ABC II Contractors assert that their allegation that the Borough PLA has "prevented" them "from obtaining past onsite construction work from Plum Borough on account of the borough's project labor agreement" – which must be assumed true and construed in their favor – adequately alleges past injury without a need for greater detail as to the status of that project.  (ABC II Docket No. 1, ¶ 35).  Additionally, the ABC II Contractors argue that their allegation that they "are likely to apply for onsite construction work from Plum Borough in the reasonably foreseeable future, and each of them is able and ready to apply for that work," adequately alleges future injury. (*Id.* ¶ 34).  Regardless of whether supplemental information is required for them to establish standing, the ABC II Contractors note that their attached Declarations supply any necessary additional factual details to support their allegations of past harm since they indicate that they would have bid on the Project but for the inclusion of the Borough PLA, and that those Declarations also provide additional detail as to their intentions regarding future Plum Borough

15

projects.

Upon review of the ABC II Complaint – like the ABC I Amended Complaint – the Court agrees with Defendants that it alone does not allege sufficient facts to demonstrate that the ABC II Contractors suffered past or future injury. However, upon review of the ABC II Complaint along with the Declarations submitted in support, the Court finds that the ABC II Contractors do allege sufficient facts to allege *past* injury since the ABC II Complaint alleges that the Contractors have been injured on account of the Borough PLA, and the Declarations state that the Contractors would have submitted bids on the Project but for the Borough PLA. (ABC I Docket Nos. 69-1, ¶ 9; 69-3, ¶ 9; 69-4, ¶ 8; ABC II Docket No. 1, ¶ 35).

Whether the ABC II Contractors have shown that they have standing to pursue prospective relief based on allegations of *future* injury, however, is a separate issue. Defendants argue that the Borough PLA, which is attached to the ABC II Complaint, squarely contradicts certain allegations of fact that the ABC II Contractors make as to future harm. Specifically, the ABC II Complaint alleges that the ABC II Contractors are likely to apply for work from the Borough in the future and they are able and ready to apply for that work, and that they therefore have standing to seek declaratory and injunctive relief against enforcement of the Borough PLA. (ABC II Docket No. 1, ¶ 34). However, the Borough PLA specifically states that it "applies exclusively to the onsite construction of the new borough building (the 'Project')," and the Contractors' Declarations provide that bids for such project were already solicited for the Project on December 8, 2020. (ABC I Docket Nos. 69-1, ¶ 8; 69-2, ¶ 8; 69-3, ¶ 8; 69-4, ¶ 7; ABC II Docket No. 1-2 at 1). Nevertheless – despite the fact that the PLA itself specifies that it *only* applies to a certain project for which bids were accepted over a year ago (and thus *not* to future projects) – Plaintiffs argue that the Court must accept their claim that this PLA will harm them in the future because the Court

must accept their allegations as true when considering a motion to dismiss.

However, Defendants point out that they are making a factual Rule 12(b)(1) challenge in attacking the allegations underlying the assertion of jurisdiction in the Complaint – rather than a facial challenge in which the allegations themselves have not been challenged – so the Court is not required to accept all of Plaintiffs' allegations as true. *See Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). Further, the Court notes that the allegations that the Borough PLA will apply to future Plum Borough projects, and will therefore also cause future injury to Plaintiffs, are flatly contradicted by the terms of the PLA that Plaintiffs attached to their Complaint. When a document attached as an exhibit to a complaint conflicts with allegations made therein, "the exhibits control." *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 111-12 (3d Cir. 2018). Therefore, because the Borough PLA by its terms clearly indicates that it applies exclusively to the Project for which bids have already been accepted, the Court finds that the ABC II Contractors have failed to allege future harm based on that attached Borough PLA, and thus they have failed to establish standing to pursue prospective relief from the Borough in ABC II.

## 2. **The Employees**

Defendants also contend that the Employees lack standing to sue.[6] The Employees argue, generally, that they have been harmed in two ways: (1) they are inconvenienced by having to go through the union hiring halls to seek work on CCAC or Borough projects (and they allege that the hiring halls will not refer them if they are not union members), and (2) their work opportunities

---

[6]     The Court notes that the ABC II Employees are also the ABC II Taxpayers and that, together with the ABC I Taxpayers, they assert additional claims as municipal taxpayers. (ABC I Docket No. 33, ¶¶ 13, 14, 41; ABC II Docket No. 1, ¶¶ 8, 9, 38). Although the allegations in the Consolidated Complaints do not clearly indicate which Plaintiffs are asserting the various claims alleged, the only claims that the Taxpayers appear to assert here are the pendent state law claims in their fourth Claims for Relief. (ABC I Docket No. 33, ¶¶ 64-74; ABC II Docket No. 1, ¶¶ 63-73). Because, as set forth in detail, *infra*, the Court is dismissing Plaintiffs' federal claims and will decline to exercise supplemental jurisdiction over their state law claims if Plaintiffs choose not to amend their complaints, the Court will not address, at this juncture, whether the Taxpayers have alleged facts to show that they have standing to sue.

are impaired since their employers, the Contractors, will have difficulty obtaining work on CCAC or Borough projects because of the PLAs.  (Tr. at 15-16).  Specifically, in the Consolidated Complaints, the Employees allege that the CCAC/Borough PLAs prevent them "from working on [CCAC/Borough] construction projects because they have exercised their constitutional and statutory right to decline union membership, and it compels them to obtain employment through the unions' hiring halls if they want to perform any onsite construction work," which "inflicts injury in fact."  (ABC I Docket 33, ¶ 40; ABC II Docket No. 1, ¶ 36).  The Employees also claim that any future injury "will be redressed by declaratory and injunctive relief that prevents the defendants from enforcing the PLA."  (*Id.*).  Additionally, the ABC II Employees, Mr. Scarpine and Mr. Casteel, separately allege that they "have also been prevented from obtaining past onsite construction work from Plum Borough on account of" the Borough PLA, and that they therefore have standing to seek damages for such past injuries on behalf of themselves and on behalf of the class they seek to represent.  (ABC II Docket No. 1, ¶ 37).  Plaintiffs maintain that they seek damages for past injuries, even if such damages are not clearly specified in both Consolidated Complaints.

Defendants argue that all the Employees fail to allege "actual or imminent harm" because they fail to identify any specific past, ongoing or imminent projects on which they have sought work or would be seeking work if not for the presence of the CCAC PLA or the Borough PLA. Defendants conclude that the Employees have therefore failed to show past or future "injury in fact" to establish standing.  Defendants also argue that the Employees fail to establish that their injuries are "fairly traceable" to the PLAs since those agreements do not, by their actual terms, explicitly interfere with the right to decline union membership and since, under certain circumstances, a non-union employer can still hire a number of non-core employees.

In response, the Employees argue that, although they do not need to identify specific imminent projects or specific past projects in order to show past or future injury, the Contractors' Declarations establish that the PLAs have deterred their employers from submitting bids on past CCAC and Borough projects and that the PLAs will continue to prevent their employers from bidding on similar work in the future absent relief from the Court. The Employees note that these Declarations show that the PLAs have prevented in the past, and will prevent in the future, the Employees from working on CCAC or Borough projects, which shows past and future harm. The Employees also submit that the requirement that, to seek work on CCAC and Borough projects, they must go through union halls – which will not hire them if they are not members of a union – serves only to inconvenience the Employees, and also clearly establishes Article III injury. *See United States v. Students Challenging Regul. Agency Proc.*, 412 U.S. 669, 689 n.14 (1973) (noting that "an identifiable trifle is enough for standing" (quoting Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613)).

Upon consideration of the parties' arguments as well as the Consolidated Complaints and the later-submitted Declarations, the Court agrees that, while the Consolidated Complaints alone lack sufficient detail to show the Employees' standing, the Declarations provided by the Employees' employers, Contractors Hampton Mechanical and R.A. Glancy & Sons, provide sufficient detail to show that the Employees have standing to sue for some, but not all, of the claims asserted in ABC I and ABC II based on their decreased work opportunities. As discussed, *supra*, since the allegations in the ABC I Amended Complaint (as supported by the Declarations) are sufficient to show the ABC I Contractors' standing to sue for past and future harm, the Court finds that the Employees of those Contractors (who allege that their work prospects are similarly affected because of their employment relationship with the Contractors) likewise have shown

19

sufficient harm to establish standing to sue for past and future injuries due to the CCAC PLA. With regard to ABC II, as explained, *supra*, Contractors Hampton Mechanical and R.A. Glancy & Sons have shown sufficient facts to establish standing to sue for past, but not future, harm because of the Borough PLA.  Therefore, by extension, the ABC II Employees also have shown that they have standing to sue for past harm from decreased work opportunities because of the Borough PLA.  However, because the ABC II Contractors have not alleged sufficient facts to show that they have standing to sue for future harm, to the extent the ABC II Employees rely on their employers' Declarations, the ABC II Employees likewise do not have standing to sue for future harm because of the Borough PLA.  Additionally, the Court notes that the ABC II Employees have not otherwise shown future harm based on the Borough PLA (which by its very terms applies exclusively to the Project) for which bids have already been accepted.[7]

Additionally, with regard to Defendants' argument that the harm the Employees have suffered is traceable not to Defendants but to the Contractors' independent decisions, the Court finds that the Employees have alleged facts that, taken as true, indicate that such decisions reflect a "predictable" response to the challenged actions of Defendants (i.e., not submitting bids because of the PLAs), which is not enough to defeat Article III standing.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).  Finally, the Court agrees with the Employees' argument that, despite

---

[7]      With regard to the Employees' argument that they have standing to sue for past and future harm based on their being inconvenienced by having to seek work through the union hiring halls, a separate analysis is required.  As to *past* harm, neither the ABC I Employees nor the ABC II Employees have shown that they experienced any such past inconvenience because their employers' Declarations indicate that they did not seek work due to the presence of the CCAC PLA or the Borough PLA, and the Employees themselves have submitted no Declarations to provide additional facts regarding their alleged past inconvenience.  As to *future* harm, the ABC I Contractors have declared that they will not seek work on CCAC projects because of the CCAC PLA, and the ABC I Employees have not submitted additional facts to show that they will suffer future inconvenience otherwise, so the ABC I Employees have not shown that they have standing to sue for future inconvenience based on the CCAC PLA.  And, as the Court has indicated, *supra*, the Borough PLA itself precludes any claims of future harm, so the ABC II Employees have not shown that they have standing to sue for future inconvenience based on the Borough PLA alone.  Also, since the ABC II Employees have not submitted Declarations regarding any inconvenience that they otherwise expect to suffer, they have not adequately alleged standing based on such future inconvenience.

the possibility that they might be hired as a "core employee" under the terms of the PLAs, the presence of the PLAs still allegedly reduces their work opportunities, which may lessen but does not eliminate the harm that they allege.

### 3. __Standing Summary__

Defendants' motion to dismiss the Consolidated Complaints pursuant to Rule 12(b)(1) for lack of standing will therefore be granted in part and denied in part in accordance with the analysis set forth, *supra*. Specifically, ABC I Contractors R.A. Glancy, Westmoreland Electric, and Hampton Mechanical have alleged facts to show that they have standing to sue for past injury, while Lawrence Plumbing and Arrow Electric have not. ABC I Contractors R.A. Glancy, Westmoreland Electric, Hampton Mechanical, and Lawrence Plumbing have alleged facts to show that they have standing to sue for future injury, while Arrow Electric has not. The ABC II Contractors have all alleged facts to show that they have standing to sue for past, but not future, injury. The ABC I Employees have alleged facts to show that they have standing to sue for both past and future injury, while the ABC II Employees have alleged facts to show that they have standing to sue for past, but not future, injury.

### B. __Rule 12(b)(6)__

In addition to arguing that Plaintiffs do not have standing to assert their claims, Defendants assert that Plaintiffs' Claims for Relief each fail to state a claim upon which relief can be granted and therefore seek dismissal pursuant to Rule 12(b)(6). While the Court will address the claims in turn, the Court notes initially that, for each Claim for Relief in the Consolidated Complaints, Plaintiffs fail to identify *which* Plaintiffs are suing *which* Defendants, even though there are many different Plaintiffs and Defendants in this case. In considering whether Plaintiffs have stated claims upon which relief can be granted, the specific Plaintiffs and Defendants allegedly involved

in each claim must be apparent to the Court and to the parties. Therefore, for purposes of addressing Defendants' motion to dismiss, the Court will attempt to identify the specific Plaintiffs and Defendants involved each claim, based on the allegations in the Consolidated Complaints.

### 1.   First and Fourteenth Amendment Claims

The first Claims for Relief set forth in the Consolidated Complaints allege "Violation of the First and Fourteenth Amendments" pursuant to 42 U.S.C. § 1983. (ABC I Docket No. 33, ¶¶ 42-48; ABC II Docket No. 1, ¶¶ 39-46). Since the allegations refer to "public and private employees" having "a constitutional right to decide whether they will join or associate with a union," and since the Consolidated Complaints assert that the Constitution forbids a public employer from requiring "its employees to join or financially support a union as a condition of employment," the Court notes that the Employees appear be the Plaintiffs in these Claims. (ABC I Docket No. 33, ¶¶ 42, 43; ABC II Docket No. 1, ¶¶ 39, 40). Additionally, the Consolidated Complaints include allegations that "the college" and "the borough" are not permitted to require contractors' employees "to relinquish their First Amendment rights as a condition of working on [their] construction projects," so these Claims appear to be asserted against the Public Entities as Defendants. (ABC I Docket No. 33, ¶ 45; ABC II Docket No. 1, ¶ 42).

"The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech." *Janus v. American Fed. of State, Cnty, and Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018). "The right to eschew association for expressive purposes is likewise protected." *Id.* (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 623 (1984)). The Employees allege in the Consolidated Complaints that the Public Entities are "violating the First and Fourteenth Amendments by requiring [their] contractors to hire their employees through the job-referral systems operated by unions affiliated with" the Building Trades

Council.  (ABC I Docket No. 33, ¶ 46; ABC II Docket No. 1, ¶ 43).  As further alleged, this requirement, in practice, compels workers to join and pay those unions as a condition of performing any work on such projects "because the unions will not refer non-members through their hiring halls."  (ABC I Docket No. 33, ¶ 29; ABC II Docket No. 1, ¶ 23).  The Employees assert a two-prong argument, that they are both (1) compelled to join and finance unions, and (2) compelled to associate with unions, both of which violate their rights under the First and Fourteenth Amendments.

As to the first prong of the Employees' argument, Defendants argue that the Employees have failed to state claims for Constitutional violations based on compulsory union membership because the Public Entities' PLAs include language expressly stating that the unions will operate their referral systems in a non-discriminatory manner, without regard to union membership and without requiring anyone to join the union or pay dues as a condition of employment.  (CCAC PLA, Art. VI § 8; Borough PLA, Art. VI § 8 (stating that no employee will be required to join a union or pay agency fees or dues as a condition of being employed, or remaining employed, on a covered project)).  In response, the Employees contend that—regardless of the PLAs' actual language – the PLAs, *in practice*, create *de facto* union shops, which compel any Employees who wish to work on the Public Entities' projects to join and subsidize Building Trades Council-affiliated unions as a condition of their employment.  The Employees argue that this requirement violates the First and Fourteenth Amendments as interpreted in *Janus*, which held that the First Amendment precludes public employers from compelling their employees to pay agency fees.  *See* 138 S. Ct. at 2486.

Upon consideration of the Consolidated Complaints, the attached PLAs, and the parties' arguments, the Court finds that the Employees have not alleged facts sufficient to state claims for

First Amendment violations based on compelled union membership. First, the Court notes that the Employees allege that, despite the actual language of the PLAs indicating otherwise, the union hiring halls – *in practice* – will not refer non-members to work on projects for the Public Entities, and that the Employees must therefore join and subsidize the unions in order to work on such projects. In thus alleging, the Employees appear to be making an *as-applied* challenge to the PLAs, rather than a facial challenge to the specific language in the agreements. However, other than stating broadly that "the unions will not refer non-members through their hiring halls," the Employees have alleged no other facts to support these claims. Nevertheless, the Employees assert that they do not need to allege additional facts, that the Court must simply accept that allegation as true, and that this allegation is sufficient to state their First Amendment claims. The Court notes, as explained, *supra*, that while it must accept the factual allegations in the Consolidated Complaints as true, those complaints must also contain sufficient factual matter, accepted as true, to state "plausible" claims. *See Iqbal*, 556 U.S. at 678. Thus, a "the-defendant-unlawfully-harmed-me" allegation is not sufficient, and the Court must be able to draw the reasonable inference from the allegations that the Public Entities are liable for the misconduct alleged. *See id.* Here, a blanket statement that unions will not refer non-members through their hiring halls, without any additional facts to explain how this is done in practice, is simply not sufficient to allege a plausible claim.

Moreover, in addition to arguing that they do not need to allege additional facts because their allegation that the unions will not refer non-union members is sufficient to state their claim, the Employees also assert in their brief that they "are *not* bringing an as-applied challenge to the [PLAs] that turns on the facts of any particular bidding process or construction project." (Docket No. 69 at 22). Instead, the Employees explain that they are "contending that the defendants'

enforcement of [the PLAs] is *per se* unlawful" under the various laws they cite in the Consolidated Complaints. (*Id.*). Thus, the Employees also appear to be arguing that they need not allege specific additional facts regarding the PLAs *in practice* because their claim is based on a facial attack on the PLAs. However, taken together, Plaintiffs' various arguments lead to circular reasoning that does not support either a *per se* challenge to the PLAs "on their faces," or an as-applied challenge to the operation of those agreements in practice: since the PLAs on their faces contain language prohibiting discrimination against non-members, Plaintiffs assert that they are relying on their allegation that *in practice* the unions "will not refer non-members through their hiring halls;" but their assertion that they are relying on the operation of the PLAs *in practice* appears to describe an as-applied challenge that requires additional facts to support that alleged practice, and – as the Court has already explained, *supra* – Plaintiffs have not alleged the necessary facts to support this alleged practice in order to state a plausible claim.

As to the second prong of the Employees' argument, the Court also finds that the Employees have not alleged facts sufficient to state claims for First and Fourteenth Amendment violations based on their compelled association with Building Trades Council-affiliated unions.[8] While "[f]reedom of association . . . plainly presupposes a freedom not to associate," not all "association" rises to the level of a First Amendment claim. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). In fact, in *Janus* (cited by both parties here to support their arguments), the Supreme Court made clear that certain elements of union representation do not implicate First Amendment rights. *See* 138 S. Ct. at 2478. For example, the Supreme Court noted that, while the First Amendment precludes public employers from compelling employees to pay agency fees, a

---

[8] Although the Constitution protects freedom of association "in two distinct senses," intimate association and expressive association, the Employees here concede that their association claim does not involve intimate association. *See Roberts*, 468 U.S. at 617-18.

state may otherwise "keep their labor-relations systems exactly as they are," such as by "requir[ing] that a union serve as exclusive bargaining agent for its employees." *Id.* at 2478, 2485 n.27; *see also Roberts*, 468 U.S. at 638 (explaining that, although a state "may not infringe on associational rights involving ideological or political associations," a state "may compel association for the commercial purposes of engaging in collective bargaining, administering labor contracts, and adjusting employment-related grievances" (O'Connor, J., concurring in part and concurring in the judgment)).

Here, the Employees base their compelled association argument solely on the allegation that they have to go through hiring halls to obtain work on the Public Entities' projects. (ABC I Docket No. 33, ¶¶ 40, 46; ABC II Docket No. 1, ¶¶ 36, 43). However, since courts have permitted a great deal of compelled association with unions without violating the First Amendment, the Employees must allege more facts regarding that association in order to state a plausible claim here. For example, without alleging additional facts to show that having to use the hiring halls does not simply serve a permissible commercial purpose, or facts to demonstrate that requiring use of the union halls does not just fall under the unions' authority as the Employees' exclusive bargaining representatives, the Employees have not alleged a plausible claim. Therefore, because the Employees have not alleged sufficient facts to show that their associational rights involving ideological or political associations are violated by having to use a hiring hall to obtain work on the Public Entities' projects, Plaintiffs have not alleged plausible First Amendment claims based on compelled association with unions. *See Janus*, 138 S. Ct. at 2464-65.

Accordingly, the Court finds that the Employees have not alleged facts sufficient to state plausible claims for violation of the First and Fourteenth Amendments. Defendants' motion to

26

dismiss Plaintiffs' first Claims for Relief will therefore be granted, and those claims will be dismissed pursuant to Rule 12(b)(6).

## 2.  NLRA Claims

In the second Claims for Relief in the Consolidated Complaints, Plaintiffs allege, pursuant 42 U.S.C. § 1983, that the Public Entities are violating Sections 7 and 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 157, 158(a)(3).  (ABC I Docket No. 33, ¶¶ 49-57; ABC II Docket No. 1, ¶¶ 47-55).  More specifically, Plaintiffs allege that by enforcing the PLAs, the Public Entities are interfering with the Employees' NLRA Section 7 right to decide whether they want union representation and to be free from discrimination based on union membership, and that they are also violating Section 8(a)(3) which abolished compulsory union shops. [9]  (ABC I Docket No. 1, ¶¶ 49-57; ABC II Docket No. 33, ¶¶ 47-55).  Defendants argue, however, that the Public Entities' use of the PLAs at issue here is not preempted by the NLRA, and that Plaintiffs therefore fail to state claims under Section 1983.

While the NLRA does not directly apply to the Public Entities,[10] the Supreme Court has held that a plaintiff may bring a claim under Section 1983 when a State interferes with rights secured by the NLRA.  *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108-09 (1982).  A claim is therefore cognizable under Section 1983 when the government's conduct at issue is "preempted" by the NLRA.  *See id.*  As the Supreme Court explained in its oft-cited *Boston Harbor* decision, "[w]hen we say the NLRA pre-empts state law, we mean that the NLRA prevents a State from *regulating* within a protected zone, whether it be a zone protected and reserved for

---

[9]      As in the first Claims for Relief, the second Claims for Relief do not specify which Plaintiffs are suing which Defendants, but the Plaintiffs in this Claim appear to be the Employers (and perhaps the Contractors), and the Defendants appear to be the Public Entities.

[10]     The NLRA's definition of "employer" excludes "any State or political subdivision thereof."  29 U.S.C. § 152(2).

market freedom . . . or for NLRB jurisdiction." *Building and Constr. Trades Council v. Assoc. Builders and Contractors of Mass.*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*") (emphasis added and internal citations omitted).  The Supreme Court further clarified that a State does not regulate "simply by acting within one of these protected areas." *Id.*  Thus, "[w]hen a State owns and manages property, for example, it must interact with private participants in the marketplace. . . . [and] [i]n so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation.*" *Id.* (emphasis in original).

*Boston Harbor* involved a challenge to a PLA that was used by the Massachusetts Water Resources Authority in a construction project, and which included various provisions typical in the construction industry such as a union security clause and an exclusive recognition provision. *See id.* at 221-22.  In that case, the Supreme Court found "no reason to expect the[] defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services," and it held "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted [under NLRA Sections 8(e) and 8(f)], this Court will not infer such a restriction."[11] *Id.* at 231-32.

---

[11]     Section 8(e) of the NLRA permits "employers in the construction industry" (but not other employers) to agree to restrict subcontracting to entities who are willing to sign certain restrictive agreements.  *See* 29 U.S.C. § 158(e).  Plaintiffs contend that the reference to "analogous" conduct being permitted actually requires that the Public Entities be "employers in the construction industry," as that phrase is used in Section 8(e), in order to take advantage of that provision.  *See id.*  Plaintiffs argue that the Public Entities cannot invoke this exception since they are not employers in the construction industry.  The Court notes, however, that preemption analysis looks to whether a public entity's market activity is similar to a private party's activity in pursuing its proprietary interests.  As Defendants characterize Plaintiffs' interpretation of this language, a public entity is only exempt from the NLRA if it complies with the NLRA.  Preemption principles have not generally been applied in this way by the courts.  *See, e.g., Boston Harbor*, 507 U.S. at 233 (finding no NLRA preemption); *Johnson v. Rancho Santiago Community Col. Dist.*, 623 F.3d 1011, 1028 (9th Cir. 2010) ("[W]e find no indication in the NLRA that Congress intended to allow state entities to adopt [PLAs] only if they use a construction-industry middleman exempt from the NLRA's proscriptions."); *Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 191 (2d Cir. 2012) (holding that New York City engaged in proprietary conduct in signing a PLA).

The Third Circuit applied the holding of *Boston Harbor* in its decision in *Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, LLC* ("*Sage*"), 390 F.3d 206 (2004).  In *Sage*, the Third Circuit articulated a two-part test to be used in determining whether a public entity is acting in pursuit of its "proprietary interests" (or as a "market participant") and therefore whether it escapes preemption review:  (1) "does the challenged funding condition serve to advance or preserve  the state's proprietary interest in a project or transaction, as an investor, owner, or financier?" and (2) "is the scope of the funding condition  'specifically tailored' to the proprietary interest?"  (i.e., is it so broad as to be considered "in effect, regulatory"?).  *Id.* at 215-16 (quoting *Boston Harbor*, 507 U.S. at 232); *Associated Builders & Contractors Inc. N.J. Chapter v. City of Jersey City, N.J.*, 836 F.3d 412, 418 (3d Cir. 2016).  The Third Circuit further explained in *Sage* that if a public entity's decision satisfies these two parts, it "reflects the government's action as a market participant and escapes preemption review."  390 F.3d at 216.  However, the Third Circuit also remarked that if a condition of funding "sweeps more broadly" than the public entity's proprietary economic interest, then "it must submit to review under labor law preemption standards."  *Id.*

Notably, other courts in Pennsylvania have found public entities to be acting as market participants in cases that resemble the situation presented here.  For instance, in *Road-Con, Inc. v. City of Philadelphia*, 449 F. Supp. 3d 476, 488, 491 (E.D. Pa. 2020), the District Court for the Eastern District of Pennsylvania dismissed an NLRA challenge similar to the challenge made in this case.  In *Road-Con*, the plaintiffs challenged a PLA that the City of Philadelphia applied to all of its projects worth more than $3 million.  *See id.* at 480-81.  The district court in *Road-Con* found that the *Boston Harbor* decision foreclosed the plaintiffs' NLRA claim because, like in *Boston Harbor*, the construction projects at issue in *Road-Con* were owned by a government entity and

the relevant PLA contained the same operative provisions as in *Boston Harbor*, specifically: "a provision requiring all employees working on the project to join the union, a provision making the union the sole bargaining agent for the project, and a provision requiring the use of union hiring halls for the project." *Id.* at 488. The district court in *Road-Con* also rejected the plaintiffs' argument (similar to Plaintiffs' argument here) that the NLRA exception for construction employers does not apply to the City of Philadelphia because it is not a construction employer. *See id.* at 489. The district court noted that the exact same argument had been raised in *Boston Harbor*, where the Supreme Court found that a state agency "which is excluded from the definition of construction employer in the NLRA, can nonetheless require project labor agreements on its own construction project." *Id.* Further, the district court in *Road-Con* explicitly relied on the *Boston Harbor* analysis in its rationale:

> [T]he exceptions provided for the construction industry in §§ 8(e) and (f) [of the NLRA, codified at 29 U.S.C. §§ 158(e) and (f)] ... are not made specifically applicable to the State. This is because the State is excluded from the definition of the term "employer" under the NLRA, see 29 U.S.C. § 152(2), and because the State, in any event, is acting but as a purchaser in this case. Nevertheless, the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections.... To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a [project labor] agreement, a public entity as purchaser should be permitted to do the same.

*Id.* (quoting *Boston Harbor*, 507 U.S. at 230-31). The district court in *Road-Con* concluded that, even though the City of Philadelphia is not a construction employer under the NLRA, the *Boston Harbor* reasoning permits the City to require contractors to use PLAs. *See id.*

Similarly, another member of this Court, United States District Judge Marilyn J. Horan adopted the Opinion of United States Magistrate Judge Lisa Pupo Lenihan in finding that

Westmoreland County acted as a market participant in entering into a PLA with the Building Trades for all of its construction projects over $150,000.  *See Associated Builders & Contractors of Western Pa. v. Cnty. of Westmoreland*, No. 19-1213, 2020 WL 571031 (W.D. Pa. Feb. 5, 2020), *adopting report and recommendation in Associated Builders & Contractors of W. Pa. v. Cnty of Westmoreland*, No. 19-1213, 2020 WL 571691, at *4 (W.D. Pa. Jan. 21, 2020) (using the *Sage* two part-test, and citing *ABC v. City of Jersey City*, 836 F.3d at 418).  Additionally, in denying a motion for a preliminary injunction and a hearing in a case before it, the Court of Common Pleas of Allegheny County, Pennsylvania partially based its decision on its conclusion that CCAC was acting as a market participant rather than as a regulator when entering into a PLA.  (Docket No. 66-1 (*R.A. Glancy & Sons, Inc. v. Cmty. Coll. of Allegheny Cnty.*, No. 10-14783 (Ct. of Common Pleas of Allegheny Cnty., Pa., Civ. Div. Apr. 29, 2011)).

Upon consideration of the parties' arguments as well as the record before the Court, the Court finds that here, too, the Public Entities were acting as market participants when they entered into the PLAs at issue in the Consolidated Complaints.  With regard to the first part of the market participant test under *Sage*, the Third Circuit has found a public entity to have a proprietary interest in a project when the entity owns and manages property subject to the project, when it hires, pays and directs contractors to complete the project, when it provides funding for the project, and when it purchases or sells goods or services.  *See ABC v. City of Jersey City*, 836 F.3d at 418 (citing various cases).  Here, while the Consolidated Complaints contain sparse allegations as to the Public Entities' specific roles, the Borough PLA refers to Plum Borough as the "Owner" and refers to the construction of "the new borough building (the 'Project')," while the CCAC PLA refers to the agreement being entered into between CCAC and the contractors, Building Trades Council, and signatory unions, and refers to it applying to the construction work to be performed on "the

CCAC's BID PROPOSAL (the 'Project')."  (Borough PLA, Art. 1, § 1; CCAC PLA, Art. 1, § 1).
Plaintiffs also allege that CCAC and the Borough each "has been imposing [the PLAs] on the
onsite construction work" that it provides to contractors, "and it will continue imposing [the PLAs]
on its future onsite construction work."  (ABC I Docket No. 33 at ¶ 23; ABC II Docket No. 1,
¶ 17).  Furthermore, Plaintiffs allege that only contractors "who agree to the terms of the [PLAs]
are eligible to perform construction work" for the Public Entities.  (ABC I Docket No. 33, ¶ 24;
ABC II Docket No. 1, ¶ 18).  For purposes of analysis at this juncture, it can be inferred from the
Consolidated Complaints and the attached PLAs that the Public Entities own the property subject
to the construction, and/or select the contractors to complete the project, and/or provide funding
for the project, and/or purchases the services at issue here.  Additionally, the PLAs expressly
provide that they are intended to ensure the projects are completed efficiently and successfully by
prohibiting work stoppages, standardizing working conditions, establishing effective procedures
for resolving disputes, and securing reliable sources of skilled labor.  (CCAC PLA, Art. I/III, § 1;
Borough PLA, Art. I/III, § 1).  All of these factors indicate that the Public Entities entered into the
PLAs to serve their proprietary interests.

As to the second element of the market participant test under *Sage*, whether the PLAs are
"specifically tailored" to the Public Entities' proprietary interests, the CCAC PLA provides that it
applies only to construction projects of CCAC, and the Borough PLA provides that it applies only
to the new Borough building.  (CCAC PLA, Art. I, § 1; Borough PLA, Art. 1, § 1).  The
Consolidated Complaints do not allege that either of the Public Entities has ever applied the PLAs
more broadly.  Thus, the Court finds that the PLAs cannot be considered to be so broad as to be
"regulatory" in nature.  Since the PLAs are clearly intended to serve the Public Entities' proprietary
interests in successfully completing their own construction projects, the Court finds that the Public

Entities acted as market participants in using the PLAs.  Accordingly, NLRA preemption principles do not apply here, and Plaintiffs have failed to state a claim pursuant to Section 1983. Plaintiffs' second Claims for Relief will therefore be dismissed pursuant to Rule 12(b)(6).

### 3.  **Sherman Act Claims**

Plaintiffs allege in their third Claims for Relief that the PLAs "restrain[] competition" in violation of federal antitrust laws, citing Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.[12] (ABC I Docket No. 33, ¶¶ 58, 59; ABC II Docket No. 1, ¶¶ 56, 57).  Plaintiffs do not specify in the Consolidated Complaints whether they are stating a claim under Section 1 or Section 2, but they aver generally that the PLAs restrain competition by disqualifying contractors and subcontractors from working on the CCAC and Borough construction projects unless those contractors and subcontractors agree to the terms of the PLAs, and that the PLAs restrain competition by disqualifying individual laborers from working on CCAC and Borough projects unless those laborers obtain job referrals from a union affiliated with the Building Trades Council. (ABC I Docket No. 33, ¶¶ 59, 60; ABC II Docket No. 1, ¶¶ 57, 58).  In their motion to dismiss, Defendants argue, among other things, that Plaintiffs' bare-bones allegations do not identify the kind of antitrust claims being alleged, and that, in any event, Plaintiffs fail to state an antitrust claim under either Section 1 or 2 because they do not identify the relevant markets in which the PLAs allegedly restrain competition.

In their brief in response to Defendants' motion, Plaintiffs recognize that the Consolidated Complaints do not indicate the type of antitrust claim being alleged, but Plaintiffs maintain that they do not need to "spell out each element of a cause of action and explain how it will be satisfied"

---

[12]      In the third Claim for Relief, Plaintiffs appear to be the Contractors and the Employees, and Defendants appear to be the Public Entities and the Building Trades Council.  (ABC I Docket No. 33, ¶¶ 59-62; ABC II Docket No. 1, ¶¶ 57-61).

in their complaints.  (Docket No. 69 at 38).  Plaintiffs contend that they can instead "decide to pursue a rule-of-reason claim under [S]ection 1 or a monopolization claim under [S]ection 2" after engaging in discovery, and that they can "define the relevant 'market' at summary judgment." (*Id.*).  Plaintiffs also assert in their brief that the PLAs may be found to be *per se* unlawful price-fixing agreements under Section 1 of the Sherman Act.  (*Id.*).

During oral argument, however, Plaintiffs conceded that they *are* now alleging that the PLAs are *per se* illegal price-fixing arrangements under Section 1.  (Tr. at 44-45).  Plaintiffs further argued that, since they are alleging a *per se* claim (rather than a rule of reason claim under Section 1 or a monopolization claim under Section 2), they do not need to allege details as to a relevant market, and they have therefore alleged enough facts for their antitrust claims to survive Defendants' motion to dismiss.  (*Id.*).

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'"  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting 15 U.S.C. § 1).  The Supreme Court has long recognized, however, "'that Congress intended to outlaw only *unreasonable* restraints.'"  *Id.* (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997) (emphasis added in *Texaco, Inc.*)).  Courts presumptively apply "rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  *Id.* (citing *State Oil Co.,* 522 U.S. at 10–19).  *Per se* liability, on the other hand, "is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"  *Id.* (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States,* 435 U.S. 679, 692 (1978)).  The Supreme Court has "'expressed reluctance to

adopt *per se* rules . . . where the economic impact of certain practices is not immediately obvious.'" *Id.* (quoting *State Oil*, 522 U.S. at 10 (internal quotation marks and citation omitted)).

In other words, "rule of reason analysis" guides a court's inquiry "unless the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) (quoting *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5 (1958)). A *per se* approach thus "permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive." *Id.* By using a *per se* approach, courts can "avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry entails." *Id.* (quoting *Arizona v. Maricopa Cnty. Med. Soc.,* 457 U.S. 332, 343–344 (1982)). Thus, "the decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* at 289-90 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 19–20 (1979) (internal quotation marks and citations omitted)); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 103–104 (1984) ("*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct")). *Per se* antitrust violations have been found, for instance, in "classic per se horizontal price fixing and group boycott conspiracies." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 139 (3d Cir. 2001).

Although Plaintiffs now argue that, since they are pursuing a *per se* claim under Section 1, their claim should not be dismissed because it does not require the pleading specificity that a claim involving a rule of reason analysis requires, Plaintiffs are mistaken in assuming that, because they are stating a *per se* claim, they are not required to allege any detail at all.  Notably, "'[w]hile antitrust complaints are not subject to especially stringent pleadings . . . neither are they exempt from the federal rules.'"  *Comm. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) (quoting *Sims v. Mack Truck Corp.,* 488 F. Supp. 592, 608 (E.D. Pa. 1980)).  For example, "[a] mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently."  *Id.* (quoting *Klobanow v. N.Y. Produce Exch.*, 344 F.2d 294, 299 (2d Cir. 1965) (J. Friendly)).  The Supreme Court explained in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* that "[a]s the case comes to us, we must assume that the [plaintiff] can prove the facts alleged in its amended complaint.  It is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged."  459 U.S. 519, 526 (1983).

During oral argument, Plaintiffs explained that they are actually alleging a "hub-and-spokes type conspiracy where all of the contractors who wish to obtain college work or borough work are agreeing among themselves by signing this PLA that they will all pay the prevailing union wage and benefit rates," and that this "is a price-fixing conspiracy that we've alleged and it is per se illegal under the antitrust laws."  (Tr. at 44-45).  However, "[i]t is one thing to set forth theories in a brief," or, as here, during oral argument, but "it is quite another to make proper

allegations in a complaint." *PepsiCo*, 836 F.2d at 181; *see also Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Here, the assertions that Plaintiffs made during oral argument with regard to a hub-and-spokes type of conspiracy and a *per se* illegal price-fixing conspiracy do not appear anywhere in the allegations of the Consolidated Complaints. As noted, *supra*, Plaintiffs allege in the Consolidated Complaints that the PLAs restrain competition by disqualifying contractors from working on their projects unless they agree to the various terms of the PLAs, and that the PLAs disqualify individual laborers from working on their projects unless they obtain a job referral from a union affiliated with the Building Trades Council, but they do not specifically allege price-fixing, nor do they allege the existence of any type of conspiratorial agreement that Plaintiffs apparently plan to use to justify a *per se* claim.

As the Third Circuit commented in *PepsiCo.*, "In *Car Carriers, Inc. v. Ford Motor Co.*, . . . the [Seventh Circuit] stated that the attachment of per se labels to defendants' conduct is inadequate in itself to sustain a complaint," and that the defendants' "'alleged activity must be scrutinized to determine whether such a characterization is appropriate.'" 836 F.2d at 182 (quoting *Car Carriers, Inc.*, 745 F.2d at 1108). The Third Circuit further noted the Seventh Circuit's remark "that the pleader may not evade the requirements of proper pleading 'by merely alleging a bare legal conclusion.'" *Id.* (quoting *Car Carriers, Inc.*, 745 F.2d. at 1106).

In considering a motion to dismiss, "[t]he test, as authoritatively formulated by *Twombly*, is whether the complaint alleges 'enough fact[ ] to state a claim to relief that is plausible on its face,' . . . which is to say, 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].'" *In re Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010)

(quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010) (internal quotation marks and citations omitted)).  Upon review of the Consolidated Complaints, the Court concludes that the allegations therein simply do not support a claim for a *per se* violation under Section 1.  In fact, Plaintiffs have made extremely limited allegations altogether in support of their antitrust claim. Quite simply, if Plaintiffs wish to make a *per se* antitrust claim, they must include in their complaints specific allegations to support such a claim.

Although Plaintiffs now appear to have abandoned a "rule of reason" claim under Section 1, the Court notes that, to the extent they may wish to assert such a claim, they must allege "'(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'" *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)); *see also Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 331 (3d Cir. 2018).  "The relevant market in a Section 1 case is 'the area of effective competition . . . within which significant substitution in consumption or production occurs.'" *Lifewatch*, 902 F.3d at 337 (quoting *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018) (internal quotation marks and citations omitted)).  "'[T]he outer boundaries of a relevant market are determined by reasonable interchangeability of use' of a particular product within a particular geographic area." *Id.* (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997)). Along with "substitutability" and "interchangeability," courts also look to "cross-elasticity of demand, which is defined as '[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other.'" *Id.* (quoting *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435-36 (3d Cir. 2016) (internal

quotation marks and citation omitted)).  Importantly, the "plaintiff bears the burden of defining both a relevant geographic and a relevant product market." *Id.*

Additionally, although Plaintiffs now appear *not* to be asserting a monopolization claim under Section 2 of the Sherman Act, the Court notes that, to the extent they may wish to assert such a claim, that Section provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C. § 2.  The right to maintain a private cause of action for damages arising under Section 2 of the Sherman Act "flows from Section 4 of the Clayton Act, which provides for suits by 'any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.'"  *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 413 (3d Cir. 1997) (quoting 15 U.S.C. § 15(a)).  To state a claim under Section 2 for *monopolization*, a plaintiff must allege "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'"  *Id.* at 412-13 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 197 (3d Cir. 1992)).  In order to state a claim for *attempted monopolization*, a plaintiff must allege "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Id.* at 413 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  In other words, to state a claim for *monopolization*, a plaintiff must allege that the defendant "willfully acquired or maintained monopoly power in the relevant market," and to state a claim for *attempted monopolization*, a plaintiff must allege that the defendant "had a dangerous probability of achieving monopoly in the relevant market."  *Id.* at 415.  In either

situation, a court "must consider the scope of the *relevant market*" when evaluating a claim concerning monopolization.  *Id.* (emphasis added).

In response to Defendants' argument that Plaintiffs have failed to allege an antitrust claim under either Section 1 or Section 2 because they have not identified the relevant markets (and before Plaintiffs conceded that they are pursuing a *per se* claim under Section 1), Plaintiffs contended in their brief that they are not required to identify a relevant market at this juncture, indicating the Third Circuit's comment in *Lifewatch* that "courts are cautious before dismissing for failure to define a relevant market."  *Lifewatch,* 902 F.3d at 337.  However, the Court notes that, as described *supra*, both Sections 1 and 2 of the Sherman Act generally require a plaintiff to define the relevant market allegedly at issue in a claim.  Moreover, in *Lifewatch*, cited by Plaintiffs, the Third Circuit explained more fully that in a Section 1 case, "[a] complaint may be properly dismissed if it defines the relevant market without reference to interchangeability or cross-elasticity of demand or if it 'alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual interferences are granted in plaintiff's favor.'"  *Id.* (quoting *Queen City Pizza, Inc.*, 124 F.3d at 436).  The Third Circuit noted that "*absent such obvious oversights*, courts are cautious before dismissing for failure to define a relevant market."  *Id.* (emphasis added).  However, the Court also remarked that the parties in *LifeWatch* did "not dispute that [the plaintiff] must allege a relevant market."  *Id.*  The Third Circuit also described how the complaint in *LifeWatch* actually asserted several relevant markets, and it held that the complaint plausibly stated a relevant market upon which a Section 1 unreasonable-restraint analysis could be based.  *See id.* at 337-40.

In contrast, Plaintiffs here do not define the relevant markets upon which they base their antitrust claims, nor do they even attempt to do so.  If Plaintiffs wish to assert a rule of reason

claim under Section 1 or a monopolization claim under Section 2, Plaintiffs should include

allegations as to the relevant market at issue in such claims.[13]  *See id.*; *Schuylkill Energy Resources*,

113 F.3d at 415.

Plaintiffs' third Claims for Relief will therefore be dismissed pursuant to Rule 12(b)(6).

### C.  Claims under Pennsylvania Competitive Bidding Laws

In the fourth Claims for Relief in the Consolidated Complaints, Plaintiffs allege that the

Public Entities are violating Pennsylvania's competitive bidding laws, citing Section 3911(a) of

the Commonwealth Procurement Code, 62 Pa. C.S.A. § 3911(a).  (ABC I Docket No. 33, ¶¶ 64-

74; ABC II Docket No. 1, ¶¶ 63-73).  These state law claims appear to be asserted by the Taxpayers

as Plaintiffs against the Public Entities as Defendants.  (Docket Nos. 66 at 43-45, 69 at 40-43, 72

at 28-30).  The Taxpayers allege these claims "under the supplemental-jurisdiction statute, 28

U.S.C. § 1367."  (ABC I Docket No. 33, ¶ 74; ABC II Docket No. 1, ¶ 73).  That statute provides

that "in any civil action of which the district courts have original jurisdiction, the district courts

shall have supplemental jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy under Article

III of the United States Constitution."  28 U.S.C. § 1367(a).  That statute further states that "[t]he

district court[] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district

court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Here, as set forth, *supra*, the Court is dismissing the claims over which it has original

jurisdiction (Claims for Relief 1 through 3) for failure to state claims upon which relief can be

granted pursuant to Rule 12(b)(6), although such dismissal is without prejudice to amendment.

---

[13]     The Court also notes that cases in which dismissal on the pleadings has been appropriate often include "failed
attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with
potential substitutes."  *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (citing various cases).

"[W]here the claim[s] over which the district court has original jurisdiction [are] dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995).  In this instance, if Plaintiffs do not elect to amend their federal claims, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state competitive bidding claims and will dismiss their fourth Claims for Relief without prejudice to their ability to bring those claims in state court.

## IV.  <u>Conclusion</u>

For the reasons stated, Defendants' motion to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is granted in part and denied in part.

With regard to Defendants' motion to dismiss Plaintiffs' first, second, and third Claims for Relief pursuant to Rule 12(b)(1) based on lack of standing, that motion is granted in part and denied in part, as set forth in detail, *supra*.

With regard to Defendants' motion to dismiss Plaintiffs' first, second, and third Claims for Relief for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), that motion is granted, and those claims are dismissed without prejudice to amendment with sufficient facts to state a claim upon which relief can be granted.  Should Plaintiffs decline to amend their federal claims, their claims will be dismissed with prejudice and their fourth Claims for Relief, alleging violations of state law, will be dismissed without prejudice to their ability to bring those claims in state court.

An appropriate Order follows.

Dated:  March 25, 2022

<u>s/ W. Scott Hardy</u>
W. Scott Hardy
United States District Judge

cc/ecf:  All counsel of record